**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HEATHER HAVENS,

ELIZABETH ROBESON,

ANNA GRUNSETH,

and WILLIAM BOYKIN,

      *Plaintiffs,*

   v.

U.S. DEPARTMENT OF EDUCATION,
400 Maryland Avenue, SW Washington,
DC 20202

    and

LINDA MCMAHON, in her official
capacity as SECRETARY OF
EDUCATION,
400 Maryland Avenue, SW Washington, DC
20202

      *Defendants,*

**Civil Action No. 1:26-cv-816-LLA**

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

## PRELIMINARY STATEMENT

1.      Millions of student loan borrowers waited almost two years for repayment terms authorized by statute and regulation. During that time, court orders and injunctions prevented the implementation of the Save on a Valuable Education (SAVE) repayment plan and its attendant benefits for most borrowers.

2.      On February 27, 2026, the District Court for the Eastern District of Missouri lifted the only legal barrier preventing the Department from implementing the SAVE Final Rule by dismissing the case.

3.      In response, the Department took no action to provide these benefits or even publicly acknowledge the legal reality. Rather, it joined the plaintiff states and petitioned the Eighth Circuit to vacate the SAVE Plan Final Rule without a final merits decision or a consideration of the basic equities at stake as required by law. And when the Department's request was granted, it took a series of actions to radically expand the scope of the court's order and continue to deny benefits to Plaintiffs.

4.      Based on political expediency and behind the veil of 'settlement negotiations,' the Department decided on this course of action long before *Missouri v. Trump* was resolved and without any form of notice and comment rulemaking or consideration of borrowers' reliance interests. In effect, the Department's actions have repealed not only SAVE but its precursor, Revised Pay As You Earn ("REPAYE"), an income-contingent repayment plan that has been in existence for nearly a decade without incident. Presumably based on this "shadow repeal" of REPAYE, Defendants intend to force Plaintiffs and millions of others off REPAYE, and onto less affordable repayment plans which will, for some Plaintiffs, also trigger significant tax consequences.

5.      In implementing the Missouri Court's final order, Defendants took two discrete

agency actions in violation of the Administrative Procedure Act. First, it shadow repealed the REPAYE repayment plan. Second, it decided to force Plaintiffs currently enrolled in REPAYE onto a different plan. These two new unlawful actions compound on the previous unlawful decision not to grant accrued SAVE benefits and the individual denial of those benefits to plaintiffs.

6.      Congress designed the federal student loan programs and repayment options to drive economic mobility and protect borrowers from facing a lifetime of unaffordable student loan debt. Throughout the history of the Direct Loan program, Congress has directed the Department to offer income-driven repayment (IDR) plans that tie a borrower's monthly payment to their income and discharge any remaining balance after a specified number of qualifying monthly payments. In all instances, this debt discharge (also known as "loan forgiveness" or "loan cancellation") occurs automatically, by operation of IDR regulations. Borrowers need not apply to have their loans cancelled once they have satisfied the eligibility criteria. Borrowers do not owe the government any additional principal or interest payments beyond this eligibility date.

7.      In 2015, the Department of Education issued a final rule creating REPAYE. The REPAYE Final Rule was promulgated under the Department's statutory authority to establish income-contingent repayment plans under section 455(d)(1)(D) of the Higher Education Act. Generally, the plan sets monthly payments at 10 percent of a borrower's discretionary income. Between the July 1, 2016, effective date of this regulation and July 1, 2023 the Department continuously provided borrowers with access to REPAYE.

8.      In 2023, the Department of Education, consistent with this mission to ensure that pursuing an education did not become a life-long economic burden, amended REPAYE to provide a more affordable way to finance higher education for millions of borrowers. In amending the REPAYE regulations, the Department created the Saving on a Valuable Education

("SAVE") plan superseding the prior rule.[1] SAVE modified existing repayment terms, reducing monthly costs for consumers and simplifying the burden of program administration for the Department of Education. *See* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan ("FFEL") Program, 88 Fed. Reg. 43,820. By making higher education financing significantly more affordable, the SAVE Plan drives economic mobility and reduces student loan delinquency and default, just as Congress intended.

9.      Nearly a year after the Department published the SAVE Final Rule and implemented significant portions of the new repayment plan – including discharging loans for tens of thousands of borrowers in SAVE – a group of states, led by the Attorney General of Missouri, sued to stop implementation of the SAVE Final Rule, arguing that the Administration exceeded its executive authority in creating the SAVE Plan. On June 24, 2024, the district court preliminarily enjoined the Department from discharging any additional debt under the SAVE Plan. *Missouri v. Biden*, 738 F.Supp.3d 1113, 1124 (E.D. Mo. 2024). On appeal the Eighth Circuit expanded the preliminary injunction and prevented the Department from implementing the SAVE Final Rule in its entirety. *Missouri v. Biden,* 112 F.4th 531, 538 (8th Cir. 2024).

10.      The injunction barred the Department from processing discharges; it did not, and could not, strip the benefits borrowers had already accrued under the regulation or stop benefits from accruing during the period. By the time the Rule was vacated, Plaintiffs and thousands of other borrowers had already satisfied the regulatory criteria for immediate discharge, in fact many were eligible for discharge on the day before the preliminary injunction was even issued.

11.      On December 9, 2025, the parties announced a proposed settlement. Under the

---

[1] In doing so, the Department amended the regulation to reference SAVE in only one place. In the preliminary income driven repayment provision which lists the variety of income-driven repayment plans, the regulation explained that these IDR plans include, among others, "the Revised Pay As You Earn (REPAYE) plan, which may also be referred to as the Saving on a Valuable Education (SAVE) plan."

publicly available terms of the settlement, the Department agreed that it would, "not forgive loans under the SAVE Plan (or under the REPAYE plan) using the Department of Education's income-contingent repayment (ICR) authority…"

12. The settlement went even further to ostensibly commit the Department to, "not enforce the original REPAYE rule or otherwise enroll any borrowers, including SAVE borrowers, into the original REPAYE Plan." A commitment devoid of any legal justification and well outside the scope of authority of the Department of Education. Perhaps because the settlement was legally unsupportable, the parties never submitted it to the Missouri Court for approval and merely asked the court to vacate the SAVE Final Rule. However, on February 27, 2026, the District Court dismissed the lawsuit, finding that the Administration's failure to defend the SAVE plan robbed the court of jurisdiction, as there was no longer a "live case or controversy" between the parties. Order of Dismissal, *Missouri v. Trump,* 4:24-cv-00520, ECF 94.

