**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HEATHER HAVENS, *et al.,*<br><br>      *Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et al.,*<br><br>      *Defendants*. | Civil Action No. 1:26-cv-816-LLA |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**</u>

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND.................................................................................................. 2

    a.    Income-Contingent Repayment and REPAYE.................................................. 2

    b.    SAVE and *Missouri v. Biden* ......................................................................... 4

    c.    Tax Consequences of Discharge....................................................................... 5

    d.    Defendants are Required to Honor their Own Regulation................................. 6

III.  DISCUSSION ..................................................................................................... 7

    a.    Plaintiffs have standing.................................................................................... 7

    b.    Injunctive Relief is Appropriate...................................................................... 8

    c.    Plaintiffs are Likely to Succeed on the Merits of their Claims that Defendants Repealed the REPAYE Plan without Authority and will Involuntarily Change Repayment Plans for Borrowers Enrolled in REPAYE Unlawfully ............................................................. 9

        i.    *The Department of Education's actions are reviewable final agency actions*................. 9

        ii.   *This Court Is Likely to Set Aside Defendants' Shadow Repeal of REPAYE Under § 706(2)(D)* ........................................................................................ 11

        iii.  *This Court Is Likely to Set Aside the Shadow Repeal of REPAYE and the Forced Transfer of Borrowers Under § 706(2)(C)* .............................................. 13

        iv.   *This Court Is Likely to Set Aside Defendants' Actions Under § 706(2)(A)* ................... 15

        v.    *This Court Is Likely to Compel Defendants to Recognize Plaintiffs Havens, Grunseth, and Robeson's Enrollment in REPAYE and to Provide Plaintiff Boykin a Mechanism to Apply, Under § 706(1)* ....................................................................... 19

    d.    Defendants' Misconduct is Causing Plaintiffs Irreparable Harm ..................... 20

    e.    The public interest and balance of equities warrants a stay.............................. 22

    f.    The Requested § 705 Stay Is Not Subject to the Limits on Universal Injunctions............ 23

IV.   CONCLUSION .................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983) ................................ 5

*Am. Fed'n of Teachers v. U.S. Dep't of Educ.*, No. 1:25-cv-00802-RBW (D.D.C. Oct. 23, 2025) ...................................................................................................................................................... 6, 20

*Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) ......................... 19

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) ............................................................................. 9

*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) ........................................... 15

*Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) .................................................. 17

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) ............................................................. 22

*Cabrera v. U.S. Dep't of Labor*, No. 25-cv-1909 (DLF), 2025 WL 2092026 (D.D.C. July 25, 2025) ...................................................................................................................................... 23

*CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) ................... 8

. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) .............. 8

*Clean Air Council v. Pruitt*, 862 F.3d 1, 6–9 (D.C. Cir. 2017) ................................................... 12

*Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982) ....................... 12

*D.A.M. v. Barr*, 486 F. Supp. 3d 404, 415–16 (D.D.C. 2020) ...................................................... 5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) ......................... 16

*Elec. Privacy Info. Ctr. v. Pres. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) ....................................................................................................................... 7

*Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) ........................................................ 5

*Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 978 (D.C. Cir. 2016) ............................................ 8

*Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564, 568 (D.C. Cir. 2022) .............. 12

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ............................................................ 8

*Michigan v. EPA*, 576 U.S. 743, 758 (2015) ............................................................................... 16

*Missouri v. Trump*, 2026 WL 548660 (E.D. Mo. Feb. 27, 2026). ................................................. 5

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ...................................................................................................................................... 15

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 121 (D.D.C. 2025) 8, 23

*Nat'l Family Planning & Reproductive Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992) .................................................................................................................................... 7, 13

*Nat'l Venture Capital Ass'n v. Duke,* 291 F. Supp. 3d 5 (D.D.C. 2017) ...................................... 12

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004) ................................................... 19

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) .......................................... 12, 22

*Padgett v. Vilsack*, No. 1:24-cv-02425-LLA (D.D.C. Aug. 30, 2024) ......................................... 20

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) ............................................................ 12

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) ......... 22

*Reuters Ltd. v. FCC*, 781 F.2d 946, 947 (D.C. Cir. 1986) ........................................................ 7, 13

*SEC v. Chenery Corp.* 318 U.S. 80, 87 (1943) ............................................................................ 16

*Winter v. NRDC*, 555 U.S. 7, 24 (2008) ...................................................................................... 23

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) ................... 20

**Statutes**

20 U.S.C. § 1087e(d) ..................................................................................................................... 13

20 U.S.C. § 1087e(d)(1)(D) ............................................................................................................. 2

20 U.S.C. § 1087e(d)(2) ................................................................................................. 15
20 U.S.C. § 1087e(d)(5)(B ............................................................................................. 15
20 U.S.C. § 1098a ................................................................................................... *passim*
5 U.S.C. § 553 ................................................................................................................ 14
5 U.S.C. § 702 ................................................................................................................ 22
5 U.S.C. § 705 ................................................................................................................ 24
5 U.S.C. § 706(1) ............................................................................................................. 9
5 U.S.C. § 706(2)(A ........................................................................................................ 15
5 U.S.C. § 706(2)(C) .................................................................................................. 9, 13
5 U.S.C. § 706(2)(D) ...................................................................................................... 12
5 U.S.C. §§ 702, 704 ........................................................................................................ 9
5 U.S.C. § 551(5), .......................................................................................................... 12
Pub. L. No. 119-21, 139 Stat. 72 (2025) ....................................................................... 14

**Other Authorities**

Press Release, U.S. Dep't of Educ., *U.S. Department of Education Announces Next Steps for
Borrowers Enrolled in the Unlawful SAVE Plan* (Mar. 27, 2026) ........................... 11