13. On March 9, the Eighth Circuit reversed the dismissal in a two-sentence order and directed the district court to enter final judgment as the parties had jointly requested. The following day, the district court complied by entering an order vacating most of the SAVE Plan Final Rule. That order rested on no finding that the Rule was unlawful, undertook no analysis of the equities at stake, and neither referenced nor incorporated the parties' settlement.

14. Following vacatur, the operative regulatory regime is the REPAYE Final Rule, which the SAVE amendments had modified and which the vacatur restored by operation of law. As of this filing, the Department has taken no action to amend the relevant IDR regulatory structure through rulemaking.

15. The Missouri Court's final judgment did not authorize the Department to claw back discharges and buyback credit that had already accrued; it did not prohibit the Department

5

from honoring the restored REPAYE Final Rule; and it did not require the Department to move any borrower off REPAYE onto a different plan – it was silent on all of these issues. Today, the Defendants are pursuing a radical set of actions that do all three. Each is a discrete choice the Department made, not a step any court ordered. Each of these actions violates the Administrative Procedure Act.

16. On the operative law, the government is required to grant immediate discharge to borrowers who satisfied the SAVE criteria before vacatur; honor the buyback credit they earned; administer the restored REPAYE Final Rule; and leave borrowers currently in REPAYE enrolled in that plan.

17. However, court filings, public statements, website language, the settlement agreement in *Missouri v. Trump*, and borrower-specific denials or non-processing evidence Plaintiffs' allegations that the Department is refusing to administer relief required under operative law and regulation.

18. The burden of this misconduct is already being felt by Plaintiffs. Plaintiffs were denied relief they are entitled to including lower monthly payments and loan discharge. These denials and the Department's inaction may force these Plaintiffs, and the thousands of borrowers like them, into making a decade or more of additional payments – ultimately paying thousands of dollars in extra costs on loans that should be discharged. They also are representative of the millions of individual borrowers either stuck in involuntary forbearances watching their loan discharge timeline slip further away or saddled with unaffordable payments while the Department of Education refuses to let them pay under REPAYE.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 1331, the Mandamus Act, 28 U.S.C. § 1361, the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because Defendants reside in D.C. and because a substantial part of the events giving rise to these claims occurred in this District.

**PARTIES**

21.    Plaintiff Heather Havens is a resident of California. She was enrolled in SAVE which reverted to REPAYE on March 10, 2026. Havens is due for discharge on two of her loans today. On these two loans, Havens has made 303 qualifying payments out of the required 300. Under the existing SAVE regulations or the prior REPAYE regulations, she is entitled to loan discharge with an effective date in November or December of 2025. On the two additional loans that may not be immediately eligible for discharge, Havens is entitled to enroll in the REPAYE Plan which would lower her monthly payments significantly.

22.    Plaintiff Elizabeth Robeson is a resident of South Carolina. She is due loan discharge for her two outstanding loans based on benefits accrued under the SAVE Plan. On these loans, Robeson has made 325 qualifying payments out of the required 216 required. Under the SAVE or REPAYE regulations, she is entitled to have her loans cancelled with an effective date in April 2024.

23.    Plaintiff Anna Grunseth is a resident of Wisconsin. She is currently enrolled in SAVE and would be due for discharge but for the prior injunction. Grunseth has made 105 eligible payments toward the 120 payments she needs to reach loan discharge under SAVE. Under the existing regulations, she is entitled to buy back her final 15 payments from the 20 months of involuntary forbearance she's been in since the start of the injunction. In contrast to Havens and Robeson who are entitled to automatic discharges by operation of the SAVE discharge timeline alone, Grunseth is also entitled to IDR buyback that when taken together with

the discharge timeline,  entitle her to make a single $165 payment to the Department and receive a loan discharge.

24.     Plaintiff William Boykin is a resident of Pennsylvania. He is entitled to buy back prior periods of forbearance that would give him enough eligible payments to have his loan cancelled. Boykin was 15 months away from completing the 132 payments required of him for loan discharge under the SAVE plan when it was preliminarily enjoined in 2024. Like Grunseth, Boykin should immediately be allowed to buy back these missing payments to satisfy the SAVE Plan's loan discharge requirement.

25.     Defendant United States Department of Education is a federal agency with its principal place of business at 400 Maryland Avenue SW, Washington, D.C. Defendant is responsible for administering federal student loan and grant programs in the United States.

26.     Defendant Linda McMahon is the Secretary of Education ("Secretary"). Plaintiffs sue Secretary McMahon in her official capacity. Secretary McMahon is charged with the supervision and management of all decisions and actions of the United States Department of Education, and so all allegations in this complaint against the Department of Education are made against her.

### BACKGROUND

#### *Income-Driven Repayment Plans*

27.     In 1965, Congress enacted the Higher Education Act (HEA) because "every citizen is entitled to an education to meet his or her full potential *without financial barriers*." 20 U.S.C. § 1221-1(2) (emphasis added). In other words, Congress aimed to "increase educational opportunities" and help students access the "benefits of postsecondary education." *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023).

28.     In 1994, Congress amended the HEA and created the William D. Ford Federal Direct Loan Program. This program increased the government's ability to directly lend money to

students. As a result, the student loan system shifted from one mostly involving private lenders to one in which the U.S. government became a significant creditor of student loans.