**Regulations**

Agency Information Collection Activities; Comment Request; Income Driven Repayment Plan
Request for the William D. Ford Federal Direct Loans and Federal Family Education Loan
Programs, 91 Fed. Reg. 20,989, 20,990 (Apr. 20, 2026)American Rescue Plan Act of 2021,
Pub. L. No. 117-2, § 9675, 135 Stat. 4, 185 (codified at 26 U.S.C. § 108(f)(5)) ........................ 5
*Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and
the Federal Family Education Loan (FFEL) Program*, 88 Fed. Reg. 43,820 (July 10, 2023 .... 4
*Reimagining and Improving Student Education—Federal Student Loan Program Final
Regulations*, 91 Fed. Reg. 23,768, 23,889 (May 1, 2026) ........................................................ 5
*Student Assistance General Provisions, Federal Family Education Loan Program, and William
D. Ford Federal Direct Loan Program*, 80 Fed. Reg. 67,204 (Oct. 30, 2015) (codified at 34
C.F.R. § 685.209(c) ................................................................................................................ 3

## I.      INTRODUCTION

Today, the Revised Pay As You Earn (REPAYE) repayment plan is the law on the books. The Eighth Circuit vacated SAVE and vacatur restored the prior rule by operation of law. Yet, in the aftermath of the March 10 vacatur of the SAVE Final Rule, the defendants aggressively moved to restructure federal student loan repayment in ways that vastly exceed the scope of that ruling or statutory and regulatory authorities. Their actions disregard well-established legal principles and trample on the procedural and substantive protections to which plaintiffs and the public are entitled. This case is about the years-long wait plaintiffs weathered for lawful student loan repayment to resume – only for the Department of Education to disregard decades of settled law and policy to implement its preferred political outcome. Unless the Court preserves the status quo before the Department's involuntary transition begins, the resulting harm to Plaintiffs – and to millions of borrowers – cannot be undone.

Defendants took three actions in response to the March 10 vacatur that violated the APA. First, defendants decided not to follow the law and revert to the REPAYE repayment plan – established by a valid final rule – without any rulemaking, without considering the relevant data or the reliance millions of borrowers placed on the plan, and without any explanation for its action. This "shadow repeal" of REPAYE made the plan inaccessible despite clear law requiring the agency to revert to the prior existing rule after the vacatur. Second, defendants decided to involuntarily move all borrowers who are currently lawfully enrolled in REPAYE into another repayment plan. Third, defendants continue to deny benefits that had already accrued and were due. This motion for preliminary injunction requests short-term relief from the consequences of the first two unlawful actions by the defendants. Preliminary injunctive relief and a stay pursuant to 5 U.S.C. § 705 are necessary to ensure that Plaintiffs are not irreparably harmed by

1

Defendants' contravention of law.

Ultimately, the defendants' current conduct will have significant, irreparable consequences for plaintiffs resulting in concrete financial injury for which later remediation is unavailable. Plaintiffs are asking the court to enforce the status quo – the lawful, unchallenged regulation that requires the defendants to honor the REPAYE plan and allow plaintiffs to remain in REPAYE until the resolution of this case.

II.    **BACKGROUND**

a.    **Income-Contingent Repayment and REPAYE**

Congress has long required the Department of Education to offer Direct Loan borrowers income-driven repayment. These programs have fallen under two statutory grants of authority; income-based repayment (IBR) and income-contingent repayment (ICR). The ICR statute directs the Secretary to establish, by regulation, repayment plans that tie a borrower's monthly payment to income and that discharge any remaining balance after a set number of qualifying payments. 20 U.S.C. § 1087e(d)(1)(D), (e).

Borrowers apply to repay their loans under any of these IDR plans using the Income Driven Repayment Plan Request for the William D. Ford Federal Direct Loans and Federal Family Education Loan Programs form. Borrowers may complete the form by submitting a paper copy or an online version. The form requires borrowers to select which repayment plan they are applying for and respond to additional questions that provide the information necessary to calculate the borrowers' monthly payment. Hinkle Decl. Ex. 11 (*Income-Driven Repayment (IDR) Plan Request*, OMB No. 1845-0102); *see also* U.S. Dep't of Educ., *Income-Driven Repayment (IDR) Plan Request*, https://studentaid.gov/sites/default/files/IncomeDrivenRepayment-en-us.pdf (last visited June 23, 2026). The current version of the form allows borrowers to select among IBR, PAYE, and ICR

2

repayment plans.[1] *Id*. Once submitted, defendants (through third party contractors) process these forms and if approved provide borrowers with a monthly payment amount based on the appropriate calculations under the plan the borrower requested. The resulting monthly payment amount is valid for 12 months. Borrowers must reapply annually based on their income.

In 2015, the Department exercised its authority under the ICR statute to promulgate REPAYE through notice-and-comment; and, as the Higher Education Act requires for Title IV regulations, negotiated rulemaking. *Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 80 Fed. Reg. 67,204 (Oct. 30, 2015) (codified at 34 C.F.R. § 685.209(c)); *See* 20 U.S.C. § 1098a. The plan was largely modeled on the existing PAYE plan, but allowed all Direct Loan borrowers to enroll regardless of when they took out the loans. *See id.* By contrast, PAYE eligibility is restricted to what the regulation referred to as "new borrowers," – people who had no student loans prior to October 1, 2007, and took out a loan after October 1, 2011. In addition, REPAYE provided added interest subsidies compared to PAYE. Under both plans, the Department of Education subsidizes 100 percent of the negative amortization effect of interest accrual for the first three years in the payment plan. REPAYE goes further; after the first three years borrowers in REPAYE benefit from a 50 percent subsidy on interest accrual indefinitely. *Id.*

For many borrowers – especially those with older loans – REPAYE reduced monthly payments compared to the other available plans, provided subsidies for interest accrual, and cancelled Direct Loan balances after 20 or 25 years of repayment, among other benefits. *See id.* By the time defendants first announced the SAVE rulemaking, millions of borrowers were

---

[1] In March 2025, defendants modified the form to remove SAVE as a repayment plan option due to the injunction in place at that time. As discussed below, defendants are in the process of updating the form again after the final judgement in *Missouri v Trump* and new repayment plan regulations. However, the proposed updates do not include adding REPAYE as an available repayment plan.