29.    Today, the United States Government, through the Department, is the country's largest student loan creditor. There are roughly 42.8 million federal student loan borrowers, with approximately $1.833 trillion outstanding in debt.

30.    Congress has provided access to income-driven repayment options for Direct Loan borrowers since the program's inception. These programs have fallen under two statutory grants of authority; income-based repayment (IBR) and income-contingent repayment (ICR).

31.    Congress directed the Secretary of Education to offer IBR plans, saying: the "Secretary shall carry out a program under which a borrower . . .who has a partial financial hardship . . . may elect, during any period the borrower has the partial financial hardship, to have the borrower's aggregate monthly payment for all such loans not exceed" a payment formula set by statute. 20 U.S.C. § 1098e(b).

32.    Second, Congress required that the Department of Education provide access to, "an income contingent repayment plan" for Direct Loan borrowers (except Direct PLUS loan borrowers). 20 U.S.C. § 1087e(d)(1)(D). This statute directs the Secretary to establish, by regulation, a payment schedule that varies in relation to "the appropriate portion of the annual income of the borrower (and the borrower's spouse, if applicable)…" 20 U.S.C. § 1087e(e)(1)(D).

33.    Since first authorized by statute, the Department of Education has conducted numerous rulemakings establishing or modifying the three primary ICR based repayment plans: the Income-Contingent repayment plan, Pay as You Earn (PAYE), and REPAYE. The REPAYE Plan was amended and superseded by SAVE in the 2023 Final Rule (SAVE Final Rule) and the

two names are used interchangeably in the regulation.[2]

34.     In every instance, the regulations promulgated to offer IDR plans provide both immediate payment relief by tying monthly payments to borrowers' income and a path to automatic loan discharge after a specified number of qualifying monthly payments. These repayment options, by design, provide payment relief and debt discharge.

35.     The Department finalized regulations establishing REPAYE under the Secretary's ICR statutory authority in 2015. The plan was modeled on the existing PAYE plan but allowed all Direct Loan borrowers to enroll regardless of when they took out the loans. By contrast, PAYE eligibility is restricted to what the regulation referred to as "new borrowers," – people who had no student loans prior to October 1, 2007, and took out at least one loan after October 1, 2011. In addition, REPAYE provided added interest subsidizes compared to PAYE. Under both plans, the Department of Education subsidizes 100 percent of the negative amortization effect of interest accrual for the first three years in the payment plan. REPAYE goes further; after the first three years borrowers in REPAYE benefit from a 50 percent subsidy on interest accrual indefinitely.

36.     For many borrowers – especially those with older loans – REPAYE reduced monthly payments compared to the other available plans, provided subsidies for interest accrual, and cancelled Direct Loan balances after 20 or 25 years of repayment, among other benefits. By the time defendants first announced the SAVE rulemaking, millions of borrowers were already relying on REPAYE. At that point, 3.3 million borrowers repaying nearly $200 billion in student loans relied on REPAYE, including plaintiff Havens.

37.     The Department has acknowledged its mandatory obligation to offer an ICR-based plan to Direct loan borrowers. *See* 90 Fed. Reg. 3695 (Jan. 15, 2025) (explaining that certain

---

[2] When discussing benefits or eligibility for SAVE/REPAYE under the 2023 SAVE Final rule this complaint refers to the SAVE Plan or SAVE Benefits. For eligibility or benefits under the prior 2015 Final Rule, the complaint refers to the REPAYE Plan or REPAYE Benefits.

10

changes were being made to meet the "Department's statutory obligation under the HEA to offer borrowers an income-contingent repayment plan.").

### *Saving on a Valuable Education*

38.     The Department issued the SAVE Final Rule to, "create a stronger safety net for Federal student loan borrowers, helping more borrowers avert delinquency and default … afford their Federal loan payments, while also increasing homeownership, retirement savings, and small business formation."

39.     In the Rule, the Department amended the "REPAYE Plan," creating the "SAVE Plan," and made changes so that it would be the best option for the bulk of student loan borrowers. *See* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43,820.

40.     The SAVE Plan increases the amount of income protected from the monthly payment calculation from 150% to 225% of the federal poverty line, waives unpaid interest, reduces the time consumers who borrowed less than $22,000 need to repay their loans under an IDR plan, and reduces undergraduate borrowers' payments to five percent of discretionary income.

41.     These changes provide lower monthly payments, faster paths to debt discharge, and no accumulation interest – dramatically easing the financial burden of federal student loans for borrowers with access to the Plan.

42.     Many provisions of the Rule were designated for early implementation and went into effect in 2023 including the reduced monthly payment amounts. *See* 88 Fed. Reg. 43,820; 88 Fed. Reg. 72,685.As a result, the Department automatically updated the monthly payment amount of all borrowers enrolled in REPAYE to conform with the new regulatory provisions in effect. In addition, millions of new student loan borrowers who were previously in other plans

enrolled in the SAVE Plan in 2023 and the first half of 2024.

*Repayment Plan Enrollment*

43.    Enrollment in specific repayment plans is governed in part by statute and regulation. The statutory language and structure clearly give borrowers the primary authority to select their repayment plan among the lawfully promulgated options. The statute does not always leave the option to the borrower. Instead, it specifies two specific circumstances in which the Secretary has the authority to select a repayment plan on a borrower's behalf.

44.    Initially after separating from school, borrowers are notified of their repayment options and may select among the available plans. 34 CFR § 685.210(a). If a borrower does not select otherwise, the Secretary designates the standard repayment plan for the borrower. *Id*. & 20 U.S.C. § 1087e(d)(2)

45.    Second, if a borrower previously defaulted the Secretary may require the borrower to repay under an income-based repayment plan. 20 U.S.C. § 1087e(d)(5)(B).