3

already relying on REPAYE. At that point, 3.3 million borrowers repaying nearly $200 billion in student loans relied on REPAYE, including plaintiff Havens. Hinkle Decl. Ex. 10; Havens Decl. ¶ 12.

### b. SAVE and *Missouri v. Biden*

In 2023, the Department amended the REPAYE regulations and rebranded the payment plan as SAVE. *See Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program*, 88 Fed. Reg. 43,820 (July 10, 2023). The 2023 amendments lowered payments, accelerated discharge, and provided 'buyback' benefits, among other changes. *Id.* Under the buyback provisions, a borrower could pay an amount equal to their current monthly payment to convert prior periods of forbearance and deferment that did not count toward IDR discharge into periods that did count toward IDR discharge. *Id*.

After a group of states challenged SAVE, the Eastern District of Missouri preliminarily enjoined the loan-forgiveness provisions, and the Eighth Circuit expanded that injunction to the entire SAVE Final Rule. *Missouri v. Biden*, No. 4:24-cv-520-JAR, 2024 WL 3104514 (E.D. Mo. June 24, 2024) (enjoining SAVE's loan-forgiveness provisions), *aff'd and remanded with instructions to enjoin the entire Final Rule*, 128 F.4th 979 (8th Cir. 2025).

On December 9, 2025, the parties announced a proposed settlement. Under the publicly available terms of the settlement, the Department agreed that it would, "not forgive loans under the SAVE Plan (or under the REPAYE plan) using the Department of Education's income-contingent repayment (ICR) authority…" Settlement Agreement ¶ 9, *Missouri v. Trump* (Hinkle Decl. Ex. 2).

The settlement went even further to ostensibly commit the Department to, "not enforce the original REPAYE rule or otherwise enroll any borrowers, including SAVE borrowers, into

the original REPAYE Plan." *Id.* ¶ 11.

However, on February 27, 2026, the District Court dismissed the lawsuit, finding that the Administration's failure to defend the SAVE plan robbed the court of jurisdiction, as there was no longer a "live case or controversy" between the parties. *See* Memorandum & Order Dismissing Case, *Missouri v. Trump*, 2026 WL 548660 (E.D. Mo. Feb. 27, 2026).

On the parties' joint request, the Eighth Circuit reversed the district court and directed it to enter a final judgment. Judgment, *Missouri v. Trump*, 2026 WL 696770 (8th Cir. Mar. 9, 2026). On March 10, 2026, the district court issued its final judgment vacating most of the SAVE Final Rule. Order at 1, *State of Missouri v. Trump*, No. 4:24-cv-00520-JAR (E.D. Mo. Mar. 10, 2026), ECF No. 102. (Hinkle Decl. Ex. 3)

Because the 2023 SAVE amendments modified the preexisting REPAYE rule, the vacatur of those amendments restored REPAYE by operation of law. "When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect." *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004); see *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983); *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 415–16 (D.D.C. 2020). Defendants' own post-vacatur rulemaking confirms the point: the Department's May 1, 2026, final rule sets a sunset date for REPAYE eligibility of June 30, 2028—a provision that would be meaningless unless REPAYE exists today. Reimagining and Improving Student Education— Federal Student Loan Program Final Regulations, 91 Fed. Reg. 23,768, 23,889 (May 1, 2026) (to be codified at 34 C.F.R. § 685.209).

### c.  Tax Consequences of Discharge

Prior to January 1, 2026, IDR discharges were not considered taxable income. *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9675, 135 Stat. 4, 185 (codified at 26 U.S.C. § 108(f)(5)). However, with the expiration of the American Rescue Plan Act provision, any

5

discharge on January 1, 2026, or later is considered taxable income. The Department treats the effective date of discharge — not the date on which it processes the discharge — as controlling for this purpose. In *Am. Fed'n of Teachers v. U.S. Dep't of Educ.*, No. 1:25-cv-00802-RBW (D.D.C. Oct. 23, 2025), the court ordered that, "for their internal purposes, the [Department] shall use only the date a borrower becomes eligible to have their loans cancelled under the IBR, Original ICR, or PAYE plans as the effective date of discharge," Order, ECF No. 55, at 2, and further ordered the Department not to file an IRS Form 1099-C for borrowers who became eligible for discharge in 2025 and satisfy the conditions of IRS Notice 2022-1, *id.* (Hinkle Decl. Ex. 1). The effective date the Department assigns to a discharge therefore determines both the tax year in which the discharge falls and the Department's own information-reporting obligations, and thus whether the borrower incurs a federal tax liability on the forgiven balance.

The order includes a provision designed to protect borrowers who applied to change repayment plans before January 1, 2026, from tax consequences that would accrue due to delay in processing. *Id at 2.* However, that backdating provision applies only where a borrower "applies to transfer to one of the IBR, Original ICR, or PAYE plans on or before December 31, 2025," and that application "is approved on or after January 1, 2026." *Id.* In that specific circumstance, the borrower's earlier cancellation-eligibility date "constitutes the effective date of their loan discharge, even if that date falls on or before the date the borrower's application was approved." *Id*. The order extends no comparable protection to borrowers who apply for, or are involuntarily transferred to, a different repayment plan after December 31, 2025.