46.    While not a statutory authority, defendants' regulations provide the Secretary authority to remove a borrower from a repayment plan and place them into a different repayment plan where the borrower fails to recertify their income under the REPAYE Plan. In that circumstance, the Department is unable to calculate a month payment under REPAYE and places the borrower into "an alternative repayment plan" setting payments at the same amount as the 10-year standard.

47.    Other than these limited, narrow circumstances the statute provides that borrowers "may choose" among the available repayment options. And the regulations go further to specify that the choice can occur "at any time by notifying the Secretary." 34 CFR § 685.210(b).

48.    Neither the statute nor regulations provide the Secretary with broad authority to determine which repayment plan borrowers are enrolled in or change that repayment plan at will.

Changing repayment plans has significant financial consequences for borrowers as they determine both monthly payment amounts and eligibility for IDR or PSLF discharge.

49.     It has been the Department's longstanding policy to allow borrowers to elect their own repayment plan and once they've done so, leave those borrowers in that plan until they affirmatively pick a new option.

50.     Notably, following the SAVE Final Rule which modified the REPAYE plan, the Department adjusted the repayment amount of everyone enrolled in the plan based on the new regulatory requirements. It did not require application for a new plan or involuntarily move borrowers to a different plan.

***Public Service Loan Forgiveness Buyback***

51.     Borrowers also received benefits under the SAVE Final Rule through Public Service Loan Forgiveness (PSLF) buyback.

52.     Under PSLF, borrowers who make 120 qualifying payments while working in a qualifying public service job can have the remaining balance of their loans discharged. Under the program, payments made in an IDR plan are considered qualifying while periods in a forbearance are not.

53.     In 2023, the Department issued a new rule allowing borrowers who had worked for a qualifying employer for 120 months but who had not made 120 qualifying payments because their loans were not in an eligible plan, to 'buyback' those ineligible periods to earn the necessary PSLF credit without having to work at the qualifying employer for more than the 10 year requirement.[3]

54.     To receive a buyback, borrowers inform the Department directly. The Department

---

[3] PSLF Buyback is distinct from IDR buyback. The Department, under different regulatory authority has been operating PSLF buyback since 2023. IDR buy back is a provision in the SAVE Final Rule which has never been implemented by the Department. The complaint discusses PSLF buyback because through its operation the Department provided borrowers SAVE benefits (payments calculated based on the SAVE payment formula) continuously between July 2023 and April 2026.

reviews borrowers' records and calculates how many payments are required (to reach 120) and how much payment is required. The regulation explains that borrowers can obtain credit toward forgiveness for certain periods of forbearance and deferment by making, "an additional payment equal to or greater than the amount they would have paid **at that time on a <u>qualifying</u> <u>repayment plan</u>**." (emphasis added). 34 CFR § 685.219(g)(6)(i).

55.     Until recently, when borrowers enrolled in SAVE requested buyback periods of the involuntary forbearance to reach PSLF discharge, the Department would calculate those payments based on the SAVE repayment plan formula. In other words, the Department maintained a policy throughout the period prior to the vacatur of the SAVE Final Rule, that certain borrowers could benefit under the SAVE plan.

56.     Even now, the Department appears to contemplate providing SAVE benefits for prior periods of forbearance or deferment under the PSLF buyback program. Its website explains,"if the start or end date for the period of deferment or forbearance that is being bought back is on or after July 1, 2024, then the amount required to buy back that period of time cannot be based on the SAVE Plan formula."

57.     The clear implication being: if a borrower's start and end date for the buyback period is between July 1, 2023 (when the early implementation of SAVE monthly payment amounts started) and July 1, 2024, the Department will use the SAVE Plan formula to calculate buyback.

***Missouri v. Trump***

58.     In April 2024, a group of states sued the Department to challenge the SAVE Final Rule in the U.S. District Court for the Eastern District of Missouri. *Missouri v. Trump,* 4:24-cv-00520, (E.D. Mo. Apr. 9, 2024). On June 24, 2024, the U.S. District Court for the Eastern District of Missouri preliminarily enjoined the Department from providing loan discharge under the SAVE Rule. *Missouri v. Biden*, 738 F.Supp.3d 1113, 1124 (E.D. Mo. 2024).

14

59.     On cross appeal, the Eighth Circuit initially granted to states' emergency motion for an administrative stay and preliminary injunction prohibiting the United States from "any further forgiveness of principal or interest, from not charging borrowers accrued interest, and from further implementing SAVE's payment-threshold provisions." *Missouri v. Biden,* 112 F.4th 531, 538 (8th Cir. 2024).

60.     On February 18, 2025, the Eighth Circuit Court of Appeals issued its opinion on the preliminary injunction. It affirmed the District Court's injunction and expanded it to further enjoin the entire SAVE Rule. *Missouri v. Trump*, 128 F.4th 979 (8th Cir. 2025).

61.     Rather than reverting to the prior rule implementing the Income-Contingent Repayment requirements of the Higher Education Act, the Department also continued to arbitrarily deny borrowers' access to the precursor to SAVE, Revised Pay as You Earn (REPAYE).

62.     On December 9, 2025 the Department of Education and plaintiff states jointly announced a "proposed" settlement to the case which would, among other things, prevent the Department from forgiving loans under the SAVE Plan using its ICR authority and enrolling new borrowers in SAVE.[4]

63.     The proposed settlement went even further than restricting access to SAVE, it purported to prohibit the Department from enforcing, "the original REPAYE rule or otherwise enroll any borrowers, including SAVE borrowers, into the original REPAYE Plan."

64.     In the proposed settlement the Department committed to pursue negotiated rulemaking to effectuate the agreement.

65.     Without presenting the settlement agreement to the Court, the Department and

---

[4] Press Release, U.S. Dep't of Ed., U.S. Department of Education Announces Agreement with Missouri to End Biden Administration's Illegal SAVE Plan (Dec. 9, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-announces-agreement-missouri-end-biden-administrations-illegal-save-plan.

plaintiff states jointly asked the District Court to enter a final judgment and vacate the Final Rule.