### d. Defendants are Required to Honor their Own Regulation

An agency is bound to administer its own rules until it lawfully amends or repeals them. *Nat'l Family Planning & Reproductive Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992). "Agencies must abide by their rules and regulations." *Reuters Ltd. v. FCC*, 781 F.2d 946,

6

947 (D.C. Cir. 1986); . The Higher Education Act independently requires Defendants to offer an ICR plan to Direct Loan borrowers, and the statute leaves the choice among the lawfully promulgated plans to the borrower. Until Defendants amend the regulations through the rulemaking the APA and HEA require, REPAYE remains an available plan that Defendants must honor.

## III.    DISCUSSION

### a.    Plaintiffs have standing

A plaintiff seeking a preliminary injunction must show "a substantial likelihood of standing." *Elec. Privacy Info. Ctr. v. Pres. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017). Each Plaintiff has suffered, or will imminently suffer, a concrete and particularized injury: involuntarily moving Plaintiffs off REPAYE will, depending on the plaintiff, either raise their monthly payments under a non-REPAYE plan or impose a significant tax burden by shifting the effective date of their loan discharge into 2026 or later. These injuries are concrete and quantified in the accompanying declarations. The lowest non-REPAYE monthly payment for which Havens is eligible is $588 — roughly $196 more than she would pay under REPAYE; for Boykin, $124 — roughly $41 more; and for Grunseth, $76 per month, none of which she would owe if the discharge she has already earned were honored. Havens Decl. ¶ 14; Boykin Decl. ¶ 6; Grunseth Decl. ¶ 7. Havens and Robeson separately face tax on roughly $64,000 and $90,000 of discharged debt, respectively, if their discharge effective dates fall in 2026 or later — a liability that, for Robeson, would exceed her entire annual income of approximately $8,000. Havens Decl. ¶¶ 7–8, 10; Robeson Decl. ¶¶ 2–3, 6.

The downstream consequences of the shadow repeal of REPAYE and involuntary change in repayment plan are significant too. All plaintiffs are due loan discharge under the automatic discharge or the IDR buyback provisions of SAVE. These losses are both "(a) concrete and

7

particularized, and (b) actual or imminent, not conjectural or hypothetical," as required to constitute an injury-in-fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 978 (D.C. Cir. 2016) (recognizing that "plaintiffs have long been empowered to challenge the rescission of government benefits in federal court"). They are also traceable to the challenged actions, without which plaintiffs would remain in REPAYE. Preliminarily enjoining defendants' shadow repeal of REPAYE and staying the involuntary change in repayment plans will preserve the status quo so plaintiffs are not forced to make additional unnecessary payments and face the tax consequences of post-2025 loan discharge before the full merits of the case can be decided. Those injuries are directly traceable to Defendants' challenged conduct, and they would be redressed by an order requiring defendants to honor REPAYE and to refrain from forced transfers. That is all Article III requires.

### b. Injunctive Relief is Appropriate

When seeking a temporary restraining order or a preliminary injunction, the moving party must show: "1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "These four considerations are factors, not elements." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,* 775 F. Supp. 3d 100, 121(D.D.C. 2025). So, "a district court must 'balance the strengths of the requesting party's arguments in each of the four required areas." *Chaplaincy*, 454 F.3d at 297 (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

Plaintiffs move for a preliminary injunction and stay to preserve the status quo that is disrupted by two actions of the defendants. First, defendants' shadow repeal of the REPAYE rule

8

is unlawful under 5 U.S.C. § 706(1) & (2); and second, defendants' decision to involuntarily move borrowers off REPAYE is unlawful under 5 U.S.C. § 706(2).

### c. Plaintiffs are Likely to Succeed on the Merits of their Claims that Defendants Repealed the REPAYE Plan without Authority and will Involuntarily Change Repayment Plans for Borrowers Enrolled in REPAYE Unlawfully

The Administrative Procedure Act (APA) provides for judicial review of final agency actions, 5 U.S.C. §§ 702, 704, and directs courts to vacate such actions if they are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C); or "without observance of procedure required by law," 5 U.S.C. § 706(2)(D). The APA also directs courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Plaintiffs are likely to show that Department's actions should be set aside under these standards.

### i. The Department of Education's actions are reviewable final agency actions

Plaintiffs request preliminary relief from two separate, but related final agency actions: (1) the shadow repeal of the REPAYE repayment plan, and (2) the decision to involuntarily move borrowers lawfully enrolled in REPAYE into a different repayment plan. Both are final agency actions reviewable under section 704 of the APA.

To be "final," agency action must "mark the 'consummation' of the agency's decision making process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted).

The defendants' actions leave little doubt that they have shadow repealed the REPAYE

9

plan. In its settlement agreement with the *Missouri v. Trump* plaintiffs, it committed to, "not enforce the original REPAYE rule or otherwise enroll any borrowers, including SAVE borrowers, into the original REPAYE Plan." Settlement Agreement, Hinkle Decl. Ex. 2. At the same time, defendants have not restarted payments under REPAYE for borrowers who were enrolled in SAVE prior to the vacatur or made access to that plan unavailable by application.

Defendants confirmed this policy in a recent update to the form used by borrowers to apply for IDR plans. On April 20, 2026, the Department of Education announced in the Federal Register that it was updating the Income-Driven Repayment Plan Request form. Agency Information Collection Activities; Comment Request; Income Driven Repayment Plan Request for the William D. Ford Federal Direct Loans and Federal Family Education Loan Programs, 91 Fed. Reg. 20,989, 20,990 (Apr. 20, 2026) (notice of proposed revision to IDR Plan Request form, OMB Control No. 1845-0102).