66.    On February 27, 2026, the District Court did not take the parties up the invitation. Rather, citing the lack of adversity between the parties – evidenced, in part, by the fact that no attempt has yet been made to promulgate new regulations in order to phase out the SAVE Plan, the Court dismissed the case as moot. Order of Dismissal, *Missouri v. Trump,* 4:24-cv-00520, ECF 94.  No court has made a final ruling on the merits of the SAVE plan.

67.    The states requested that the District Court stay the dismissal on March 2 which the court denied on March 4. The states subsequently noticed their appeal of the dismissal the same day.

68.    On March 5, plaintiff states filed their Emergency Motion for Stay with the Eighth Circuit. In that motion, the plaintiff states requested that the Eighth Circuit either stay the dismissal pending appeal or reverse the dismissal and direct the district court to enter the parties joint request to vacate the SAVE Final Rule.

69.    The plaintiff states acknowledge that the dismissal, "renders the district court's preliminary injunction and this Court's orders a 'nullity,' thus resurrecting the unlawful SAVE Plan." Emergency Mot. for Stay Pending Appeal and to Expedite, *Missouri v. Trump*, No. 26-1394 (8th Cir. Mar. 5, 2026), Docket No. 805469112. Based on the arguments presented in this motion the United States consented to the relief plaintiff states requested.

70.    On March 9, the Eighth Circuit entered its order directing the district court to vacate the SAVE Final Rule. Final judgment was entered the following day.

71.    The effect of this consent vacatur is to reinstate the rules previously in force, namely REPAYE. *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983); *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) ("When a court vacates an agency's

rules, the vacatur restores the status quo before the invalid rule took effect…); *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 415–16 (D.D.C. 2020) ("But in each of these cases, vacatur simply restored the prior *regulatory* status quo; the invalid rule was eliminated and replaced by any preexisting rule it had superseded").

### *One Big Beautiful Bill Act*

72.    The One Big Beautiful Bill Act (OBBBA) became law on July 4, 2025, making significant changes to student loan repayment.

73.    In effect, the OBBBA directed the Department to end all ICR plans authorized under section 455(e) by July 1, 2028. The legislation treats SAVE, REPAYE, and other ICR plans equally.

74.    Despite the prevalence of the SAVE plan in the media, and the opportunity and desire to reform student loan repayment, the OBBBA did not terminate or otherwise invalidate the SAVE plan specifically.

75.    It also did not repeal section 455(e) immediately—an option debated by Congress during the consideration of the OBBBA and included in an earlier version of this legislation passed by the U.S. House of Representatives. Ultimately, Congress elected to preserve section 455(e) of the Higher Education Act for nearly three full calendar years following the enactment of OBBBA.

76.    It is clear that, if Congress intended to repeal the SAVE Plan or REPAYE effective immediately, it would have done so.  It did not. In fact, by grouping all the ICR related repayment plans together the OBBBA provides for the continuation of the benefits under these plans during the transition period to the new repayment system envisioned by the statute.

### *Department of Education Rulemaking*

77.    The Department of Education moved quickly to implement some of these

statutory changes. Within a month of the OBBBA's passage, the Department of Education announced it was establishing a negotiated rulemaking committee to implement changes to Title IV, HEA programs.

78.    The committee convened and negotiated on the Department's rules related to student loan repayment between September 29 and October 3, 2025.

79.    The committee included representatives from the Department and a student loan servicer trade association, among other constituencies. This included the President of the National Council of Higher Education Resources, a trade association representing student loan servicers, guaranty agencies, lenders, secondary markets, and private collection agencies.

80.    The committee reached consensus, which requires that none of the members dissent to the proposed regulatory text.

81.    The Department published the Notice of Proposed Rulemaking (NPRM) on January 30, 2026, using the consensus regulatory text as required by the negotiated rulemaking process.

82.    On May 1, 2026, after the vactur of the SAVE Final Rule, the Department issued final regulations. The final regulations largely mirrored the proposed rule and leaves the terms of the SAVE Final Rule largely "on the books" despite the vacatur. These regulations left in place both the SAVE Final Rule's timeline for loan discharge and, the 'buy back' provision providing credit toward IDR discharge for certain months in which the borrower was in an otherwise ineligible deferment or forbearance.

83.    The Rule did address how long borrowers could remain eligible for IDR plans. These modifications specified that Direct Loan borrowers will remain eligible to repay their loans under REPAYE (without specifying whether they mean SAVE or pre-SAVE REPAYE) through June 30, 2028, provided they do not take out any new loans after July 1, 2026. In doing

so, defendants apparently agree that some version of REPAYE must exist following the vacatur, otherwise a sunset provision would be entirely unnecessary.

84.    In effect, the proposed rule – as agreed to by the Department of Education – sets a clear termination date for  REPAYE eligibility of June 30, 2028 - in line with the OBBBA requirements.

85.    To date, ED has not taken any regulatory action to terminate the SAVE Final Rule or REPAYE plan earlier than the statutorily defined end date, June 30, 2028.

## FACTUAL ALLEGATIONS

### *Millions of Borrowers Benefit Under SAVE*

86.    The SAVE plan provided significant financial benefits to Direct Loan borrowers that they did not receive during the preliminary injunction.

87.    Consumers are entitled to loan discharge based on their original loan balance and years in repayment. Specifically, the SAVE Final Rule provided loan discharge for borrowers who received loans for undergraduate study after 240 monthly payments, or after 300 monthly payments for borrowers who are repaying at least one loan received for graduate or professional study.

88.    Notwithstanding this general loan discharge timeline, the Final Rule provides for loan discharge after 120 monthly payments if the borrower's total original principal balance on all loans that are being paid under SAVE was less than or equal to $12,000, plus an additional 12 monthly payments for every $1,000 if the total original principal balance is above $12,000.