That notice explains that there are three ICR based repayment plans but that, "[t]he court action effective March 10, 2026, invalidates the SAVE Plan and the OBBBA requires the remaining income-contingent plans be sunset by July 1, 2028." *Id.* The notice provides no updates to SAVE or REPAYE because, "the SAVE Plan was removed in a previous version of the form as a result of a court injunction." *Id*. In other words, following the SAVE vacatur defendants affirmatively acted to update the IDR application form and did not revise it to include REPAYE as an option. The notice operates as if the vacatur of the SAVE Final Rule also vacated the prior regulation. It did not, and cannot.

The Department's treatment of plaintiffs confirms that the shadow repeal is determining rights and obligations. Robeson was told on March 4, 2026 that the only path to a discharge was to apply for a different plan, and the agent was unaware that the injunction had even been lifted.

10

Robeson Decl. ¶ 5. And when Boykin attempted to select SAVE or REPAYE through the income-driven-repayment application on studentaid.gov on March 6, 2026, neither plan was available, and the site stated that SAVE remained enjoined by the Eighth Circuit. Boykin Decl. ¶ 5. Plaintiff Havens's account remains coded as a SAVE-plan account in administrative forbearance, and the Department has removed REPAYE from its IDR application and payment calculator. Hinkle Decl. Ex. 5; Havens Decl. ¶ 13. Hinkle Decl. Ex. 5; *see* Hinkle Decl. Exs. 6-9 (Plaintiffs' use of the Department's Loan Simulator does not display REPAYE as an option); Hinkle Decl. Ex. 11 (current IDR Plan Request form listing only IBR, PAYE, and ICR). These are not isolated servicing errors; they are the uniform implementation of a single decision to treat REPAYE as a dead letter — the "consummation" of the agency's decision making from which "legal consequences flow." *Bennett*, 520 U.S. at 177–78.

On March 27, 2026, defendants announced that, beginning July 1, 2026, loan servicers would notify SAVE enrollees of a deadline of at least 90 days to enroll in a different repayment plan. Press Release, U.S. Dep't of Educ., *U.S. Department of Education Announces Next Steps for Borrowers Enrolled in the Unlawful SAVE Plan* (Mar. 27, 2026) (Hinkle Decl. Ex. 4), https://www.ed.gov/about/news/press-release/us-department-of-education-announces-next-steps-borrowers-enrolled-unlawful-save-plan.  The press release explained that borrowers currently enrolled in SAVE can choose a different plan. As discussed above, defendants eliminated the ability for borrowers to apply for REPAYE. Borrowers who do not apply for a different plan within the 90-day period will be automatically enrolled into either the Standard Repayment Plan, or the new Tiered Standard Plan.

> ii.  *This Court Is Likely to Set Aside Defendants' Shadow Repeal of REPAYE Under § 706(2)(D)*

Section 706(2)(D) directs courts to "hold unlawful and set aside agency action" taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Repealing a rule is itself rulemaking: the APA defines "rule making" to include "repealing a rule," 5 U.S.C. § 551(5), and an agency accordingly must "use the same procedures when [it] amend[s] or repeal[s] a rule as [it] used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). For a legislative rule, those procedures are notice and comment under § 553. The Higher Education Act further requires defendants to engage in negotiated rulemaking for all regulations pertaining to student assistance programs – including federal student loans. 20 U.S.C. § 1098a

An agency cannot evade these obligation by undoing a rule indirectly: suspending a rule, declining to administer it, or otherwise treating it as a nullity is tantamount to amending or revoking it and requires the same notice-and-comment process. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6–9 (D.C. Cir. 2017); *see also Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) (enjoining suspension of a rule undertaken without notice and comment); *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5 (D.D.C. 2017) (vacating delay of a rule's implementation for the same defect). Requiring notice and comment before repeal "ensures that an agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal." *Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564, 568 (D.C. Cir. 2022) (quoting *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982)).

The REPAYE plan is a legislative rule the Department adopted through notice-and-comment rulemaking — indeed, through the negotiated rulemaking the HEA requires for Title IV regulations. *See* 20 U.S.C. § 1098a. As far as plaintiffs can identify, the only public statement

12

about the shadow repeal of REPAYE is the *Missouri v Trump* settlement agreement itself which provides no indication of the basis for defendants' decision. Indeed, defendants agreed that negotiated rulemaking is a required step in the settlement agreement itself. At no point have defendants engaged in rulemaking of any kind nor explained why repealing the REPAYE plan could be exempt from the requirements imposed by the APA or HEA. In violating the APA and HEA's rulemaking requirements, defendants acted without observance for the procedures of law.

      iii.    *This Court Is Likely to Set Aside the Shadow Repeal of REPAYE and the Forced Transfer of Borrowers Under § 706(2)(C)*

Section 706(2)(C) directs courts to "hold unlawful and set aside agency action," when such action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Agencies are bound to administer their own rules until they are amended or revoked. *Nat'l Family Planning*, 979 F.2d at 234. Indeed, "[a] precept which lies at the foundation of the modern administrative state is that agencies must abide by their rules and regulations." *Reuters Ltd. v. FCC*, 781 F.2d 946, 947 (D.C. Cir. 1986).