89.    The discharge of eligible borrowers' loans occurs automatically. The regulation specifies that the Secretary tracks borrowers' progress toward eligibility for IDR discharge and "forgives loans that meet the criteria…without the need for an application or documentation from the borrower." 88 Fed. Reg. at 43,904. The right to this debt discharge vests immediately

upon a borrower's satisfaction of the eligibility criteria described above – that is, the moment a borrower makes their final payment. At that point, borrowers have no action left to take, the Department has no discretion, and all that remains is ministerial tasks to effectuate the discharge.

90.     Plaintiffs and other borrowers are also due benefits under the SAVE IDR buyback provisions. Under the longstanding regulatory requirements, some periods of forbearance and deferment, including the current forbearance borrowers enrolled in SAVE are in, do not count toward IDR loan discharge.

91.     However, under the SAVE Final Rule, borrowers may obtain credit toward cancellation for these otherwise ineligible periods of forbearance and deferment if they make an additional payment equal or greater than their current IDR payment.

92.     Borrowers can functionally "buyback" periods of deferment or forbearance that occurred after July 1, 2024, and that ended within three years of the date of the buy back under the regulation. Following vacatur, the functional rule is that borrowers accrued buyback eligibility for periods of otherwise ineligible deferment or forbearance between July 1, 2024 through March 10, 2026, and may buy those periods back within three years of the end of the forbearance or deferment or March 10, 2029, whichever is earlier.

93.     For borrowers enrolled in IDR plans, the buyback amount is the amount owed under the appropriate calculation of monthly payment under those plans.

94.     The regulation specifies that "Upon request, the Secretary informs the borrower of the months for which the borrower can make payment under [the buyback provision]." This is a discrete, mandatory, and ministerial function. Again, the Department retains no discretion. For borrowers with a $0 payment, the buyback costs nothing. For these borrowers in particular, the only obstacle between them and forgiveness credit is the Secretary identifying the months.

95.     Borrowers are entitled to the benefits that have already accrued.

96.    Vacatur of a rule operates prospectively. It eliminates a rule going forward; it does not reach back to divest benefits or credits that vested while the rule was in force and it does not automatically vacate benefits or rights accrued under the rule. See *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983); cf. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 269–70 (1994) (describing the "deeply rooted" presumption against retroactivity and against unsettling rights that have vested). The March 10, 2026 vacatur therefore did not—and could not—strip Plaintiffs of the discharge eligibility and buyback credit they had already earned.

### The Department of Education Denied Plaintiffs' Vested Interests for Discharge and IDR Buyback

97.    Following the dismissal of *Missouri v. Trump*, the Department of Education failed to follow the law by affirmatively denying Plaintiffs benefits.

98.    One Plaintiff, Anna Grunseth, is enrolled in SAVE and would be due for discharge next month but for the prior injunction. She borrowed $8,583 to attend Mid-State Technical College in Wisconsin Rapids, WI in 2014. Grunseth made 105 eligible payments toward the 120 payments she needs to reach loan discharge under SAVE. Under the SAVE regulations, she is entitled to buy back the periods of forbearance she was forced into following the injunction. Under this program, she should immediately be allowed to buy back her missing 15 payments from the 20 months of forbearance she's been in since July of 2024 for $165.

99.    If the Department of Education is not required to follow the law, Grunseth could be forced to continue making payments for more than 15 years under the best available IDR option.

100.    The Department of Education denied Grunseth IDR buy back and subsequent loan discharge under SAVE.

101.    Grunseth called the Department's "Loan Discharge and Forgiveness Customer

Support" line on March 6, 2026, to ask about IDR buy back and SAVE loan discharge.

102.    The agent informed Grunseth that IDR buy back was not available.

103.    The agent said that "The SAVE program is not something we acknowledge at the moment," and that "we do not recommend you stay in the SAVE program."

104.    When Grunseth pressed further and informed the agent that she heard SAVE was back in effect because of the recent court decision, the Department of Education agent stated that was not true.

105.    Plaintiff William Boykin is entitled to enroll in the SAVE Plan and buy back prior periods of forbearance that would give him enough eligible payments to have his loan cancelled. Boykin was 15 months away from completing the 132 payments required of him for loan discharge under the SAVE plan when it was preliminarily enjoined in 2024. Believing public statements that the SAVE plan was illegal and that it would not be available again, Boykin applied for a different repayment plan in January 2025, which was not processed until January of 2026. In total, Boykin remained in an involuntary forbearance for 17 months.

106.    Like Grunseth, Boykin is entitled to buy back those months of forbearance to reach the required number of payments for discharge. Boykin's current IDR payment is $0 per month. Under the terms of the regulation, he is entitled to buyback those months at no cost.

107.    If the Department of Education is not required to follow the law, Boykin could be forced to make payments for more than 10 years under the best available IDR option.

108.    On March 6, 2026, Boykin attempted to change his repayment plan to SAVE using the IDR application on studentaid.gov but neither SAVE nor REPAYE was available online. There was no other notice or communication about its availability, and, in fact, the website informed him that the SAVE plan was enjoined by the Eighth Circuit.

109.    Plaintiff Heather Havens is enrolled in SAVE and due for discharge on two of her loans today. On these two loans, Havens has made 303 qualifying payments out of the required 300 for her consolidation loans used to pay off debt she incurred to attend the University of California, Santa Cruz in 1996. Under the existing SAVE regulations or prior REPAYE regulations, she is entitled to have her loans cancelled with an effective date in November or December of 2025.

110.    If Havens changed repayment plans, she would also be entitled to loan discharge, but the effective date would be the month she was enrolled in the new payment plan.

111.    The American Rescue Plan Act excluded discharge of student loan debt from taxation through December 31, 2025. The Department determines whether to issue a 1099-C form showing taxable income based on discharged debt, based on the *effective* date of the discharge rather than the date the actual date of discharge. *American Federation of Teachers v. U.S. Department of Education*, No. 1:25-cv-00802-RBW (D.D.C.) Order, ECF No. 55, at 2 (Oct. 23, 2025). Plaintiffs understand that the effective date of discharge cannot be any earlier than the date of enrollment in the IDR plan that makes the borrower eligible for discharge.