Furthermore, the Higher Education Act mandates that defendants offer the repayment plans it created by regulation and until defendants conduct another rulemaking, REPAYE remains one of those plans. In fact, the recently passed One Big Beautiful Bill Act (OBBBA) confirms this statutory mandate directly. 20 U.S.C. § 1087e(d) directs the Secretary of Education to offer certain repayment options to borrowers with outstanding loans before July 1, 2026. For these existing borrowers – like plaintiffs – the statute explains that, "[c]onsistent with criteria established by the Secretary, the Secretary shall offer…" direct loan borrowers, "a variety of plans…" While the statute mandates that the Secretary offer the repayment plans provided for by regulation, "[t]he borrower may choose" among them. The only lawful way to change the

13

established criteria is through rulemaking which defendants haven't done so REPAYE remains one of the "criteria established by the Secretary." *See* 5 U.S.C. § 553;  20 U.S.C. § 1098a. That is, the statute requires defendants to offer plans under the terms they lay out in rulemaking; for example, REPAYE. Congress reaffirmed this duty as recently as last year. Pub. L. No. 119-21, 139 Stat. 72, 337 (2025) (codified as amended at 20 U.S.C. § 1087e(d)).

Following the March 10, 2026, vacatur of the SAVE Final Rule, the operative regulation reverted to REPAYE and as of this moment, the only lawful understanding of the repayment status for borrowers that were previously enrolled in SAVE is that they are now enrolled in REPAYE. Yet, defendants shadow repeal of REPAYE exceeds the agency's limitations on what repayment plans it is required to offer. Defendants stated clearly in the *Missouri v. Trump* settlement that they would not enroll any borrowers in REPAYE and they in fact have not. Defendants have not provided updated billing statements to plaintiffs reflecting the REPAYE formula, have not provided loan discharge as required by the REPAYE regulation, or even updated their accounts to reflect that the loans are enrolled in REPAYE – they remain in 'SAVE Forbearance.' Nor have they made REPAYE an available repayment option for Plaintiff Boykin.

Likewise, the decision to involuntarily move borrowers lawfully enrolled in the REPAYE repayment plan into another option exceeds the agency's statutory authority. The statutory language and structure clearly gives borrowers the primary authority to select their repayment plan among the lawfully promulgated options. Following vacatur, REPAYE is the lawful regulation which defendants are required to offer and which plaintiffs "may choose." This is by design. The statute does not always leave the option to the borrower. Instead, it specifies the specific circumstances in which the Secretary has the authority to select a repayment plan on a borrower's behalf.

14

Under the statutory scheme, the Secretary may select or require a repayment plan for a borrower in two circumstances: if the borrower does not select a plan, 20 U.S.C. § 1087e(d)(2), or if the borrower previously defaulted the Secretary may require the borrower to repay under an income-based repayment plan. 20 U.S.C. § 1087e(d)(5)(B). Neither scenario applies to plaintiffs.

Had Congress wanted to provide the Secretary with broad authority to require repayment by borrowers under certain plans or exclude them from otherwise lawful repayment options, it would have. Rather, Congress gives borrowers the right to choose their repayment plan and defendants' decision to move borrowers currently enrolled in REPAYE into another repayment plan exceeds the statutory authority granted by Congress.

*iv.   This Court Is Likely to Set Aside Defendants' Actions Under § 706(2)(A)*

Even if defendants were acting within their authority, Section 706(2)(A) directs courts to "hold unlawful and set aside agency action," when such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  To pass muster, the agency "must examine the relevant data and articulate a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Id*. (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Agency action is generally deemed unlawful if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*.

15

The decision to shadow repeal the REPAYE Rule is contrary to law and arbitrary and capricious in at least three ways.

First, defendants have not articulated any explanation for its action. Administrative actions "must be judged" based on the grounds, "upon which the record discloses that its action was based." *SEC v. Chenery Corp.* 318 U.S. 80, 87 (1943); *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015))).

Here, the sum-total of justification for the action appears to be the *Missouri v. Trump* settlement – the press release that accompanies the settlement does not even mention REPAYE and only provides IDR background information back to the 2023 publication of the SAVE Final Rule. The settlement agreement provides no rationale and treats the termination of the REPAYE Rule as a footnote in settlement negotiated between two aligned parties. Without justification, the decision to shadow repeal the REPAYE Rule is facially unlawful.

If defendants believed, as they will no doubt argue, that the REPAYE plan shared the legal defects as the SAVE Final Rule articulated by the Eighth Circuit, they were obligated to articulate that view and take formal administrative steps to repeal the REPAYE Rule. Particularly, as is the case here, where defendants' own actions contradict that rationale. Defendants have not repealed and continue to offer borrowers access to the other two repayment plans authorized under the same statutory authority – Pay As You Earn (PAYE) and Income-Contingent Repayment (ICR). In fact, PAYE is so similar to REPAYE that one of the principle rationale's for creating REPAYE was to provide access to the same terms as PAYE for all

borrowers.[2] Finally, any attempt to justify the decision to shadow repeal REPAYE based on the non-final, preliminary assessment from the Eighth Circuit is an entirely distinct agency action from the vacatur of SAVE and clearly reviewable by this court.

Second, defendants appear to have failed entirely to consider the implications for this shadow repeal on borrowers and did not examine critical data in their possession. Agency action is arbitrary and capricious and not in accordance with the law where the agency fails to apprise itself of the economic consequences of an action. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011). Defendants are in possession of an incredible amount of repayment data, including income levels, expected monthly payments, and delinquency and default rates from decades of repayment. In particular, defendants could determine with specificity how many borrowers enrolled in REPAYE will have higher monthly costs under a different plan, how many will face major tax consequences if they are involuntarily moved to another plan, and how many additional years of repayment and interest accrual will result from its decision shadow repeal REPAYE.

Indeed, even a review of publicly available data show that millions of borrowers were relying on REPAYE **before** the defendants even announced the SAVE negotiated rulemaking. At that point, 3.3 million borrowers repaying nearly $200 billion in student loans relied on REPAYE, including plaintiff Havens. Hinkle Decl. Ex. 10. The benefits added by the SAVE Final Rule resulted in millions more enrolling in the plan. The most recently available data show more than 7 million borrowers were enrolled in REPAYE at the end of March 2026. *Id*. Collectively these borrowers are repaying nearly $400 billion in student loans. *Id*. For many of them, removing REPAYE will result in the same injuries faced by plaintiffs. There is no evidence that

[2] Only borrowers who took out loans on or after October 1, 2011 and who did not have any loans prior to October 1, 2007.