112.    If the Department of Education involuntarily moves Havens to a new repayment plan it will reset the effective date of her discharge and trigger a significant tax liability.

113.    If the Department of Education is not required to follow the law, Havens may be forced to pay income taxes on loan discharge that she would not otherwise owe.

114.    The Department of Education denied Havens's loan discharge under SAVE.

115.    Havens called the servicer of her federal student loan, Aidvantage at 12:16 p.m. on March 6, 2026. Havens explained that she was eligible for loan discharge under the SAVE plan and asked how she could apply. The agent explained that Havens did not need to apply for IDR loan discharge. That if she was eligible under one of the plans, it would be processed

automatically.

116.    Havens asked specifically about loan discharge under SAVE. In response, the agent told Havens that the SAVE plan was no longer being offered, so Havens would have to apply for another IDR plan.

117.    Finally, Havens is entitled to enroll in the SAVE plan to repay the remaining balance on the two loans do not already qualify for loan discharge. If the Department is not required to follow the law, Havens could be forced to pay more than $500 per month more under the best available IDR option.

118.    Plaintiff Elizabeth Robeson is due loan discharge for her two outstanding loans under SAVE today. On these loans, Robeson has made 325 qualifying payments out of the 216 required. Robeson remaining student loan debt stems from her graduate study at the University of Mississippi where she borrowed less than $12,000, but today she owes over $90,000. Under the existing SAVE regulations or prior REPAYE regulations, she is entitled to have her loans cancelled with an effective date in April of 2024 – when she first enrolled in SAVE.

119.    Like Havens, changing repayment plans could have significant tax consequences.

120.    If the Department of Education involuntarily moves Robeson to a new repayment plan it will reset the effective date of her discharge and trigger a significant tax liability.

121.    Today, Robeson relies on her part-time job and Social Security payments to make ends meet. Her adjusted gross income for 2025 was approximately $8,000.

122.    If the Department of Education is not required to follow the law, Robeson may be forced to pay income taxes on $90,000 of loan discharge – an amount that may be more than she makes in an entire year.

123.    The Department of Education denied Robeson loan discharge under SAVE.

24

124.    Robeson called the Department of Education's "Loan Discharge and Forgiveness Customer Support" on March 4, 2026.

125.    Robeson inquired about loan discharge under SAVE. In response, the agent informed her that the only way to get loan discharge would be to apply for another IDR plan.

126.    The agent explained that she knew nothing about the injunction being lifted, nor was she updated about the status of the SAVE plan following the dismissal of *Missouri v. Trump*.

127.    Millions of borrowers are entitled to lower monthly payments under REPAYE. Many of these borrowers will likely default on their loans as a result of the Department's decisions not to follow the law.

### *Department of Education Refuses to Process Accrued Benefits and Shadow Repealed the REPAYE Plan Unlawfully*

128.    The Plaintiffs' experiences are not isolated, one-off errors, they are part of a final agency action to deny borrowers benefits they are entitled to. Department of Education leadership decided long before the resolution of *Missouri v. Trump* its plan for student loan repayment but refused to follow the well-established procedures for effectuating that change. Rather, than going through the time-consuming process required by the APA and HEA, the Department attempted to use a settlement agreement that was never reviewed or approved by any court and a consent based vacatur of the 2023 SAVE Final Rule, to radically change more than a decade of settled law and policy.

129.    The Department made clear its intent through a series of public statements mischaracterizing the SAVE Final Rule and borrowers options under it:

    a.    In July 2025, the Department mischaracterized the state of the law when it said that "the Eighth Circuit Court of Appeals held that the SAVE Plan is unlawful."[5]

---

[5] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Continues to Improve Federal Student Loan Repayment Options, Addresses Illegal Biden Administration Actions* (July 9, 2025),

That overstated the procedural posture because, while the Eighth Circuit affirmed preliminary injunctive relief and addressed likelihood of success, no final merits judgment was entered in the case.

b.  A December 9, 2025, press release from the Department repeatedly refers to the SAVE plan as the "illegal SAVE plan" despite the fact that no court has found the Plan to be illegal on the merits, and Congress has taken no action to immediately alter the SAVE Plan. [6]

c.  The Department *thanked* the State of Missouri and other plaintiffs for bringing the lawsuit that will increase the costs of higher education. *Id*.

d.  The *Missouri v Trump* settlement agreement itself lays out these specific policy actions that are injuring Plaintiffs and other borrowers

130.  Even where the Department publicly holds up its intention to comply with basic procedural protections designed to provide Plaintiffs and others with an opportunity to assert their interests on major policy changes, it refuses to actually follow through.

131.  The Department explained in the press release the settlement would go into effect ***if*** it was approved by the courts – assuring the public that a neutral party would evaluate the agreement and check any legal deficiencies it contained. The Department explained that, "if the parties' joint proposal is approved by the court, borrowers currently enrolled in the illegal SAVE Plan will have a limited time to select a new, legal repayment plan and begin repaying their student loans." However, the Department never submitted the settlement agreement to the court but continues to proceed as if the settlement had already been effectuated.

---

https://www.ed.gov/about/news/press-release/us-department-of-education-continues-improve-federal-student-loan-repayment-options-addresses-illegal-biden-administration-actions.

[6] Press Release, U.S. Dep't of Ed., U.S. Department of Education Announces Agreement with Missouri to End Biden Administration's Illegal SAVE Plan (Dec. 9, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-announces-agreement-missouri-end-biden-administrations-illegal-save-plan (quoting the Under Secretary of Education, saying, "thanks to the State of Missouri and other states" for bringing the lawsuit).

132.    In addition, the Department seemingly acknowledged that the terms of the settlement agreement would require formal rulemaking. It went out of its way to note that it has not "prejudged the outcome of that negotiated rulemaking process…" Yet that rulemaking has not even been announced by the Department.