17

defendants considered the widespread impacts of their decision.

Third, defendants entirely failed to consider the reliance interests of plaintiffs and other borrowers. The 3.3 million borrowers who enrolled in REPAYE prior to SAVE did so presumably because it was the best repayment option for them. Many paid under that plan for years without incident. Following the SAVE Final Rule, borrowers' accounts were automatically updated to reflect the new monthly payment formula. Defendants were not "'writing on a blank slate'" and where therefore "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33.

Plaintiffs relied on the availability of the REPAYE plan in structuring their finances and made financial decisions based on the plan. For one, plaintiff Grunseth relied on lower monthly payments when making long-term financial decisions like purchasing a second car in April 2024 – after years of sharing a single vehicle with her spouse – in direct reliance on SAVE's reduced monthly payment and shortened discharge timeline, making additional contributions to her retirement savings, and planning a visit to her brother, who now lives overseas. Grunseth Decl. ¶¶ 3-4. Havens, too, made concrete financial decisions in reliance on the plan. After SAVE lowered her monthly payment, she used the freed-up funds to pay off a $2,200 credit-card balance. Havens Decl. ¶ 13. She had selected REPAYE as her best repayment option after consulting her servicer and had budgeted around its monthly payment, and her account has continuously shown her enrolled — scheduled to run through May 2029 — reinforcing her reasonable expectation that the plan would remain in place. Havens Decl. ¶ 12. Second, for plaintiffs Robeson and Havens, remaining in the plan was the only way to avoid the potential tax liability of loan discharge under another program. These interests reflect a subset of the broader

18

reliance interests of the more than seven million borrowers lawfully enrolled in REPAYE that defendants never considered.

> ### v. *This Court Is Likely to Compel Defendants to Recognize Plaintiffs Havens, Grunseth, and Robeson's Enrollment in REPAYE and to Provide Plaintiff Boykin a Mechanism to Apply, Under § 706(1)*

Section 706(1) of the Administrative Procedure Act states that courts "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A plaintiff proceeding under § 706(1) must establish two things: first, that the agency had a discrete, "ministerial or non-discretionary" duty "amount[ing] to a specific, unequivocal command," *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016); and second, that the agency "failed to take" that required action, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004).

Here the two criteria are easily satisfied. As discussed above, once the Department of Education has established a repayment plan through rulemaking – setting the eligibility criteria, repayment terms and other critical features – it has no discretion in whether to enroll borrowers in that plan when requested. Indeed, as discussed in section ii above, both basic administrative law principles and the Higher Education Act specifically command the result. All that remains for defendants to do is calculate monthly payments and conduct the regular activity required for loan servicing. These purely ministerial functions are exactly what defendants refuse to do.

Second, defendants' failure to take those actions is well documented. The *Missouri v. Trump* settlement, current loan status of plaintiffs' accounts reflected on studentaid.gov and their servicers' web portals, removal of REPAYE information from the IDR payment calculator, IDR application, and other places on the website all evidence this failure. Defendants should allow plaintiff Boykin to apply for REPAYE and update the other Plaintiffs' accounts to reflect that

19

they are enrolled in the REPAYE plan a rather than involuntarily move them to another, less favorable repayment option.

### d.  Defendants' Misconduct is Causing Plaintiffs Irreparable Harm

Plaintiffs injuries are "certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis in original).

While economic harm is generally not considered irreparable injury because of "adequate compensatory or other corrective relief . . . at a later date," here the nature of the claim forecloses that possibility. *Wis. Gas Co.*, 758 F.2d at 674 (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). In this case, plaintiffs have no avenue for later compensatory relief and therefore even the economic harm facing plaintiffs should be a factor in the irreparable-injury analysis. *Padgett v. Vilsack*, No. 1:24-cv-02425-LLA, slip op. at 6 (D.D.C. Aug. 30, 2024).

Plaintiffs face a range of imminent, irreparable harm for which later remediation is unavailable. Initially, plaintiffs Havens and Robeson face significant tax consequences if defendants are allowed to repeal REPAYE and involuntarily transfer borrowers to another repayment plan. Havens Decl. ¶ 10; Robeson Decl. ¶ 6. As discussed elsewhere, student loan discharges are non-taxable events if they occurred prior to January 1, 2026. Elsewhere, defendants have been ordered to determine the date of discharge, and whether it will issue income tax forms based on a discharge, based on the effective date of discharge rather than the date it is ultimately processed by defendants. *Am. Fed'n of Teachers*, ECF No. 55, at 2. Shadow repealing REPAYE – the plan Havens and Robeson are currently enrolled in – and moving them to a different repayment plan will push the effective date of their loan discharge in 2026 or later.

20

In other words, merely honoring the existence of REPAYE will save plaintiffs thousands of dollars in tax liability and involuntarily transferring them to another repayment will irreparably lock them into a new effective date and therefore a major tax obligation.

For plaintiff Grunseth, the shadow repeal of REPAYE and forced transition to a different repayment plan is likely to have significant financial consequences. Grunseth and her spouse have significant medical expenses and are facing mounting financial costs. Grunseth Decl. ¶ 4. Rising costs of living are cutting into their monthly budget, and Grunseth would use the savings to save for retirement. Grunseth and her spouse have lived in a 1-bedroom apartment for the past 10 years. The potential that payments could resume at a much higher rate makes it impossible for her to make any significant long-term financial plans like looking for a slightly bigger apartment or replacing an aging vehicle. Grunseth Decl. ¶ 7. In particular, the potential for higher monthly student loan bills is preventing Grunseth from saving for retirement or planning a trip to see her brother who moved overseas. *Id*. Increased, and unnecessary, student loan payments have direct financial trade offs for Grunseth's investments in her long-term financial stability and her family.