133.    The Department has maintained the same policy throughout this period – deny loan discharge, shadow repeal REPAYE, and involuntarily move borrowers onto less affordable repayment plans.

134.    The problem, of course, is that neither Congress nor the Department has taken action consistent with their authorities or the APA to effectuate this policy; apparently relying on the courts to do what should properly be done through legislation or rulemaking.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

*Agency Action Taken Without Observance of Procedure Required by Law in Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(D)*

135.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

136.    The Department's effective repeal of the REPAYE Final Rule – carried out through its refusal to enroll borrowers in, bill under, or process discharges under REPAYE, and implemented through borrower-by-borrower denials like those of Plaintiffs – is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

137.    The APA prohibits agency action that is taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

138.    Repealing a legislative rule is "rule making." 5 U.S.C. § 551(5). It required notice-and-comment under § 553 and the negotiated rulemaking the Higher Education Act mandates for Title IV regulations, 20 U.S.C. § 1098a. The Department conducted neither, and may not evade those requirements by declining to administer the rule.

27

139. The effective repeal of REPAYE was therefore taken without observance of procedure required by law, in violation of 5 U.S.C. § 706(2)(D).

## SECOND CAUSE OF ACTION

*Arbitrary, Capricious Agency Action and Agency Action that is an Abuse of Discretion or Otherwise not in Accordance with Law in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)*

140. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

141. Each of the following is final agency action reviewable under 5 U.S.C. §§ 702 and 706: (a) the Department's effective repeal of the REPAYE Final Rule; (b) its policy of involuntarily transferring borrowers enrolled in REPAYE to other repayment plans; and (c) its denial and non-processing of Plaintiffs' requests for the loan discharges and IDR buyback they had already earned – including the denial of Grunseth's buyback and the refusal to process Havens's and Robeson's discharges.

142. Those actions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. The Department offered no reasoned explanation; failed to consider the reliance interests of millions of enrolled borrowers and the data in its possession; treated REPAYE differently from the materially identical PAYE and ICR plans it continues to offer; and failed to acknowledge or justify its change of position. 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION

*Agency Action in Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C)*

143. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

144. Each of the following is final agency action reviewable under 5 U.S.C. §§ 702 and 706: (a) the Department's shadow repeal of the REPAYE Final Rule; (b) its policy of involuntarily

transferring REPAYE borrowers to other repayment plans; and (c) its denial and non-processing of Plaintiffs' earned discharges and IDR buyback.

145.    The Higher Education Act requires the Secretary to offer Direct Loan borrowers an income-contingent repayment plan and leaves the choice among lawfully promulgated plans to the borrower. 20 U.S.C. § 1087e(d), (e). The Secretary may select a plan for a borrower in only two circumstances — where the borrower has not selected one, id. § 1087e(d)(2), or has previously defaulted, id. § 1087e(d)(5)(B) — neither of which applies to Plaintiffs. Shadow repealling REPAYE, forcing borrowers off the plan, and denying the discharges and buyback borrowers earned under operative law exceeds the Department's statutory authority, in violation of 5 U.S.C. § 706(2)(C).

## FOURTH CAUSE OF ACTION

*Unlawful Withholding of Agency Action in Violation of the
Administrative Procedure Act, 5 U.S.C. § 706(1)*

146.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

147.    The Secretary owes discrete, nondiscretionary duties that she has refused to perform as to Plaintiffs specifically and to borrowers generally: (a) to cancel the Direct Loans of borrowers who satisfied the SAVE discharge criteria before the March 10, 2026 vacatur, using the effective dates those borrowers had reached; (b) to identify, and to accept payment for, the months of involuntary forbearance between July 1, 2024 and March 10, 2026 that borrowers are entitled to buy back, and to credit the resulting discharges; and (c) to administer the restored REPAYE Final Rule.

148.    The Department's denial of Grunseth's buyback request and its refusal to process Havens's and Robeson's discharges are the withholding of these duties as to Plaintiffs. Each duty remained only ministerial once the borrower satisfied the criteria, and each right vested while the Rule was in force and survives its prospective vacatur. The Department's refusal is agency action unlawfully withheld, in violation of 5 U.S.C. § 706(1).

29

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

A. Declare that, following the March 10, 2026 vacatur of the SAVE Plan Final Rule, the REPAYE Final Rule is the operative regulation governing Plaintiffs' loans and that Defendants are required to administer it

B. Hold unlawful and vacate and set aside, pursuant to 5 U.S.C. § 706(2), (i) the Department's shadow repeal of the REPAYE Final Rule and (ii) its policy of involuntarily transferring borrowers enrolled in REPAYE to other repayment plans

C. Permanently enjoin Defendants from giving effect to the shadow repeal of REPAYE and from involuntarily transferring any borrower enrolled in REPAYE to a different repayment plan

D. Compel Defendants, pursuant to 5 U.S.C. § 706(1), to cancel the Direct Loans of borrowers who satisfied the SAVE discharge criteria before March 10, 2026 (using the effective dates those borrowers had reached); to identify and accept payment for the months of involuntary forbearance between July 1, 2024 and March 10, 2026 that borrowers are entitled to buy back, and to credit the resulting discharges; and to administer the REPAYE Final Rule

E. Award Plaintiffs their costs and reasonable attorneys' fees as authorized by law, including under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F. Grant such other and further relief as is just and proper.

Dated: June 23, 2026                     Respectfully submitted,

                                         */s/ W. Austin Hinkle*
                                         William Austin Hinkle
                                         D.C. Bar No. 90043756

Public Goods Practice LLP
1502 W 7th St.
STE 100
Erie, PA 16502
(215) 931-9240


<u>Paul Delaney Mayer (pro hac vice)</u>
D.C. Bar No.1671773
Public Goods Practice LLP
1717 N Street NW
STE 1
Washington, DC 20036

*Counsel for Plaintiffs*