Finally, the shadow repeal of REPAYE will result in lost interest subsidies for plaintiff Havens. Havens initially enrolled in REPAYE in late 2018 and by operation of the rule, received a 100 percent subsidy benefit for any accrued interest until late 2021. Havens Decl. ¶ 3. At that point the subsidy reduced to 50 percent of accrued interest. The shadow repeal of REPAYE deprives Havens of the continued interest subsidy that she is entitled to and cannot receive but for REPAYE.

If plaintiffs are successful on the merits, there is no remediation for these injuries absent a preliminary injunction. Transferring Grunseth's repayment plan will result in immediate payments being due of approximately $76 per month. *Id*. The proposed preliminary injunction

will stop Grunseth from being forced to make these unlawful payments while the case resolves. This Court is not authorized to direct defendants to deposit more funds into Grunseth's IRA account if this challenge is successful and certainly cannot compensate her for the lost connection with her brother as she continues to delay visits.

Beyond the tax and payment harms, the forced transfer and the continued denial of accrued benefits inflict distinct, unrecoverable injuries. Higher or resumed monthly payments will push borrowers toward delinquency and default — Boykin attests that he would risk losing his transportation or defaulting on credit cards — damaging their credit and their ability to obtain a mortgage or auto loan. Boykin Decl. ¶ 7. Havens has already lived this harm: in 2022 she was denied a mortgage because her debt-to-income ratio was too high, driven by the very student-loan balance that should have been discharged. Havens Decl. ¶ 11. At the same time, interest will accrue and capitalize on balances that should already have been discharged, and plaintiffs will lose qualifying months toward IDR discharge that cannot be re-earned once the time passes. Because the APA waives sovereign immunity only for relief "other than money damages," 5 U.S.C. § 702, none of these losses can be remedied by a later judgment. That is the definition of irreparable harm.

e.  **The public interest and balance of equities warrants a stay**

When a government entity is a party to the case, the third and fourth factors merge. *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). "There is generally no public interest in the perpetuation of an unlawful agency action." *Id*. (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the

22

federal laws." *Id*. (citation omitted).

Those interests are at their apex here. In weighing the public interest, the Court must give "particular regard for the public consequences" of the relief it orders, *Winter v. NRDC*, 555 U.S. 7, 24 (2008), and the consequences here are vast: more than seven million borrowers were enrolled in REPAYE as of March 2026, and the defendants' refusal to administer the plan threatens each of them with higher payments, lost discharge time, and, for many, default. This Court has held that precisely this kind of widespread harm "tip[s] the public interest heavily in favor" of relief. *Nat'l Council of Nonprofits,* 775 F. Supp. 3d at 112. The breadth of that harm bears on the public-interest factor; it does not expand the remedy, which Plaintiffs ask the Court to tailor as set out above.

### f.    The Requested § 705 Stay Is Not Subject to the Limits on Universal Injunctions

Plaintiffs principally seek a stay under 5 U.S.C. § 705, the APA's preliminary-relief provision, which authorizes a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." A section 705 stay operates on the challenged agency action, not on the parties. A court in this District recently rejected the government's argument that *CASA* limits section 705 relief to the named plaintiffs, holding that a section 705 stay is not a party-specific remedy and that "courts in this circuit have . . . consistently applied section 705 to permit wholesale, rather than party-specific, stays of agency action." *Cabrera v. U.S. Dep't of Labor*, No. 25-cv-1909 (DLF), 2025 WL 2092026 (D.D.C. July 25, 2025). A section 705 stay of Defendants' shadow repeal and forced-transfer policy thus preserves the status quo as to the challenged actions as a whole, pending final judgment.

That conclusion has particular force here. Plaintiffs challenge a single, across-the-board

decision to stop administering REPAYE and to move borrowers off the plan—not a series of party-by-party determinations. A stay postponing the effective date of that action cannot logically be confined to four borrowers, because the action either has effect or it does not.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and, pursuant to 5 U.S.C. § 705, (1) stay the Department's shadow repeal of the REPAYE plan to preserve borrowers' status and rights and (2) postpone the effective date of the Department's policy of involuntarily transferring REPAYE borrowers to other plans, in each case pending final judgment — relief that, because it operates against the agency action itself, applies nationwide. In the alternative, Plaintiffs request a preliminary injunction running to the four named Plaintiffs. Plaintiffs further request that because the requested relief asks only that the Department administer its own valid regulation, that the Court waive any bond under Federal Rule of Civil Procedure 65(c).

Dated: June 23, 2026                    Respectfully submitted,

                                        */s/ W. Austin Hinkle*
                                        William Austin Hinkle
                                        D.C. Bar No. 90043756
                                        Public Goods Practice LLP
                                        1502 W 7th St. STE 100
                                        Erie, PA 16502
                                        (215) 931-9240

                                        Paul Delaney Mayer (admitted pro hac vice)
                                        D.C. Bar No.1671773
                                        Public Goods Practice LLP
                                        1717 N Street NW STE 1
                                        Washington, DC 20036

                                        *Counsel for Plaintiffs*

24

**CERTIFICATE OF SERVICE**

I certify that on June 23, 2026, a true and accurate copy of the forgoing document was

electronically filed through the Court's CM/ECF System. This document was distributed via that system.

*/s/ William Austin Hinkle*
William Austin Hinkle