**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HEATHER HAVENS, *et al.*,

                Plaintiffs,

         v.                              No. 1:26-cv-816-LLA

U.S. DEPARTMENT OF EDUCATION, *et al.*,

                Defendants.

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION AND STAY</u>**

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................................1

BACKGROUND..................................................................................................................................2

I.      Factual and Regulatory Background......................................................................................2

        A.      Overview of Student Loan Forgiveness...................................................................2

        B.      REPAYE and SAVE..................................................................................................3

II.     The Courts Enjoin SAVE and Then REPAYE ....................................................................4

        A.      Loan Forgiveness Under SAVE Was Enjoined in June 2024; Monthly Payments
                Under SAVE Was Enjoined in July 2024; and Loan Forgiveness Under REPAYE
                Was Enjoined in August 2024 ...................................................................................4

        B.      Congress Abolishes ICR Plans and Gives the Agency Two Years to Move
                ICR Borrowers to New Plans....................................................................................6

        C.      Defendants Settle *Missouri v. Trump*, and Plaintiffs Belatedly Jump In ..........8

        D.      The Situation Today..................................................................................................10

III.    Plaintiffs' Allegations .........................................................................................................10

        A.      Plaintiffs Ask Defendants to Reinstate REPAYE for the Second Time .....................10

        B.      Plaintiffs' Various Theories of Injury ...................................................................11

LEGAL STANDARD.......................................................................................................................13

ARGUMENT ....................................................................................................................................14

I.      Plaintiffs Have Failed to Show Irreparable Harm, and Lack Article III Standing for Many of
        Their Claims........................................................................................................................14

        A.      Plaintiffs Havens and Robeson's Tax Injuries Do Not Establish Standing, Much Less
                Irreparable Harm, to Sue on REPAYE's Loan Forgiveness Rules.............................15

                1.      Any Tax Liability Would Be Self-Inflicted, Which Refutes Both
                        Injury-in-Fact and Causation.................................................................15

                2.      The Department of Education Did Not Cause Plaintiffs' Injuries, and
                        an Injunction Against the Agency Would Not Redress Them ........................17

                3.      Tax Injuries Are Usually Litigated in Tax Court ................................................18

i

B.  No Plaintiff Is Injured by REPAYE's Shorter Payment Term, Because REPAYE Will Sunset Before Any Remaining Loans Are Forgiven ................................................19

C.  Plaintiffs Grunseth and Boykin's Claim that REPAYE Would Lower Their Monthly Payments Does Not Show Irreparable Harm ..................................................................19

D.  Plaintiff Havens' Alleged Loss of Interest Subsidies Is Not Irreparable Harm ..........21

E.  Plaintiffs' Litigation Strategy Confirms Emergency Relief Is Unnecessary .................22

   1.  Plaintiffs Delayed Bringing These Claims for Months .....................................22

   2.  Plaintiffs Did Not Move for Emergency Relief on a Third Legal Theory That, If True, Would Moot This Motion ..........................................23

II.  Plaintiffs Have Not Pleaded a Plausible Claim, Much Less Shown That They Are Likely to Succeed on the Merits ...............................................................................................................24

A.  The REPAYE Claim Fails ................................................................................................24

   1.  The Eighth Circuit Already Rejected Plaintiffs' Proposed Solution ...............24

   2.  When a Court Invalidates a Rule on Grounds that Would Also Invalidate the Earlier Rule, Agencies Do Not Have to Reinstate the Earlier Rule ...................................................................................................25

B.  Plaintiffs' SAVE Transition Claim Fails ........................................................................28

   1.  The SAVE Transition Claim Stands and Falls With the REPAYE Claim ...............................................................................................................28

   2.  The Decision to Start the SAVE Transition on July 1, 2026 Was Not Arbitrary or Capricious .............................................................................29

C.  [MTD Only] The Current Complaint's Retroactive-Benefits Allegations Merely Repackage the Original Complaint's Legally Deficient Allegations ..............................30

   1.  Plaintiffs Lost Any Forward-Looking Entitlement to Regulatory Benefits When the Relevant Regulatory Provisions Were Vacated .................30

   2.  Plaintiffs Cannot Claim Regulatory Benefits From the Eleven Days the SAVE Plan Final Rule Was Temporarily Enforceable .............................32

      i.  The Eighth Circuit's Order Undoing the District Court's Dismissal of *Missouri* Applies Retroactively ..........................................32

      ii.  Plaintiffs Are Not Entitled to Equitable Non-Retroactivity ..............33

   3.  Judicial Comity Counsels Against Equitable Relief, and Would Even Support a Stay of Proceedings or Dismissal ......................................................36

ii

III.    The Balance of Equities and the Public Interest Favor the Government .................................38

IV.    Any Relief Should Be Limited to the Named Plaintiffs and Should Only Keep
Them in SAVE, Rather than Reinstate REPAYE on a Temporary Basis .................................40

    A.    *Trump v. CASA* Directs Courts to Limit Injunctive Relief to the Parties ....................40

    B.    *Trump v. CASA* Directs Courts to Explore Alternatives to Programmatic Relief ......41

    C.    The Traditional Equitable Principles *CASA* Outlined Apply to APA § 705 ..............42

V.    If the Court Issues Injunctive Relief, the Court Should Issue a Stay Pending
Appeal and Require Plaintiffs to Post Security .............................................................................43

CONCLUSION.............................................................................................................................................44

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Action on Smoking & Health v. Civil Aeronautics Board (ASH I),*
699 F.2d 1209 (D.C. Cir. 1983) ...................................................................................27

*Action on Smoking & Health v. Civil Aeronautics Board (ASH II),*
713 F.2d 795 (D.C. Cir. 1983) ...............................................................................26, 27

*Al-Aulaqi v. Obama,*
727 F. Supp. 2d 1 (D.D.C. 2010) ................................................................................13

*Alcresta Therapeutics, Inc. v. Azar,*
318 F. Supp. 3d 321 (D.D.C. 2018) ............................................................................13

*Ali v. Rumsfeld,*
649 F.3d 762 (D.C. Cir. 2011) ....................................................................................31

*Allina Health Servs. v. Sebelius,*
756 F. Supp. 2d 61 (D.D.C. 2010) ..............................................................................20

*Alpine Sec. Corp. v. FINRA,*
121 F.4th 1314 (D.C. Cir. 2024)..................................................................................14

*American Great Lakes Ports Ass'n v. Schultz,*
962 F.3d 510 (D.C. Cir. 2020) ....................................................................................41

*American Health Care Ass'n v. Sullivan,*
1991 WL 154456 (D.D.C. May 30, 1991) ...................................................................23

*Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.,*
249 U.S. 134 (1919) ...............................................................................................35, 43

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .....................................................................................................14

*Azar v. Allina Health Servs.,*
587 U.S. 566 (2019) .....................................................................................................28

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .....................................................................................................14

*Benisek v. Lamone,*
585 U.S. 155 (2018) .....................................................................................................22

*Bergh v. Washington,*
535 F.2d 505 (9th Cir. 1976) ................................................................................................36

*Biden v. Missouri,*
145 S. Ct. 109 (2024) ...........................................................................................................5

*Bowen v. Georgetown University Hospital,*
488 U.S. 204 (1988) ..................................................................................................... 26, 33

*Burlington N., Inc. v. United States,*
459 U.S. 131 (1982) .............................................................................................................26

*Burlington Res. Oil & Gas Co. v. U.S. Dep't of Interior,*
21 F. Supp. 2d 1 (D.D.C. 1998) ...........................................................................................33

*C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.,*
310 F.3d 197 (D.C. Cir. 2002) ............................................................................................31

*Cabrera v. U.S. Dep't of Labor,*
792 F. Supp. 3d 91 (D.D.C. 2025) ......................................................................................43

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) ...............................................................................................42

*California v. Grace Brethren Church,*
457 U.S. 393 (1982) ............................................................................................................19

*California v. Texas,*
593 U.S. 659 (2021) ............................................................................................................17

*Cardinal Health, Inc. v. Holder,*
846 F. Supp. 2d 203 (D.D.C. 2012) .....................................................................................13

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ..................................................................................... 2, 15

*Children's Hosp. Ass'n of Tex. v. Azar,*
507 F. Supp. 3d 249 (D.D.C. 2020) .....................................................................................32

*Church v. Biden,*
573 F. Supp. 3d 118 (D.D.C. 2021) .....................................................................................13

*Citibank, N.A. v. Citytrust,*
756 F.2d 273 (2d Cir. 1985) ................................................................................................23

*Clean Fuels All. Am. v. U.S. EPA,*
169 F.4th 307 (D.C. Cir. 2026) ...........................................................................................31

*Cobelfret S.A. v. Joint Faith Shipping Co.*,
   2025 WL 4631995 (C.D. Cal. Dec. 31, 2025) ......................................................................21

*Cozzi v. CIR*,
   88 T.C. 435 (1987) ......................................................................................................17

*Cranford v. U.S. Dep't of Interior*,
   2026 WL 369717 (D.D.C. Feb. 10, 2026) ..........................................................................22

*Dallas Safari Club v. Bernhardt*,
   453 F. Supp. 3d 391 (D.D.C. 2020) ............................................................................ 22, 23

*Davis v. District of Columbia*,
   925 F.3d 1240 (D.C. Cir. 2019) ..................................................................................38

*De Csepel v. Republic of Hungary*,
   859 F.3d 1094 (D.C. Cir. 2017) ..................................................................................27

*Department of Education v. California*,
   604 U.S. 650 (2025) ....................................................................................................44

*Dorfmann v. Boozer*,
   414 F.2d 1168 (D.C. Cir. 1969) ..................................................................................13

*Douglas v. National Park Serv.*,
   _ F. Supp. 3d _, 2026 WL 1701344 (D.D.C. June 12, 2026) ..........................................22

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999) ......................................................................................44

*Edwards v. Vannoy*,
   593 U.S. 255 (2021) ....................................................................................................34

*Electric Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) ....................................................................................24

*Ellis v. CIR*,
   67 F. Supp. 3d 325 (D.D.C. 2014) ..............................................................................16

*Entergy, Ark. Inc. v. Nebraska*,
   241 F.3d 979 (8th Cir. 2001) ......................................................................................25

*Friends of the Earth, Inc. v. Weinberger*,
   562 F. Supp. 265 (D.D.C. 1983) ................................................................................31

*Fund for Animals v. Frizzell*,
   530 F.2d 982 (D.C. Cir. 1975) ....................................................................................22

*Gardner v. United States*,
211 F.3d 1305 (D.C. Cir. 2000) ........................................................................................19

*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011) ..........................................................................................22

*Green v. Mansour*,
474 U.S. 64 (1985) ............................................................................................................32

*Griffin v. County School Board*,
363 F.2d 206 (4th Cir. 1966) ............................................................................................35

*Gu v. U.S. Dep't of Treasury*,
2025 WL 3089260 (D.D.C. Nov. 5, 2025) .......................................................................16

*Gulf Oil Corp. v. Dep't of Energy*,
514 F. Supp. 1019 (D.D.C. 1981) .....................................................................................20

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ..........................................................................................................18

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .........................................................................................38

*Harper v. Virginia Dep't of Taxation*,
509 U.S. 86 (1993) ............................................................................................................32

*Harvey v. Fresquez*,
2011 WL 855875 (S.D.N.Y. Mar. 8, 2011) ......................................................................21

*Henderson v. United States*,
568 U.S. 266 (2013) ..........................................................................................................31

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ..........................................................................................................43

*Hi-Tech Pharmacal Co. v. U.S. FDA*,
587 F. Supp. 2d 1 (D.D.C. 2008) ......................................................................................20

*Immigrant Defenders Law Center v. Noem*,
145 F.4th 972 (9th Cir. 2025).............................................................................................42

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021) ..........................................................................................14

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ..........................................................................................14

vii

*Khadr v. United States*,
    529 F.3d 1112 (D.C. Cir. 2008) ................................................................................32

*Klayman v. Rao*,
    49 F.4th 550 (D.C. Cir. 2022) .......................................................................... 36, 37

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ....................................................................................................33

*Lovell v. United States*,
    795 F.2d 976 (11th Cir. 1986)....................................................................................23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................... 14, 15, 18, 25

*Manzanita Band of Kumeyaay Nation v. Wolf*,
    496 F. Supp. 3d 257 (D.D.C. 2020) ...........................................................................16

*Matos ex rel. Matos v. Clinton School Dist.*,
    367 F.3d 68 (1st Cir. 2004) ........................................................................................22

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ....................................................................................................13

*Menorah Med. Ctr. v. Heckler*,
    768 F.2d 292 (8th Cir. 1985)................................................................................ 6, 24

*Missouri ex rel. Nixon v. Prudential Health Care Plan, Inc.*,
    259 F.3d 949 (8th Cir. 2001) .....................................................................................37

*Missouri v. Biden*,
    112 F.4th 531 (8th Cir. 2024)............................................................................ 1, 3, 5

*Missouri v. Biden*,
    738 F. Supp. 3d 1113 (E.D. Mo. 2024) ............................................................. 4, 5, 37

*Missouri v. Biden*,
    2024 WL 3462265 (8th Cir. July 18, 2024) .................................................................5

*Missouri v. Trump*,
    128 F.4th 979 (8th Cir. 2025)..............................................................................*passim*

*Missouri v. Trump*,
    2026 WL 548660 (E.D. Mo. Feb. 27, 2026) ...............................................................8

*Missouri v. Trump*,
    2026 WL 696770 (8th Cir. Mar. 9, 2026) ...................................................................9

*Morgan Stanley Cap. Group v. Public Util. Dist. No. 1,*
  554 U.S. 527 (2008) ..................................................................................27

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ....................................................................................15

*N. Air Cargo v. USPS,*
  756 F. Supp. 2d 116 (D.D.C. 2010) ...........................................................20

*National Family Planning & Repro. Health Ass'n, Inc. v. Gonzales,*
  468 F.3d 826 (D.C. Cir. 2006) ...................................................................16

*National Fuel Gas Supply Corp. v. FERC,*
  59 F.3d 1281 (D.C. Cir. 1995) ...................................................................33

*National Institutes of Health v. American Pub. Health Ass'n,*
  145 S. Ct. 2658 (2025) ...............................................................................44

*Nat'l Treasury Emps. Union v. Trump,*
  No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) .......................44

*New Hampshire v. Maine,*
  532 U.S. 742 (2001) ...................................................................................38

*Newdow v. Bush,*
  355 F. Supp. 2d 265 (D.D.C. 2005) ...........................................................23

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................. 14, 39

*NLRB v. Wyman-Gordon Co.,*
  394 U.S. 759 (1969) ...................................................................................27

*Oceana, Inc. v. Evans,*
  389 F. Supp. 2d 4 (D.D.C. 2005) ..........................................................1, 26, 27, 28

*Padgett v. Vilsack,*
  2024 WL 4006050 (D.D.C. Aug. 30, 2024) ......................................... 18, 19

*Pennsylvania v. DeVos,*
  480 F. Supp. 3d 47 (D.D.C. 2020) .............................................................14

*Petro-Chem Processing, Inc. v. EPA,*
  866 F.2d 433 (D.C. Cir. 1989) ...................................................................16

*Powers v. Ohio,*
  499 U.S. 400 (1991) ...................................................................................13

*Reynoldsville Casket Co. v. Hyde*,
 514 U.S. 749 (1995) ...................................................................................................33

*Schilling v. Rogers*,
 363 U.S. 666 (1960) ...................................................................................................31

*Second City Music, Inc. v. City of Chicago*,
 333 F.3d 846 (7th Cir. 2003) ....................................................................................16

*Seeger v. U.S. Dep't of Def.*,
 306 F. Supp. 3d 265 (D.D.C. 2018) .........................................................................16

*Sierra Club v. U.S. EPA*,
 793 F. Supp. 3d 158 (D.D.C. 2025) .........................................................................23

*Small Refiner Lead Phase-Down Task Force v. U.S. EPA*,
 705 F.2d 506 (D.C. Cir. 1983) ......................................................................1, 25, 26

*State of Nebraska Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*,
 435 F.3d 326 (D.C. Cir. 2006) ...........................................................................42, 43

*Stone & Webster, Inc. v. Georgia Power Co.*,
 965 F. Supp. 2d 56 (D.D.C. 2013), *aff'd*, 779 F.3d 614 (D.C. Cir. 2015) ............37

*Taylor v. FAA*,
 351 F. Supp. 3d 97 (D.D.C. 2018) ...........................................................................17

*Taylor v. Sturgell*,
 553 U.S. 880 (2008) ...................................................................................................18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ...................................................................................................14

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) ............................................................................................*passim*

*United States v. DAS Corp.*,
 18 F.4th 1032 (9th Cir. 2021) ...................................................................................18

*United States v. Goodner Bros. Aircraft, Inc.*,
 966 F.2d 380 (8th Cir. 1992) .....................................................................................33

*UtahAmerican Energy, Inc. v. Dep't of Labor*,
 685 F.3d 1118 (D.C. Cir. 2012) ....................................................................36, 37, 38

*Vermont v. Goldschmidt*,
 638 F.2d 482 (2d Cir. 1980) ................................................................................31, 35

x

*Virginia Society of Human Life, Inc. v. FEC,*
   263 F.3d 379 (4th Cir. 2001) ................................................................................43

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ..............................................................................................41

*Wilson v. Schnettler,*
   365 U.S. 381 (1961) ..............................................................................................37

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 24 (2008) .......................................................................................13, 25, 38

*Wisconsin Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 19, 20

*WorldCom, Inc. v. FCC,*
   246 F.3d 690 (D.C. Cir. 2001) ............................................................................28

*Younger v. Harris,*
   401 U.S. 37 (1971) ................................................................................................36

**Statutes**

5 U.S.C. § 705 ...............................................................................................................42

20 U.S.C. § 1078..............................................................................................................7

20 U.S.C. § 1087e..................................................................................................*passim*

20 U.S.C. § 1098e............................................................................................................3

26 U.S.C. § 61 ...............................................................................................................11

26 U.S.C. § 108 (2023)...................................................................................................11

26 U.S.C. § 6213.............................................................................................................19

American Rescue Plan Act of 2021, Pub. L. No. 117–2, 135 Stat. 4 .......................11

Higher Education Act of 1965 (HEA) §§ 451–460, 493C [20 U.S.C. §§ 1087a-1087j, 1098e] ......... 2, 3

One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21, 139 Stat. 72 (2025) .....................6, 8, 28, 29

**Rules**

FED. R. CIV. P. 12(b)(1)..................................................................................................14

FED. R. CIV. P. 12(b)(6) .................................................................................................14

FED. R. CIV. P. 65(c)..........................................................................................................44

**Regulations**

34 C.F.R. § 685.202..........................................................................................................22

34 C.F.R. § 685.205..........................................................................................................22

34 C.F.R. § 685.208............................................................................................................3

34 C.F.R. § 685.209.....................................................................................................*passim*

34 C.F.R. § 685.209 (2024) ................................................................................................4

34 C.F.R. § 685.211..........................................................................................................21

80 Fed. Reg. 67204 (Oct. 30, 2015)....................................................................................3

88 Fed. Reg. 43,820 (July 10, 2023)....................................................................................3

**Other Authorities**

Adam S. Minsky, *Huge Win For Borrowers As Student Loan Forgiveness Resumes for Millions*, FORBES (Oct. 17, 2025), *available at* forbes.com/sites/adamminsky/2025/10/17/huge-win-for-borrowers-as-student-loan-forgiveness-resumes-for-millions ..........................................................................16

Cong. Rec. S4146-4235 (June 30, 2025) ............................................................................16

"Interest Rates and Fees for Federal Student Loans," FEDERAL STUDENT AID [perma.cc/EL4H-9VHZ]..............................................................................................21

Kane & Lahav, 11A *Federal Practice & Procedure* § 2948.1 (3d ed. Apr. 2026 update)............................16

*One Big Beautiful Bill Act: Report of the Committee on the Budget, House of Representatives*, Book 1 of 2, H.R. Rep. 119-106 (2025)........................................................................................16

S. Amdt. 2848 ......................................................................................................................7

Tara Siegel Bernard, *Education Dept. Agrees to Resume More Student Loan Cancellations*, THE NEW YORK TIMES (Oct. 17, 2025), *available at* nytimes.com/2025/10/17/business/student-loan-cancellation-idr.html....................................................................................................................16

**INTRODUCTION**

This case is about whether a federal agency is required to reinstate a student loan repayment plan that the Eighth Circuit enjoined in August 2024 and declared unlawful in February 2025. In October 2015, Defendant Department of Education introduced the Revised Pay As You Earn (REPAYE) plan. In July 2023, the agency modified REPAYE and renamed it to Saving on a Valuable Education (SAVE). In June 2024, the U.S. District Court for the Eastern District of Missouri enjoined one of the SAVE Plan Final Rule's revisions to REPAYE, so the agency reinstated the corresponding portion of the 2015 rule. In response, the Eighth Circuit issued two universal preliminary injunctions against SAVE and REPAYE. *Missouri v. Biden*, 112 F.4th 531, 534 (8th Cir. 2024); *Missouri v. Trump*, 128 F.4th 979, 997-99 (8th Cir. 2025). The agency had created REPAYE and SAVE under color of the same statute, and the panel held both plans suffered from a common legal infirmity. *Id.* at 998.

"When an agency replaces an existing regulation with a new regulation, and [a court] vacate[s] all or part of the new regulation, … the better course is generally to vacate the new rule without reinstating the old rule[.]" *Small Refiner Lead Phase-Down Task Force v. U.S. EPA*, 705 F.2d 506, 545 (D.C. Cir. 1983). Vacatur reinstates older regulations that were "litigated and upheld," *Oceana, Inc. v. Evans*, 389 F. Supp. 2d 4, 7 (D.D.C. 2005), but here, the Eighth Circuit knocked out SAVE and REPAYE in one go. In response, the agency settled the suit by moving to vacate most of the SAVE Plan Final Rule and by agreeing to not reinstate REPAYE. In return, the *Missouri* plaintiffs acquiesced to two other loan forgiveness plans, which nearly three million borrowers rely on today. In early March 2026, the district court ordered vacatur. Three months later, these Plaintiffs moved for a preliminary injunction here, alleging that the vacatur automatically requires Defendants to reinstate REPAYE. That is an untimely attempt to relitigate what the agency already tried and failed to do in 2024. Not reinstating REPAYE was not unlawful, so the REPAYE claim should be dismissed.

The motion for preliminary injunction and stay independently fails because the irreparable harm allegations fail across the board and the complaint is riddled with discrete standing defects. The complaint principally alleges REPAYE would lower two Plaintiffs' tax bills, but the tax injuries are self-inflicted (the agency offered Plaintiffs in 2025 the relief they demand today), speculative (the

Internal Revenue Service is not a party and has not weighed in), or both. The other two plaintiffs seek $1,320 (total) in discounts on their monthly loan repayments over two years. But that is not *irreparable* harm. If this Court rules against the agency on the merits at final judgment, the agency can refund Plaintiffs' overpayments. And to support a preliminary injunction, even irreversible economic injuries must be "both certain and great," which these temporarily-lost and minor discounts are not. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Underscoring the absence of irreparable harm, Plaintiffs did not file this motion until over three months after vacatur. And the balance of the equities and public interest strongly favor preserving the *Missouri* settlement and the three million borrowers who rely on it over speculative and legally questionable benefits to less than a handful of Plaintiffs. On similar grounds, any injunction should be limited to the actual plaintiffs.

Finally, Plaintiffs' emergency motion excludes a third set of claims premised on the SAVE Plan Final Rule that (if true) would provide the relief they seek and more. Those claims fail, as they merely repackage the first complaint, which the Eighth Circuit fatally undercut the day it was filed. That is this case in miniature: everything Plaintiffs say today has been exhaustively argued before.

## BACKGROUND

### I.    Factual and Regulatory Background

#### A.    Overview of Student Loan Forgiveness

The Department of Education lends money to students attending institutions of higher education. Higher Education Act of 1965 (HEA) §§ 451–460, 493C [20 U.S.C. §§ 1087a-1087j, 1098e]. Over time, the federal government has developed a variety of programs to assist borrowers whose personal circumstances make it hard for them to repay their loans in full.

Income-Driven Repayment (IDR) is a catchall term for several loan repayment plans that have each historically provided for loan forgiveness. 34 C.F.R. § 685.209(a). As relevant, borrowers stop making monthly repayments after accumulating a certain amount of repayment credit—usually 240/300 months, or 20/25 years. *See id.* § 685.209(k). The number of required months is also called the "payment term." However, that by itself would not distinguish IDR from the "Standard," "Extended," or "Graduated" plans, which require borrowers to pay down the full balance of their

2

loans by the end of the payment term. *See id.* § 685.208. IDR plans set monthly loan payments that are usually lower than what it would mathematically take to repay the loans in full; this is sometimes called a "payment-threshold component." *See id.* § 685.209(f); *Missouri v. Biden*, 112 F.4th 531, 534 (8th Cir. 2024). Thus, historically, the agency forgave the balance of IDR loans at the end of the payment term.

The IDR plans were created under two statutes: the Income-Based Repayment (IBR) statute, HEA § 493C [20 U.S.C. § 1098e], and the Income Contingent Repayment (ICR) statute, HEA § 455(e) [20 U.S.C. § 1087e(e)]. Congress directly created the IBR plan by statute. The agency also created three ICR plans by regulation under color of the ICR statute: (1) Income Contingent Repayment (Original ICR), (2) Pay As You



Earn (PAYE), and (3) Revised Pay As You Earn (REPAYE), which was eventually rebranded as Saving on a Valuable Education (SAVE). 34 C.F.R. § 685.209(a).

## B.    REPAYE and SAVE

In 2015, the agency introduced the REPAYE plan, which forgave undergraduate-only loans after 20 years and all other loans after 25 years. *Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 80 Fed. Reg. 67204, 67205 (Oct. 30, 2015). REPAYE's monthly payment formula capped payments at 10 percent of adjusted gross income (AGI). *Id.* at 67208. Unlike PAYE, where monthly payments for married borrowers were calculated differently based on whether the couple filed their taxes separately or jointly, REPAYE usually combined "the AGI for each spouse … to calculate the monthly payment amount." *Id.* at 67210. Also unlike PAYE, there was no other cap on monthly payments, so high earners could theoretically pay more under REPAYE than PAYE. *See id.* at 67213.

In 2023, the agency made significant changes to REPAYE, and also renamed it SAVE. It did so through the final rule *Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program*, 88 Fed. Reg. 43,820 (July 10, 2023) (the

SAVE Plan Final Rule). Plaintiffs are four borrowers who are either enrolled in SAVE or previously applied to enroll in SAVE. First Amended Complaint (FAC) ¶¶ 98, 108, 109, 118, ECF 18.

As relevant here, in addition to the name change, the SAVE Plan Final Rule did three things. *First*, it set a new monthly repayment formula. *Missouri v. Trump*, 128 F.4th at 987-88 (in February 2024, over half of SAVE borrowers had a monthly payment of $0). *Second*, it generally provided for faster loan forgiveness by shortening the payment term under certain circumstances. *Id. Third*, it allowed borrowers to "buy back" non-qualifying months by "making an additional payment equal to or greater than their current" monthly loan payment. 88 Fed. Reg. at 43903; 34 C.F.R. § 685.209(k)(6)(i) (2024).

## II.     The Courts Enjoin SAVE and Then REPAYE

### A.     Loan Forgiveness Under SAVE Was Enjoined in June 2024; Monthly Payments Under SAVE Was Enjoined in July 2024; and Loan Forgiveness Under REPAYE Was Enjoined in August 2024

In April 2024, several states sued the agency in the Eastern District of Missouri to challenge the SAVE Plan. Complaint, *Missouri v. Biden*, No. 4:24-cv-520-JAR, ECF 1 (E.D. Mo. Apr. 9, 2024). The case presented questions of statutory interpretation and severability: whether the ICR statute authorized loan forgiveness, and whether the loan forgiveness provisions of regulations promulgated under color of the ICR statute could be severed from the monthly payment formulas.

That June, the district court issued a preliminary injunction (PI) against "any further loan forgiveness for borrowers under the Final Rule's SAVE plan." Preliminary Injunction, *Missouri*, ECF 36. But it severed loan forgiveness from the rest of the SAVE Plan Final Rule, letting borrowers keep accumulating credit toward forgiveness under SAVE's monthly payment formula. *Missouri v. Biden*, 738 F. Supp. 3d 1113, 1155-56 (E.D. Mo. 2024). The parties cross-appealed. *Missouri*, ECF 37 & 42.

Because the June 2024 order enjoined only SAVE's loan forgiveness provisions, the agency had to determine the legal effect of that injunction—specifically, what happens when a court enjoins (or vacates) a rule amending another rule, but only in part. The agency concluded that it had authority to reinstate REPAYE's corresponding loan forgiveness provisions. *See* Defendants' Response to Plaintiffs' Motion for Clarification, *Missouri*, ECF 52. After the June 2024 injunction, the agency directed borrowers enrolled in SAVE to continue repaying their loans under SAVE's monthly

4

payment formula, on the understanding that they would "not be eligible for loan forgiveness … for at least 20 years, as opposed to as early as 10 years." *Missouri v. Biden*, 112 F.4th at 535. The state plaintiffs and the Eighth Circuit later characterized the agency's response as the "hybrid rule" or "hybrid plan," *see id.*, but in the agency's view, the partial reinstatement of REPAYE was not a new "rule" because SAVE was not a new "plan." Rather, "because the Court … enjoined Defendants from implementing [only] the forgiveness-related provisions of 'the Final Rule's SAVE Plan,'" the agency argued that "those provisions of SAVE ha[d] *not* replaced the corresponding provisions of REPAYE," and SAVE's payment term and loan forgiveness provisions had simply "reverted to the terms of REPAYE." Defendants' Response to Plaintiffs' Motion for Clarification at 4, *supra*.

The *Missouri* plaintiffs moved for clarification to question REPAYE's partial reinstatement. The district court denied the motion, saying the original PI motion had challenged the SAVE Plan Final Rule but not the 2015 REPAYE Rule. Order of July 10, 2024, *Missouri*, ECF 54 ("The Court need not extend this injunction beyond the scope of the [SAVE Plan] Final Rule as Plaintiffs only sought injunctive relief from implementation of the Final Rule, which the Court has granted in part.").

The Eighth Circuit viewed the matter differently. In July, it administratively stayed the SAVE Plan Final Rule in full pending appeal, without comment. *Missouri v. Biden*, 2024 WL 3462265 (8th Cir. July 18, 2024). In August, it dissolved the administrative stay and, after summarizing the agency's reinstatement of REPAYE, enjoined "any further forgiveness of principal or interest, … not charging borrowers accrued interest, and … further implementing SAVE's payment-threshold provisions." *Missouri v. Biden*, 112 F.4th at 534-35, 538. The Supreme Court denied the Government's application to stay the injunction. *Biden v. Missouri*, 145 S. Ct. 109 (2024).

In February 2025, the Eighth Circuit formally overruled the district court's severability analysis and ordered the district court to expand its injunction to cover the entire SAVE Plan Final Rule, "as well as the hybrid rule." *Missouri v. Trump*, 128 F.4th at 998. Although the district court had determined that "the Final Rule still appear[s] to function adequately even if participants in the SAVE plan cannot receive forgiveness under the plan," 738 F. Supp. 3d at 1156, the Eighth Circuit disagreed; it held that SAVE's loan forgiveness provisions stood and fell with SAVE's monthly payment formula, as "most

5

borrowers repaying under SAVE will not repay even the principal of their loans if they follow the prescribed payment plan" and "'it would make little sense for an ICR plan to end in default,' which is what will happen for most borrowers enrolled in SAVE if forgiveness is enjoined while other provisions like the payment provisions remain in effect." 128 F.4th at 998 (citation omitted).

With respect to the agency's efforts to partially reinstate REPAYE, the Eighth Circuit further concluded that while under standard administrative law principles the Government would "[g]enerally" retain authority to "reinstate[]" valid regulations, the Government invalidly reinstated REPAYE's loan-forgiveness provisions after the district court's partial injunction in June 2024. It wrote that REPAYE "suffers from the same legal errors as the [rule] challenged here [that is, the SAVE Plan Final Rule] — the Secretary lacks the power to authorize loan forgiveness in an ICR plan." *Id.* (citing *Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 297 (8th Cir. 1985)). And REPAYE was (like SAVE) an ICR plan, structured to offer loan forgiveness under the same statutory-interpretation theory that the Eighth Circuit had now explicitly rejected in a precedential opinion. In other words, the Eighth Circuit held that the Government could not replace one unlawful rule by reinstating another rule that suffered from an identical legal infirmity.

In April 2025, the district court entered the expanded injunction, as required by the Eighth Circuit's mandate. Order, *Missouri*, ECF 69. The Government did not seek further appellate review.

B.    **Congress Abolishes ICR Plans and Gives the Agency Two Years to Move ICR Borrowers to New Plans**

On July 4, 2025, Congress enacted the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21, 139 Stat. 72, which sought to facilitate an orderly transition from ICR plans to other plans. *See* OBBBA subtitle C, §§ 82001-05, 138 Stat. at 337-49. The OBBBA repealed the ICR statute effective July 1, 2028. *Id.* § 82001(c)(1), (c)(3), 138 Stat. at 340-41. It created a new (statutory) plan, the Repayment Assistance Plan (RAP), and authorized the agency to begin administering RAP on July 1, 2026. *Id.* § 82001(b)(1)(D), (d), 13 Stat. at 338, 341. It also expanded access to IBR by removing that plan's "partial financial hardship" requirement. *See id.* § 82001(b)(1)(C), 138 Stat. at 138.

6

Then as now, the agency needed time to move borrowers enrolled in ICR plans to new plans. Usually, borrowers who want to enroll in an IDR plan must select and apply for that plan. 20 U.S.C. § 1087e(d)(1)-(2) ("[T]he Secretary shall offer a borrower of a loan … a variety of plans" and the borrower shall "select a repayment plan"). The application process can take several months. At present, the agency usually cannot move a borrower to an IDR plan unless they are in default. *See id.* § 1087e(d)(2) (usual rule is that the agency can assign a borrower only to a non-IDR plan), § 1078(m)(1) (special rule for defaulted borrowers). (Those rules will change on July 1, 2028. *See infra.*)

The OBBBA's drafters recognized this practical difficulty, at least in part. The version of the bill reported by the House Budget Committee would have given the agency nine months to complete the transition. *See One Big Beautiful Bill Act: Report of the Committee on the Budget, House of Representatives*, Book 1 of 2, at 173, H.R. Rep. 119-106 (2025) (Section 30021(a)(1)(A)-(B), "Authority to Transition to Income-Based Repayment Plans"). To incentivize ICR borrowers to choose a new plan, the committee version would have required the agency to move any borrowers still on an ICR plan by July 1, 2026 to the 10-year standard repayment plan, which does not allow loan forgiveness. *Id.* at 175 (Section 30021(b)(3), "Selection by Secretary").

However, it was not clear that the agency could actually move the 7.73 million borrowers enrolled in SAVE to a new plan within nine months while still giving borrowers a choice of plans. *See Portfolio by Repayment Plan*, FEDERAL STUDENT AID (Mar. 31, 2026), attached as **Exhibit I** to the Declaration of Winston Shi (Shi Decl.) (data entry for 2025 Q3—that is, June 30, 2025). At that time, it had a backlog of 1.5 million IDR applications and was processing around 200-300,000 applications a month. *See* Status Report of June 17, 2025, *American Fed. of Teachers v. U.S. Dep't of Educ. (AFT v. ED)*, No. 1:25-cv-802-RBW (D.D.C.), ECF 37, attached as **Exhibit J** to the Shi Decl.; Status Report of July 16, 2025, *AFT v. ED*, ECF 38, attached as **Exhibit K** to the Shi Decl. Even at 300,000 applications a month, it would need over 25 months to process every SAVE borrower's application.

On July 1, 2025, Senator Graham introduced a reconciliation amendment (S. Amdt. 2848) that extended the earlier draft's nine-month transition timeline. *See* Cong. Rec. S4146-4235, at S4218 (June 30, 2025). Congress passed the OBBBA two days later, and the President signed it on July 4, 2025.

As enacted, the OBBBA directs the agency to "take such steps as may be necessary to ensure that before July 1, 2028," ICR borrowers will choose a new plan. OBBBA § 82001(a)(1), 138 Stat. at 337, *codified as note to* 20 U.S.C. § 1087e. To incentivize ICR borrowers to pick a new plan, the OBBBA requires the agency to move any borrowers who do not pick a new plan by July 1, 2028 to RAP (if eligible) or IBR (if not). *Id.* § 82001(a)(3)(A), 138 Stat. at 337, *codified as note to* 20 U.S.C. § 1087e.

###### C.    Defendants Settle *Missouri v. Trump*, and Plaintiffs Belatedly Jump In

After Congress enacted the OBBBA, and while the injunction was in place, the parties settled *Missouri v. Trump*, as the Eighth Circuit had already resolved the core merits issues against the Government and the OBBBA had significantly altered the student loan regulatory regime.

The settlement agreement, which the agency publicly posted on its website, said the agency would no longer implement SAVE (or REPAYE), with one exception. *See* Settlement Agreement ¶¶ 9, 11, U.S. DEP'T OF EDUC. (Dec. 9, 2025) [perma.cc/T32E-7CLZ]. It added that the parties would ask the Court to enter a joint motion for entry of final judgment. *Id.* ¶ 8. The Joint Motion would vacate most of the SAVE Plan Final Rule and enter final judgment. *See* Joint Motion for Entry of Final Judgment at 3, *Missouri*, ECF 91 (Dec. 9, 2025). The surviving provision modified the criteria for qualifying forbearances and deferments across several IDR plans, 34 C.F.R. § 685.209(k)(4)(iv), and is not at issue in this case.

On February 27, 2026, the *Missouri* district court dismissed the case as moot instead of entering the parties' requested final judgment. *See* Memorandum & Order Dismissing Case, *Missouri v. Trump*, 2026 WL 548660 (E.D. Mo. Feb. 27, 2026). The next business day, the states moved for a stay pending appeal. Motion for Stay of Dismissal Pending Appeal, *Missouri*, ECF 95 (Mar. 2, 2026). The district court denied the stay two days later, and the states renewed their stay motion before the Eighth Circuit the day after that. Order, *Missouri*, ECF 96 (Mar. 4, 2026); Emergency Motion for Stay of District Court Dismissal Order Pending Appeal, *Missouri v. Trump*, No. 26-1394 (8th Cir. filed Mar. 5, 2026), Entry No. 5615320, attached as **Exhibit A** to the Shi Decl. The states alternatively invited the Eighth Circuit to summarily reverse the district court. *See* Ex. A at 16 ("This Court has already determined the SAVE Plan is unlawful. … Therefore, to avoid unnecessary litigation and expenditures of this

8

Court's resources, this Court should reverse the district court and remand with instructions to enter judgment in accordance with the parties' joint motion.").

On March 9, 2026, the *Havens* Plaintiffs filed this lawsuit. They argued that *Missouri*'s dismissal legally dissolved that case's PI against the SAVE Plan Final Rule, thereby requiring the agency to revive the SAVE Plan. *See* Compl. ¶¶ 48, 75, ECF 1.

That afternoon, at 2:29 p.m., the *Missouri* plaintiff states alerted the Eighth Circuit to this lawsuit and warned that without emergency relief, this Court could order the agency to "forgive student loans under an administrative rule that [the Eighth Circuit] already determined to be unlawful." Notice of Supplemental Authority under Rule 28(j) at 2, *Missouri v. Trump*, No. 26-1394 (8th Cir. filed Mar. 9, 2026), Entry No. 5616220, attached as **Exhibit C** to the Shi Decl.; CM/ECF Notification of Ex. C, attached as **Exhibit B** to the Shi Decl.

99 minutes later, the Eighth Circuit summarily reversed the district court's dismissal of the case. It immediately issued the mandate and ordered the district court to enter final judgment as requested by the parties. Judgment, *Missouri v. Trump*, 2026 WL 696770 (8th Cir. Mar. 9, 2026), *filed on the district court docket*, *Missouri*, ECF 100 (Mar. 9, 2026), attached as **Exhibit E** to the Shi Decl.; CM/ECF Notification of Ex. E, attached as **Exhibit D** to the Shi Decl.; Mandate, *Missouri v. Trump* (8th Cir. Mar. 9, 2026), *filed on the district court docket*, *Missouri*, ECF 101 (Mar. 9, 2026), attached as **Exhibit F** to the Shi Decl. The next day, the district court carried out the Eighth Circuit's directive by issuing a final judgment that, with the aforementioned exception, the "SAVE Plan Final Rule is hereby **VACATED** in full." Order Granting Motion for Final Judgment at 1, ECF 102 (Mar. 10, 2026), attached as **Exhibit G** to the Shi Decl.

On March 13, 2026, the *Havens* Plaintiffs moved to intervene in *Missouri*. They filed a proposed motion for reconsideration, telling the district court that the Court of Appeals had committed a "manifest error of law" by telling it to vacate (most of) the SAVE Plan Final Rule. Motion for Leave to Intervene, *Missouri*, ECF 104; Memorandum in Supp. of Granting Motion for Reconsideration at 18-21, *Missouri*, ECF 106-1. The motion to intervene remains pending.

### D.        The Situation Today

As of March 31, 2026, Defendants reported 12.74 million IDR borrowers (potentially including duplicates) with $763.8 billion in loans. Most were on SAVE (6.99 million / $383.0 billion). The rest were split between IBR (2.92 million / $197.0 billion), Original ICR (1.30 million / $55.9 billion), and PAYE (1.53 million / $127.9 billion). *See Portfolio by Repayment Plan*, Ex. I. (These figures include only Direct Loans, which represent 90.7% of the agency's loan portfolio. *See Portfolio Summary*, FEDERAL STUDENT AID (Mar. 31, 2026), attached as **Exhibit H** to the Shi Decl.)

Until SAVE borrowers affirmatively "choose" a new repayment plan (20 U.S.C. § 1087e(d)(3)) or the agency reassigns them to a non-IDR plan (*id.* § 1087e(d)(2)), they are on a forbearance, which suspends their monthly payments, but by the same token stops them from making progress toward loan forgiveness. On March 27, 2026, the agency announced that consistent with the OBBBA, it would direct staggered batches of borrowers to move to new plans starting on July 1, 2026. The earliest date a borrower will be required to move is September 29, 2026 (90 days after July 1). *See* ECF 20 ¶ 11.

## III.    Plaintiffs' Allegations

### A.        Plaintiffs Ask Defendants to Reinstate REPAYE for the Second Time

On June 9, 2026, Defendants moved to dismiss the complaint in this case. They explained that Plaintiffs had sued to enforce the SAVE Plan Final Rule, and now that the relevant aspects of the rule had been vacated, the suit could no longer proceed. ECF 17. Plaintiffs amended their complaint on the day their opposition brief would have been due. First Amended Complaint (FAC), ECF 18 (filed June 23, 2026). The complaint identifies three sets of claims which arise under various APA provisions. Plaintiffs moved for a preliminary injunction on the first two claims. ECF 19.

1.        Plaintiffs allege the *Missouri* case's vacatur of (most of) the SAVE Plan Final Rule reinstated the 2015 REPAYE Rule and the REPAYE plan by operation of law. FAC ¶¶ 14, 71, 135-39 (Count 1), 141(a) (Count 2), 144(a) (Count 3), 147(c) (Count 4).

2.        Plaintiffs allege the agency should not require any borrowers enrolled in SAVE / REPAYE to switch to a new plan as long as REPAYE purportedly is the law—that is, until the ICR plans sunset on July 30, 2028. *Id.* ¶¶ 84, 141(b) (Count 2), 144(b) (Count 3).

3.      Plaintiffs allege they became entitled to the benefits of the SAVE Plan Final Rule as soon as the *Missouri* district court dismissed that case and dissolved its PI against the SAVE Plan Final Rule, notwithstanding the Eighth Circuit's reversal of the order of dismissal. *See id.* ¶¶ 69, 89, 141(c) (Count 2), 144(c) (Count 3), 147(a)-(b) (Count 4).

### B.      Plaintiffs' Various Theories of Injury

Plaintiffs raise different theories of injury. Each submitted their own fact-specific declaration. *See* ECF 19-3 (Havens), 19-4 (Grunseth), 19-5 (Robeson), 19-6 (Boykin).

**Elizabeth Robeson (Tax Injuries).** Robeson is currently enrolled in SAVE and has 325 months of credit towards loan forgiveness. FAC ¶¶ 22, 118-22. She would be eligible for a discharge upon switching to an operative IDR plan; if REPAYE were operative, she would be discharge-eligible under that plan too. She did not receive a discharge before the June 2024 injunction against SAVE loan forgiveness because she did not become eligible until October 2024, when the agency increased her payment count by processing a one-time adjustment. Declaration of Anthony Lowery (Lowery Decl.) ¶ 8.

Robeson wants her discharge to take place under REPAYE (or the SAVE Plan Final Rule) for tax reasons. For context, student loan forgiveness is taxable income, like loan forgiveness in general. 26 U.S.C. § 61(a)(11). But Congress enacted a five-year tax holiday for student loan forgiveness, which expired at the end of 2025. *See* American Rescue Plan Act of 2021 § 9675, Pub. L. No. 117–2, 135 Stat. 4, 185-86, *previously codified at* 26 U.S.C. § 108(f)(5) (2023). The agency backdates discharges to the month the borrower became discharge-eligible, rather than the date the discharge is administratively processed, which can be several months later. *See generally* FAC ¶ 111. As such, identifying the precise date the borrower became discharge-eligible can have tax consequences.

Robeson says that if she receives a discharge under REPAYE / SAVE, it would be tax-free, because the event making her discharge-eligible would have taken place before 2026. She fears that if the agency requires her to switch to a new plan in 2026 and she obtains loan forgiveness under that plan, her discharge will be taxed since the agency will identify the event making her discharge-eligible as her switch to the new plan. *See id.*

11

**Heather Havens (Tax Injuries, Higher Monthly Payments).** Havens is currently enrolled in SAVE. She has four loans, two of which are immediately dischargeable on the same basis as Robeson's (as she has 303 months of credit), and two of which are not. FAC ¶¶ 21, 117. Like Robeson, Havens did not receive a discharge on her older loans before the June 2024 injunction because she did not become eligible until August 2024, when the agency processed her one-time payment count adjustment. Lowery Decl. ¶ 10. She raises the same tax argument as Robeson. FAC ¶¶ 109-13.

On Havens' two remaining loans, she says that based on REPAYE's payment formula, her monthly loan payment would be $196/month lower under REPAYE than the next-cheapest IDR plan. ECF 19-3 ¶ 15. That is a miscalculation, as IBR and PAYE payments can vary wildly depending on the size of the loan balance. Unlike REPAYE, those plans cap payments based on the size of the loan balance,[1] and Havens' dischargeable loans are 86.4% of her total balance. *See id.* ¶ 7 ($64,860.22 of $75,086.37). After deducting the dischargeable loans, Havens' monthly loan payment under IBR would be $119/month. Under REPAYE, it would be $401/month. Lowery Decl. ¶¶ 13-16.

**Anna Grunseth (Higher Monthly Payments, SAVE Plan Final Rule Buyback).** Grunseth is currently enrolled in SAVE and has 105 months of credit toward loan forgiveness. FAC ¶ 23. She says her monthly loan payment would be $14/month lower under REPAYE than the next-cheapest IDR plan. ECF 19-4 ¶¶ 6-7.

Grunseth also wants to combine SAVE's shorter payment term with the Final Rule's buyback provision, 34 C.F.R. § 685.209(k)(6). She currently has 105 months of credit towards loan forgiveness. ECF 19-4 ¶ 8. As alleged, SAVE would have shortened her payment term from 25 to 10 years. FAC ¶¶ 98-99. She has spent over 15 months in the post-*Missouri* injunction forbearance. *Id.* ¶ 98. She alleges that under the SAVE Plan Final Rule's buyback provision, she should be allowed to clear her student loan debts in full by buying back 15 months at her then-prevailing SAVE monthly payment figure of $11. ECF 19-4 ¶ 9.

---

[1] Monthly payments under IBR and PAYE cannot be higher than what they would be under the Standard plan. 34 C.F.R. § 685.209(f)(2)-(3). The Standard plan does not offer loan forgiveness, so a monthly payment under that plan is intrinsically tied to the size of the borrower's loan balance.

12

**William Boykin (Higher Monthly Payments, SAVE Plan Final Rule Buyback).** Boykin was previously enrolled in SAVE, but switched to a different IDR plan in January 2026. ECF 19-6 ¶¶ 2, 4. He has 117 months of credit toward loan forgiveness. *Id.* ¶ 8. He says his monthly loan payment would be $41/month lower under REPAYE than the next-cheapest IDR plan. *See id.* ¶ 6.

Like Grunseth, Boykin wants to combine SAVE's shorter payment term with the Final Rule's buyback provision, with the added wrinkle that he also needs to re-apply for SAVE. *Id.* ¶ 5. As alleged, SAVE would have shortened his payment term from over 20 to 11 years. FAC ¶¶ 105-08. He spent 17 months in the post-*Missouri* injunction forbearance. *Id.* ¶ 105. He wants to buy back 15 of those months to qualify for a discharge. ECF 19-4 ¶ 3.[2]

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Such a request involves the exercise of a far-reaching power that "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted). The moving party must demonstrate, by "a clear showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted), all of the following requirements: "that (1) it 'is likely to succeed on the merits'; (2) it 'is likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the

---

[2] Two business days before Defendants were due to file this brief, Plaintiffs moved to file five new declarations from non-plaintiff borrowers, representing that in doing so, they did not intend to "raise [] new claims or legal arguments." ECF 23 ¶ 1. As Defendants explained to Plaintiffs at the time, the timing did not allow Defendants to fully analyze the declarants' contentions before the filing deadline. *See id.* ¶ 4 (Defendants' position statement). As of the time of filing, the motion remains pending.

In an abundance of caution, Defendants note that Plaintiffs may not shore up their flawed allegations of irreparable harm with third-party declarations. *See Winter*, 555 U.S. at 24 (the movant "must establish … that *he* is likely to suffer irreparable harm in the absence of preliminary relief.") (emphasis added); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012) (under *Winter*, third-party harm goes only to the public interest); *see also Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018); *Church v. Biden*, 573 F. Supp. 3d 118, 14 (D.D.C. 2021). The analysis is similar for standing: third-party standing requires the plaintiff to show (1) she has standing in her own right, (2) she has a close relation to the third party, and (3) the third party has "some hindrance to [his or her] ability to protect his or her own interests." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010) (quoting *Powers v. Ohio*, 499 U.S. 400, 415 (1991)). Here, at least one plaintiff (Robeson) lacks any standing, and the latter points—though potentially prudential, *see id.*—do not seem to appear.

13

balance of equities tips in [its] favor'; and (4) the issuance of a preliminary injunction 'is in the public interest.'" *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (citation omitted). The balance of equities and the public interest "'merge when,' as here, 'the Government is the opposing party.'" *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The same factors govern Plaintiffs' request for a stay under Section 705 of the APA. *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020).

On a FED. R. CIV. P. 12(b)(1) challenge to subject-matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction "in the same way as any other matter on which [it] bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Thus, on a motion to dismiss under either FED. R. CIV. P. 12(b)(1) or FED. R. CIV. P. 12(b)(6) (failure to state a claim), the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[C]onclusory statements" and "legal conclusion[s] couched as … factual allegation[s]" are not presumed true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (simplified).

When assessing subject-matter jurisdiction, a court "may consider materials outside the pleadings," such as judicially noticeable agency materials. *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021). When assessing a pleading's factual sufficiency, a court considers "the complaint in its entirety, as well as … documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## ARGUMENT

### I.    Plaintiffs Have Failed to Show Irreparable Harm, and Lack Article III Standing for Many of Their Claims

The Court should deny a PI based on the absence of irreparable harm, and for overlapping reasons should dismiss subsets of Plaintiffs' claims on standing grounds. Defendants thus address standing through the irreparable-harm framework applicable at the preliminary-injunction stage. Here, standing knocks out Plaintiffs' centerpiece tax arguments. Taxes aside, Plaintiffs seek at most $1,320 in discounts on their monthly loan repayments, payable over two years until the ICR plans

sunset in July 2028. That is not an emergency. In fact, the agency will refund any such overpayments at final judgment if Plaintiffs ultimately prevail on the merits. Lowery Decl. ¶ 5.

When moving for a preliminary injunction, Plaintiffs "must make a 'clear showing' that [they are] 'likely' to establish each element of standing … that [they have] suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57-58 (2024) (cleaned up). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. Independent of standing, the D.C. Circuit "has set a high standard for irreparable injury. First, the injury must be both certain and great; it must be actual and not theoretical. The moving party must show [t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm. Second, the injury must be beyond remediation. … The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (citations and quotation marks omitted).

### A. Plaintiffs Havens and Robeson's Tax Injuries Do Not Establish Standing, Much Less Irreparable Harm, to Sue on REPAYE's Loan Forgiveness Rules

#### 1. Any Tax Liability Would Be Self-Inflicted, Which Refutes Both Injury-in-Fact and Causation

Plaintiffs have already forfeited their best opportunity to solve their tax problem—for free. As they themselves allude, in September 2025, the American Federation of Teachers (AFT) sued Defendants to confirm that borrowers who qualified for forgiveness in 2025 but whose discharges were not processed until 2026 could still take advantage of the American Rescue Plan tax holiday. *See* PI Motion at 6; First Amended Complaint ¶ 123, *AFT v. ED*, No. 1:25-cv-802-RBW (D.D.C. filed Sep. 9, 2025), ECF 41. In response, Defendants said (and Judge Walton confirmed by court order) that they would not disclose loan discharges to the Internal Revenue Service (IRS) as taxable income if the borrowers applied for a new repayment plan by December 31, 2025 and were immediately discharge-eligible under the new plan once the application was approved. *See* Status Report of Oct.

17, 2025 ¶ 8(b), *AFT v. ED*, ECF 54, attached as **Exhibit L** to the Shi Decl.; ECF 19-2 at 6-10 (Plaintiffs filing the order as an exhibit to their PI Motion); **Exhibit M** to the Shi Decl. (same).[3]

Plaintiffs rely on Judge Walton's order to define their tax injury, and complain that the order "extends no comparable protection to borrowers who apply for … a different repayment plan after December 31, 2025." PI Motion at 6. But equally, they could have avoided this alleged tax problem by filing an IDR application in 2025. They did not take this deal, so they lack standing today. Self-inflicted harm is neither an injury in fact nor "fairly traceable to the defendant's challenged conduct." *National Family Planning & Repro. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). Thus, a plaintiff usually may not base standing on injuries she could have avoided. *See Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (a plaintiff that "can avoid the threatened injury" but chooses to not do so "presumably [acts] in [her] own self-interest," which does not create standing); *Gu v. U.S. Dep't of Treasury*, 2025 WL 3089260, at *4 (D.D.C. Nov. 5, 2025) (AliKhan, J.) (plaintiff who chose to not seek a fee waiver could not base standing on the lack of that fee waiver); *Ellis v. CIR*, 67 F. Supp. 3d 325, 336 (D.D.C. 2014) (plaintiff could not create his own tax injury by refusing to file a tax return, "a voluntary step … that lead[s] inexorably to his complained of injuries").

Similarly, on a motion for preliminary injunction, a non-moving party may defuse irreparable harm by offering its own mitigation measures. *See Manzanita Band of Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257, 265 (D.D.C. 2020); *Seeger v. U.S. Dep't of Def.*, 306 F. Supp. 3d 265, 291 (D.D.C. 2018); *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("Injury caused by failure to secure a readily available license [from the government] is self-inflicted[.]"); *see generally* Kane & Lahav, 11A *Federal Practice & Procedure* § 2948.1 (3d ed. Apr. 2026 update) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."). That is precisely

---

[3] The AFT agreement did not fly under the radar. *See, e.g.*, Adam S. Minsky, *Huge Win For Borrowers As Student Loan Forgiveness Resumes for Millions*, FORBES (Oct. 17, 2025), *available at* forbes.com/sites/adamminsky/2025/10/17/huge-win-for-borrowers-as-student-loan-forgiveness-resumes-for-millions/; Tara Siegel Bernard, *Education Dept. Agrees to Resume More Student Loan Cancellations*, THE NEW YORK TIMES (Oct. 17, 2025), *available at* nytimes.com/2025/10/17/business/student-loan-cancellation-idr.html.

what happened here.[4] Having failed to resolve their own situations in 2025 when they had the chance, Plaintiffs cannot now sue for programmatic tax relief (or any tax relief) in 2026.

### 2. The Department of Education Did Not Cause Plaintiffs' Injuries, and an Injunction Against the Agency Would Not Redress Them

Plaintiffs want loan discharges and Defendants want to discharge their loans. The sticking point is that Plaintiffs may have trouble paying taxes on the discharges. ECF 19-5 ¶ 2 (Robeson); ECF 19-3 ¶ 16 (Havens). As such, their real dispute is with the IRS (and the Internal Revenue Code), which is not a party to this suit. The IRS's absence creates several jurisdictional problems.

*First*, injury in fact and causation. As Plaintiffs explain, if the Court were to enjoin Defendants to discharge Plaintiffs' loans under REPAYE, Defendants would not report the discharges to the IRS as taxable income by filing an IRS Form 1099-C. *See* PI Motion at 6. But Defendants' failure to file a 1099-C does not bind the IRS, which is free to treat REPAYE discharges as taxable income.[5] Because a plaintiff usually cannot premise standing on "speculation about the decisions of independent actors," she "must show at the least that third parties will likely react in predictable ways." *California v. Texas*, 593 U.S. 659, 675 (2021) (citations and quotation marks omitted). The tax question Plaintiffs raise is not straightforward, so the response is far from predictable.

Defendants do not know how the IRS would classify a 2026 switch back to REPAYE. Usually, a discharge becomes taxable upon an "'identifiable event' which fixes the loss with certainty," that is, "[t]he moment it becomes clear that a debt will never have to be paid." *Cozzi v. CIR*, 88 T.C. 435, 445 (1987). Since a borrower needs to be in an operative loan repayment plan to get a discharge, a tax specialist should address the tax implications of the March 2026 vacatur in the first instance.

---

[4] Judge Mehta addressed a similar fact pattern in *Taylor v. FAA*, 351 F. Supp. 3d 97 (D.D.C. 2018). Although he dismissed the case on injury-in-fact and redressability grounds, he added in dicta that causation was also questionable because the plaintiff "did not avail himself of the opportunity that the FAA" offered "to request both a refund and removal of his personal information from the agency's database. Had he done so, Plaintiff would have achieved much of what he now seeks, at least on his own behalf, through this lawsuit. … Thus, the injury he now claims feels manufactured." *Id.* at 106.

[5] In *AFT v. ED*, the parties agreed that the IRS and the Department of the Treasury, and not the Department of Education, retained "the final say on whether Defendants' student loan cancellations qualify as taxable income" under the American Rescue Plan. Ex. L ¶ 10.

17

Maybe the IRS will say for tax purposes, a borrower's discharge takes place on the day of the final qualifying payment, or the day of the one-time payment count adjustment (that is, before 2026). But it could also say the discharges are taxable because Plaintiffs' REPAYE discharges did not become legally inevitable until the district court dissolved the injunction against REPAYE loan forgiveness by vacating (most of) the then-enjoined SAVE Plan Final Rule in March 2026. The point being, Plaintiffs' theory of the case relies on pure speculation about the complex legal question of how the IRS might classify REPAYE discharges, and the asserted injury is merely "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up and citation omitted).

*Second*, redressability. The IRS is not a party to this suit, so anything the Court might say here about the legal timing of REPAYE loan discharges in 2026 would not bind the IRS. "Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (citation omitted). Because "[a] person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit," *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008), determining the rights of the IRS in an action where the IRS is not a party would raise "serious due process concerns that would cast doubt on the judgment's validity and enforceability." *United States v. DAS Corp.*, 18 F.4th 1032, 1042 (9th Cir. 2021).[6]

### 3.     Tax Injuries Are Usually Litigated in Tax Court

Plaintiffs acknowledge that "economic harm is generally not considered irreparable injury," but suggest they "have no avenue for later compensatory relief" because money damages are not available under the APA. PI Motion at 20 (quoting *Padgett v. Vilsack*, 2024 WL 4006050 (D.D.C. Aug.

---

[6] Indeed, this case resembles the inter-agency conflict in *Lujan* itself. Four Justices would have held that even if the District Court ordered the Secretary of the Interior "to revise his regulation to require consultation for foreign projects … this would not remedy respondent's alleged injury unless the funding agencies were bound by the Secretary's regulation." 504 U.S. at 568 (Scalia, J., writing for a plurality on this point). Although the Secretary himself "thought [his regulation] was binding on the agencies," the agencies disagreed, and so did the Solicitor General. *Id.* at 569. It would be particularly inappropriate to intervene here, where Defendants have strained to *avoid* attributing any statements to the IRS or saying something that the IRS might disagree with someday.

30, 2024) (AliKhan, J.)). But in *Padgett*, this Court held the plaintiff "failed to make the required showing" that compensatory relief was impossible. 2024 WL 4006050, at *4. Plaintiffs have the burden of showing irreparable injury, which means they must rule out both administrative options for financial relief and the availability of the Tax Court (or a tax refund suit in district court) as a forum for their claims. *See* 26 U.S.C. § 6213; *Gardner v. United States*, 211 F.3d 1305, 1311 (D.C. Cir. 2000) (taxpayer may "institute a refund suit after payment of taxes"); *California v. Grace Brethren Church*, 457 U.S. 393, 412 n.29 (1982) (tax refund suit is an adequate remedy at law that precludes equitable remedies).

**B.**     **No Plaintiff Is Injured by REPAYE's Shorter Payment Term, Because REPAYE Will Sunset Before Any Remaining Loans Are Forgiven**

No Plaintiff alleges that REPAYE would usefully shorten their payment term, as REPAYE carries a minimum term of 20 years. Excluding the currently dischargeable loans, Plaintiffs would not be due for a REPAYE discharge until 2031 (Havens) or later (Grunseth, Boykin). Lowery Decl. ¶¶ 12, 18, 20. (Boykin says he is eligible for discharge under either SAVE or REPAYE "after making 132 payments," ECF 19-6 ¶ 3, but that seems to be a typo.) REPAYE is an ICR plan, and all ICR plans will sunset by July 1, 2028. Thus, Plaintiffs' remaining loans will not be discharged under REPAYE, preventing either causation or irreparable harm.

**C.**     **Plaintiffs Grunseth and Boykin's Claim that REPAYE Would Lower Their Monthly Payments Does Not Show Irreparable Harm**

At most, Plaintiffs can say REPAYE would save them $55/month (put together) compared to a different repayment plan. *See* ECF 19-4 ¶¶ 6-7 ($14/month for Grunseth); ECF 19-6 ¶ 6 ($41/month for Boykin). A temporary loss of $1,320 over two years would not justify the sweeping programmatic relief they demand. Havens lacks standing altogether: she quoted a difference of $196/month, ECF 19-3 ¶ 15, but as previously noted, she miscalculated her liability, and IBR is a better deal for her. Lowery Decl. ¶¶ 13-16.

At the outset, the Court should apply the exacting standard for irreparable harm based on pure financial loss even though money damages are not available under the APA. *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 675 (D.C. Cir. 1985) (explaining that an agency may have options to remedy financial losses beyond paying money damages, such as allowing regulated parties to seek "recovery

of … costs" in an administrative proceeding). Here, the agency has tools to prevent irreparable harm. Depending on Plaintiffs' preference, the agency can either refund their overpayments or credit them toward Plaintiffs' next payment. Lowery Decl. ¶ 5. (As Plaintiffs recognize, the agency refunds other kinds of overpayments. *See* ECF 19-2 at 3 (saying the agency reimburses discharge-eligible borrowers "for any payments made on the loan after the final payment that qualified them for a discharge")).

Just as importantly, the $55/month alleged by Grunseth and Boykin does not meet this circuit's "both certain and great" standard for preliminary relief, *Wisconsin Gas*, 758 F.2d at 674. "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is 'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'" *Hi-Tech Pharmacal Co. v. U.S. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (quoting *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)). Even when financial recovery is precluded by sovereign immunity, "a party asserting [economic] loss is not relieved of its obligation to demonstrate that its harm will be 'great,'" *N. Air Cargo v. USPS*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010); *see also Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 67-68 (D.D.C. 2010) (noting that "an inability to recover lost profits or payments does not always constitute irreparable harm" and collecting cases).

Here, Grunseth and Boykin's figures appear manageable, as at worst they would be on a non-REPAYE plan for only several months while this litigation progresses on the merits. Grunseth declares that her household income is over $60,000. ECF 19-4 ¶ 6. Boykin speculates that he "would risk losing my transportation or defaulting on credit cards" if he pays an additional $41/month, ECF 19-6 ¶ 7, but his declaration omits his income and provides no specifics. And if Plaintiffs are focused solely on lowering their short-term monthly payments, it is possible that RAP—which debuted after they filed their declarations—might offer lower payments than REPAYE. Lowery Decl. ¶ 4.

To shore up their small-dollar claims, Plaintiffs improperly invite the Court to look at secondary consequences of temporarily having less discretionary income during the litigation. PI Motion at 22 (arguing that the Court cannot "direct defendants to deposit more funds into [an] IRA account" and that Plaintiffs' credit will be damaged). But that is merely another way of saying money is fungible. And "[b]ecause money is fungible, courts have long recognized that monetary injury alone

20

does not ordinarily constitute irreparable harm." *Cobelfret S.A. v. Joint Faith Shipping Co.*, 2025 WL 4631995, at *3 (C.D. Cal. Dec. 31, 2025) (collecting cases); *see also Harvey v. Fresquez*, 2011 WL 855875, at *2 (S.D.N.Y. Mar. 8, 2011) (agreeing that because "money is fungible," a PI was inappropriate). Anyone can come up with something intangible they would buy if they had more money. If Plaintiffs' argument is correct, the economic harm doctrine would have no meaning. And there is nothing unusual or improper about a litigant having to wait until final judgment to obtain financial relief.

### D.    Plaintiff Havens' Alleged Loss of Interest Subsidies Is Not Irreparable Harm

Plaintiff Havens adds that REPAYE would give her an indefinite 50% interest subsidy on interest accrual, which will impact her loans that are not discharge-eligible today. PI Motion at 21; FAC ¶ 35. For context, borrowers who intend to repay their loan in full ordinarily do not accrue interest on a long-term basis, because their "monthly loan payment [already] covers all the interest that accrues between monthly payments." *See* "Interest Rates and Fees for Federal Student Loans," FEDERAL STUDENT AID [perma.cc/EL4H-9VHZ]. And some IDR borrowers who intend to take advantage of loan forgiveness will still not accrue interest, because the agency applies monthly payments to interest before principal. 34 C.F.R. § 685.211(a)(1)(i)-(ii).

Accrued interest is primarily relevant to IDR borrowers whose monthly payments are so low they do not cover even interest (and, by definition, none of the principal). *See id.* The interest thus accrues in the borrower's account, increasing the borrower's total loan balance. REPAYE's 50% reduction in interest accrual slows that growth. 80 Fed. Reg. at 67214-15, 67227. But even then, accrued interest comes into play in only two scenarios, neither of which warrant emergency relief.

*First*, the accrued interest will be forgiven at the end of the payment term, so there is no imminent injury. Since none of the Plaintiffs intend to repay their loans in full, accrued interest merely increases the amount of loan forgiveness they will receive. That could in turn increase Plaintiffs' tax liability, but that is many years in the future, and for reasons already stated, Plaintiffs may not sue the Department of Education to challenge the unknown future rulings of the Internal Revenue Service.

*Second*, the accumulation of unpaid interest, by itself, does not affect the size of a borrower's monthly payment. The agency first would have to capitalize that unpaid interest (that is, reclassify the

unpaid interest as added principal on the loan) *and* the current monthly payment would have to be lower than any applicable income-based cap. Capitalization, in turn, requires a separate triggering event, such as a deferment on an unsubsidized loan or an enrollment and subsequent withdrawal from the IBR plan—none of which Plaintiffs allege is imminent. *See* 34 C.F.R. §§ 685.202(b), 685.205(a), 685.209(j); "Interest Rates and Fees for Federal Student Loans," *supra.*

### E.    Plaintiffs' Litigation Strategy Confirms Emergency Relief Is Unnecessary

#### 1.    Plaintiffs Delayed Bringing These Claims for Months

Since a party seeking a PI "must generally show reasonable diligence," *Benisek v. Lamone*, 585 U.S. 155, 159 (2018), self-inflicted delay implies the lack of irreparable harm, *Gordon v. Holder*, 632 F.3d 722, 724-25 (D.C. Cir. 2011). "The D.C. Circuit has held that a delay of forty-four days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,' particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm." *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 403 (D.D.C. 2020) (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)). Here, Defendants advised Plaintiffs to amend their complaint shortly after filing, but Plaintiffs waited until June. *See* Defendants' Motion for Extension of Time to Respond to Plaintiffs' Complaint at 2, 5, 7, ECF 8.

Plaintiffs say this case is time-sensitive because the Department of Education started giving SAVE borrowers 90-day notices to switch repayment plans on July 1, 2026. But had they diligently litigated this case, which was filed on March 9, 2026, it could have been resolved on a non-emergency basis by July 1. As they note, Defendants announced the SAVE transition months ago, on March 27, 2026. *See* Ex. 4 to Plaintiffs' PI Motion, ECF 19-2 at 23-29. Following that announcement, "Plaintiffs could therefore expect [the challenged activity] to commence." *Cranford v. U.S. Dep't of Interior*, 2026 WL 369717, at *7 (D.D.C. Feb. 10, 2026); *see also Douglas v. National Park Serv.*, _ F. Supp. 3d _, 2026 WL 1701344, at *5 (D.D.C. June 12, 2026) (rejecting claim of irreparable harm when the event to be enjoined was publicly announced in July 2025 and the plaintiffs moved for emergency relief in June 2026). A plaintiff may not seek a PI when the case can be decided on the merits before the projected injury occurs. *Matos ex rel. Matos v. Clinton School Dist.*, 367 F.3d 68, 74 (1st Cir. 2004). It follows that

Plaintiffs may not accentuate the *appearance* of irreparable harm by delaying briefing until a real-world deadline comes up. *See Dallas Safari Club*, 453 F. Supp. 3d at 403 (delay of two months from lawsuit to emergency motion counseled against emergency relief); *Sierra Club v. U.S. EPA*, 793 F. Supp. 3d 158, 165 (D.D.C. 2025) (delay of "over one month … 'suggests that there is, in fact, no irreparable injury'") (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985)); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (delay of roughly six weeks from the act creating standing to the motion for preliminary injunction "implie[d] a lack of urgency and irreparable harm").

### 2. Plaintiffs Did Not Move for Emergency Relief on a Third Legal Theory That, If True, Would Moot This Motion

Plaintiffs Havens and Robeson's claims of irreparable harm sit uncomfortably with their own theory of the case. They say they will lose their chance at tax relief forever if the agency requires them to move to a new repayment plan, but their third set of allegations says they became entitled to SAVE Plan loan discharges—backdated to before 2026 and thereby tax-free—by operation of law as soon as the district court dismissed *Missouri v. Trump* on February 27, 2026. FAC ¶¶ 69, 89, 141(c), 144(c), 147(a)-(b). (Plaintiffs Boykin and Grunseth also claim discharges, but not backdated discharges. If the Court reinstates REPAYE, they can (re-)apply at that time.) If so, the date this case is decided is irrelevant, and the IDR plan Plaintiffs receive their discharges under is irrelevant. Plaintiffs are not required to move for emergency relief on each of their claims at the same time, but the availability of an assertedly adequate and non-time-sensitive alternative implies no irreparable harm. *American Health Care Ass'n v. Sullivan*, 1991 WL 154456, at *1 (D.D.C. May 30, 1991) (denying PI because "the papers [show] an adequate alternative remedy for injunctive relief from state plans which has been followed in the past"); *cf. Lovell v. United States*, 795 F.2d 976, 977 (11th Cir. 1986) (denying injunctive relief in tax suit "because [appellants] do not show irreparable harm and inadequacy of alternative remedies").

\* \* \*

For the foregoing reasons, Plaintiffs lack standing to challenge tax injuries or REPAYE's potentially-shorter payment term, and have failed to show irreparable harm across the board.

23

## II.    Plaintiffs Have Not Pleaded a Plausible Claim, Much Less Shown That They Are Likely to Succeed on the Merits

Plaintiffs' theory of the case—that the vacatur of a revision to a regulation automatically reinstates the earlier regulation—incorrectly presumes Defendants are required to enforce a rule that the Eighth Circuit already rejected. Plaintiffs' associated request to halt Defendants' transition of SAVE borrowers to new plans is derivative of the former theory and fails for the same reasons; in any case, it carries out the will of Congress and is not arbitrary and capricious. Finally, Plaintiffs' final set of claims—that the benefits of the SAVE Plan Final Rule irreversibly vested before the Eighth Circuit restored the injunction against that rule on March 9, 2026—largely retreads the points made in the original complaint and refuted in Defendants' original Motion to Dismiss. Because Plaintiffs are unlikely to succeed for these reasons (and also, where applicable, for lack of standing), "there is no need to consider the remaining [preliminary injunction] factors." *Electric Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017).

### A.    The REPAYE Claim Fails

#### 1.    The Eighth Circuit Already Rejected Plaintiffs' Proposed Solution

Plaintiffs want the agency to reinstate REPAYE, writing that "the vacatur of [the SAVE Plan Final Rule's] amendments [to the 2015 REPAYE Rule] restored REPAYE by operation of law." PI Motion at 5. They seek a declaration that REPAYE is the "operative regulation governing Plaintiffs' loans and that Defendants are required to administer it," and an injunction requiring Defendants "to administer the REPAYE Final Rule[.]" FAC Prayer for Relief ¶¶ A, D.

This request ignores all the hard-fought litigation over this precise issue. What Plaintiffs demand today, Defendants attempted two years ago. The Eighth Circuit said no:

> Generally, in the absence of "special circumstances," "prior regulations remain valid until replaced by a valid regulation or invalidated by a court." *Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 297 (8th Cir. 1985). Under this principle, the pre-amendment REPAYE forgiveness provision could be reinstated as the Secretary did here. However, we find this case presents such special circumstances, namely *the portion of the old rule the federal officials seek to revive suffers from the same legal errors as the one challenged here — the Secretary lacks the power to authorize loan forgiveness in an ICR plan*. We therefore conclude the district court's injunction should be broadened to enjoin the Secretary's attempt to forgive loans in the SAVE plan through the old REPAYE provisions.

24

*Missouri v. Trump*, 128 F.4th at 998 (emphasis added). Defendants did not violate the law in accounting for this precedent and the litigation risk it presented. True, *this* action was filed in the D.C. Circuit. But the agency has to account for the law in every circuit. It was lawful and reasonable for Defendants to have accounted for the Eighth Circuit's precedent.

Because Plaintiffs want to restore the same rule that was rejected in *Missouri*, the litigation risk of administering REPAYE is extraordinarily high, to put it mildly. If the plaintiff states renewed their challenge and Defendants tried to defend REPAYE, the Eighth Circuit's published decision in *Missouri v. Trump* would likely affect the strength of the Government's merits arguments. Plaintiffs protest that *Missouri v. Trump* was a preliminary injunction ruling, not a "final merits judgment." *See* FAC ¶ 129(a). But the panel published a 25-page opinion on an issue of law after several rounds of briefing and four months after argument. Such a decision could have, at the very least, a strongly persuasive effect on future panels. *Cf. Entergy, Ark. Inc. v. Nebraska*, 241 F.3d 979, 987 (8th Cir. 2001) (a published decision in a preliminary injunction appeal on a "carefully considered" issue of law, reviewed *de novo*, is binding for law of the case purposes). In settling the case, the agency appropriately determined further litigation would be redundant and a waste of time and resources. Sometimes, it really just is that "the preliminary injunction [is] the whole ball game." *Winter*, 555 U.S. at 33 (simplified).[7] In any case, the agency did not forego merits litigation by settling until after the OBBBA repealed ICR effective July 1, 2028, at which point any merits win would have been temporary.

2.    **When a Court Invalidates a Rule on Grounds that Would Also Invalidate the Earlier Rule, Agencies Do Not Have to Reinstate the Earlier Rule**

"When an agency replaces an existing rule with a new rule, and [a court] vacate[s] all or part of the new rule, … the better course is generally to vacate the new rule without reinstating the old rule … leav[ing] it to the agency to craft the best replacement for its own rule." *Small Refiner Lead Phase-*

---

[7] On this basis, the Court could also dismiss Plaintiffs' REPAYE claim on redressability grounds. Plaintiffs essentially ask the Court to review two connected documents—the *Missouri* settlement and the joint motion for final judgment required by that settlement. If the settlement collapsed due to this litigation, that might restore the April 2025 injunction, which covered both SAVE and REPAYE. Thus, it is far from "likely" that the Court can redress Plaintiffs' injuries. *Lujan*, 504 U.S. at 560.

*Down Task Force v. U.S. EPA*, 705 F.2d 506, 545 (D.C. Cir. 1983) (citing *Burlington N., Inc. v. United States*, 459 U.S. 131 (1982)). Plaintiffs say that because SAVE replaced REPAYE, the judicial vacatur of the SAVE Plan Final Rule automatically reinstates REPAYE. *See* FAC ¶ 71. But *Small Refiner* considered and rejected that argument. There, the D.C. Circuit "invalidated an interim rule regarding the lead content standard for gasoline because it was too strict. Given that the old standard was even stricter, the Court reasoned that it would be 'irrational' to order the agency to return to it rather than allowing the agency to choose a suitable replacement." *Oceana, Inc. v. Evans*, 389 F. Supp. 2d 4, 7 (D.D.C. 2005) (citing *Small Refiner*, 705 F.2d at 545). *Small Refiner* is on all fours. The Eighth Circuit has already declared REPAYE's loan-forgiveness provisions invalid, and the legal problem the panel identified with respect to SAVE applies equally to REPAYE.

To avoid putting the Government into an even more difficult situation, the *Missouri* panel at least clarified that vacatur of an invalid rule does not *compel* the agency to re-implement previous rules that are themselves invalid. Rather, the agency "could … reinstate[]" the earlier rule unless "special circumstances," such as the asserted illegality of the earlier rule, dictate otherwise. 128 F.4th at 998. That is the same practical approach the D.C. Circuit embraced in *Small Refiner*. An agency that receives a court order invalidating a rule but not enjoining it may square the circle by voluntarily declining to enforce the rule. For example, in *Bowen v. Georgetown University Hospital*, after a court invalidated a rule but concluded it lacked jurisdiction to enjoin said rule, the Secretary of Health and Human Services "recogniz[ed] the invalidity of the rule" via a short, court-ordered notice in the Federal Register—i.e., not a formal rulemaking—and declined to apply it. 488 U.S. 204, 207 (1988).

Plaintiffs respond with a different D.C. Circuit case decided two months after *Small Refiner*, which did not cite or distinguish its predecessor. They say that under *Action on Smoking & Health v. Civil Aeronautics Board*, 713 F.2d 795, 797 (D.C. Cir. 1983) (*ASH II*), because the SAVE Plan Final Rule replaced REPAYE, the vacatur of (most of) the SAVE Plan Final Rule reinstates REPAYE. FAC ¶ 71; PI Motion at 5. Indeed, that is normally what happens—and what the agency argued (unsuccessfully) in the *Missouri* litigation. But this is not a normal case, given the extensive litigation history on that exact nuance. Here, Plaintiffs identify no Supreme Court case requiring an agency to

26

exchange one assertedly-invalid rule for another. Indeed, that would generate the "ping-pong game" administrative law usually seeks to avoid. *Morgan Stanley Cap. Group v. Public Util. Dist. No. 1*, 554 U.S. 527, 545 (2008) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766-67 & n.6 (1969) (plurality)).

Although the earlier case controls in the event of a true conflict, a court should first try to eliminate a conflict between two D.C. Circuit opinions before choosing to follow the earlier one. *See De Csepel v. Republic of Hungary*, 859 F.3d 1094, 1105 (D.C. Cir. 2017). And as Judge Huvelle showed in *Oceana*, harmonizing *Small Refiner* and *ASH II* is straightforward. The two panels adopted different solutions to very different problems. *See Oceana*, 389 F. Supp. 2d at 7 (distinguishing *Small Refiner* on the basis that while the old rule addressed in that case suffered from the same legal defect as the rule being vacated, the old rule in *Oceana* "has been litigated and upheld").

A review of the facts of *ASH II* confirms that its rule is tailored to a very different scenario. The panel responded to an agency's attempt to repeal a valid rule, rather than expand an existing rule. In 1979, the Civil Aeronautics Board (CAB) promulgated several rules to curb secondhand smoke on passenger airplanes. *See* 713 F.2d at 797 n.1. The CAB engaged in "extensive notice and comment rulemaking." *Action on Smoking & Health v. Civil Aeronautics Board*, 699 F.2d 1209, 1212, 1217 (D.C. Cir. 1983) (*ASH I*). But following a change in administration, the CAB revoked the rules. *Id.* at 1217. In January 1983, the D.C. Circuit vacated the revocation, finding that the CAB had not sufficiently explained its action. *See id.* In response, the CAB promulgated, without notice and comment, a new rule partially revoking the 1979 rules. *ASH II*, 713 F.2d at 798. It conceded that the vacatur of the 1981 revocation "reinstat[ed] the rules previously in force," *id.* at 797, but claimed its new rule was procedurally sufficient because it corrected the specific procedural defect in *ASH I*, *id.* at 798.

The D.C. Circuit disagreed. It responded that in light of the agency's concession that the 1979 rules were still in effect, the agency needed to start the repeal process from the beginning and to use full notice and comment, writing that "[a]n agency cannot remedy a deficiency in one regulation by promulgating a new rule, equally defective for the same or other reasons." *Id.* at 798-99. Given the CAB's desire to repeal (instead of building on) the old rule, allowing the old rule to remain inoperative following vacatur of an invalid rule designed to undo the old rule would allow the agency to achieve

27

by losing in court what it had so far failed to achieve by winning in court. *See Oceana*, 389 F. Supp. 2d at 7 (explaining that "[t]he only way to reverse [the new agency decision's nullification of the prior agency decision] is to revive [the prior decision]"). Thus, the CAB prudently conceded that it would apply the old rule upon vacatur.

*ASH II* says nothing about how to address the winding road of litigation in *Missouri*. Although Plaintiffs rely on the CAB's concession about vacatur of revisions to past rules, *ASH II*'s specific holding of that case was that an agency may not replace one legally defective rule with another legally defective rule—and that is functionally what Plaintiffs want Defendants to do here. *Cf. Azar v. Allina Health Servs.*, 587 U.S. 566, 571 (2019) (agency may not use an invalid rule to promulgate its own replacement); *WorldCom, Inc. v. FCC*, 246 F.3d 690, 696 (D.C. Cir. 2001) (vacating order when the agency improperly "relied not only on the … [previously-]vacated [order] but also on its defective reasoning"). Here, the agency forcefully defended SAVE and REPAYE, and the Eighth Circuit responded by enjoining *both* programs. *ASH II* would not prevent the agency from moving on.

## B.    Plaintiffs' SAVE Transition Claim Fails

### 1.    The SAVE Transition Claim Stands and Falls With the REPAYE Claim

In enacting the OBBBA, Congress both repealed the ICR statute by July 1, 2028 and required any borrower enrolled in a plan under the ICR statute to already be off that plan by that same date. OBBBA § 82001(a)(1), (c)(1), (c)(3), 138 Stat. at 337, 340, 341. Defendants are implementing those directives by giving staggered batches of borrowers 90 days to transition to a new plan, starting on July 1, 2026. That decision is authorized by statute and is not arbitrary or capricious. Thus, Plaintiffs' only objection to the plan is that they believe REPAYE is a current plan. Since that is not true, the Court should dismiss these claims.

This part of the lawsuit is fairly straightforward. Plaintiffs do not appear to object to being asked to leave SAVE in the abstract—indeed, they protest they cannot make progress toward loan forgiveness as long as Defendants do not reclassify them as REPAYE enrollees. *See* PI Motion at 22 (expressing concern that "plaintiffs will lose qualifying months toward IDR discharge that cannot be re-earned once the time passes"); *id.* at 10 (complaining that the agency "ha[s] not restarted payments

under REPAYE for borrowers who were enrolled in SAVE"). Rather, they object to being asked to leave REPAYE. *See id.* at 9 (challenging "the decision to involuntarily move borrowers lawfully enrolled in REPAYE into a different repayment plan"). And the parties appear to agree that if REPAYE is defunct, Defendants would have statutory authority to require borrowers to choose an operative repayment plan. *See id.* at 15 (citing 20 U.S.C. § 1087e(d)(2) for the point that the agency has statutory authority to "select or require a repayment plan for a borrower … if the borrower does not select a plan"). Thus, these claims turn on whether REPAYE is actually defunct. Because Plaintiffs' challenge to the SAVE transition is a subset of their REPAYE argument, it fails for the same reasons.

### 2. The Decision to Start the SAVE Transition on July 1, 2026 Was Not Arbitrary or Capricious

Nor could Plaintiffs argue that the OBBBA gives them a right to remain in a *defunct* ICR plan until June 30, 2028. In addition to the agency's preexisting authority to require borrowers to select a plan if they do not select one, 20 U.S.C. § 1087e(d)(2), the OBBBA directs the agency to "take such steps as may be necessary to *ensure* that before July 1, 2028, each [ICR] borrower … selects" a new plan. OBBBA § 82001(a)(1), 138 Stat. at 337 (emphasis added). The extended timeline and the wide-ranging term "such steps as may be necessary" contemplates a gradual transition—and that means Defendants need to get started well before June 30, 2028.

Congress' desire for a gradual transition is reflected in the OBBBA's drafting history. Three days before enactment, Congress amended the OBBBA, seemingly to accommodate the agency's processing backlogs. The House version would have required the agency to transition ICR borrowers within nine months, before even RAP became available. The as-enacted version gave the agency two years after RAP opened (that is, two years after July 1, 2026) to get the job done.[8] Perhaps not coincidentally, two years was how long it would take the agency to process the IDR applications of

---

[8] Congress underscored its intent for a gradual transition through the carrot-and-stick structure of the OBBBA. Borrowers who work with the agency will get to pick between RAP and IBR (and, for two years, Original ICR and PAYE). Borrowers who don't will usually get channeled into RAP.

7.73 million SAVE borrowers at the then-current processing rates. The SAVE transition will put exceptional stress on the system. It was not arbitrary or capricious for the agency to get a head start.

**C.      [MTD Only] The Current Complaint's Retroactive-Benefits Allegations Merely Repackage the Original Complaint's Legally Deficient Allegations**

The complaint presents one final argument not presented in the PI Motion, which restates the original complaint's allegations and fails for the same reasons. In the original complaint—filed the day before the relevant portions of the SAVE Plan Final Rule were vacated—Plaintiffs alleged that as soon as the District Court dismissed *Missouri* and assertedly dissolved its injunction against the SAVE Plan Final Rule, the Rule instantly became enforceable again, and Defendants were required by law to reinstate it immediately. *See* Compl. ¶¶ 48, 75. After the Eighth Circuit summarily reversed the District Court's decision and Defendants moved to dismiss the original complaint, Plaintiffs amended their complaint to double down on this legally deficient argument. After repeating that Defendants were required to enforce the SAVE Plan Final Rule after the district court dismissed *Missouri* and that entitlements under the Final Rule "vest[] immediately," Plaintiffs asserted that Defendants had denied them regulatory benefits "they had already earned." FAC ¶¶ 69, 89, 141(c).

In plain English, Plaintiffs are saying that even if the SAVE Plan Final Rule does not exist today, even if it was enforceable for fewer than two weeks, and even if the judicial decision rendering the Rule enforceable was summarily reversed, that erroneous decision—however brief—created a permanent and irreversible entitlement to student loan forgiveness. Put differently, Plaintiffs say the Eighth Circuit lacks the power to undo an incorrect ruling of the Eastern District of Missouri. This argument flouts basic tenets of appellate review, and the Court should reject it.

**1.      Plaintiffs Lost Any Forward-Looking Entitlement to Regulatory Benefits When the Relevant Regulatory Provisions Were Vacated**

Plaintiffs filed this lawsuit in an attempt to take advantage of a momentary and technical lapse in the series of injunctions against loan forgiveness under the SAVE Plan Final Rule. That lapse was sandwiched between two Eighth Circuit orders, neither of which this Court may review: the original February 2025 order directing a preliminary injunction, and the March 2026 order summarily reversing dismissal of the case and directing vacatur. The complaint alleged that SAVE still existed, due to the

30

technical consequences of the dismissal of the *Missouri* action on mootness grounds—a dismissal that, as it turns out, was extremely short-lived. That theory of the case is now invalid.

A "court must apply the law in effect at the time it renders its decision." *Henderson v. United States*, 568 U.S. 266, 271 (2013) (citation omitted). Therefore, a lawsuit premised on a rule that no longer exists is subject to dismissal, either because it is moot or because the complaint no longer states a claim. *See, e.g., Clean Fuels All. Am. v. U.S. EPA*, 169 F.4th 307, 313 (D.C. Cir. 2026) (declaring the case moot after a change in law, because "viewing the case prospectively as petitioners request, one might say that the legal question petitioners present … no longer exists"); *Friends of the Earth, Inc. v. Weinberger*, 562 F. Supp. 265, 270 (D.D.C. 1983) (Congress may moot a pending claim by passing legislation); *Vermont v. Goldschmidt*, 638 F.2d 482, 485 (2d Cir. 1980) (declaring case moot); *id.* at 486 (Newman, J., concurring in the result) (for similar reasons, "the enactment of the new statute does not moot the claim, it defeats it on its merits").

Today, the regulatory provisions creating the SAVE Plan have been vacated, so Plaintiffs cannot "establish [their] entitlement" to loan forgiveness under that plan. *Vermont*, 638 F.2d at 485. Thus, the Court is "hardly in a position to order" the agency to forgive debts consistent with the SAVE regulation. *Id.* (after Congress updated a grantmaking formula, Vermont's demand to receive grants under the old formula was moot, notwithstanding an earlier district court injunction in Vermont's favor). Plaintiffs cannot enroll in the SAVE Plan, cannot make monthly payments under the SAVE Plan, cannot receive discharges under the SAVE Plan, and cannot buy back non-qualifying months under the SAVE Plan Final Rule. There is nothing for this Court to enforce.

Plaintiffs' request for declaratory relief, FAC ¶ 19 & Prayer for Relief ¶ A, stands or falls with the injunctive claims. "[T]he Declaratory Judgment Act 'is not an independent source of federal jurisdiction'" and does not provide a freestanding cause of action. *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (quoting *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)); *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011). Nor would the DJA allow Plaintiffs to challenge past violations of a once-enforceable regulation. Rather, a "declaratory judgment that

31

respondent violated federal law in the past" cannot "stand on its own feet as an appropriate exercise of federal jurisdiction." *Green v. Mansour*, 474 U.S. 64, 74 (1985).

### 2. Plaintiffs Cannot Claim Regulatory Benefits From the Eleven Days the SAVE Plan Final Rule Was Temporarily Enforceable

The amended complaint says the Eastern District of Missouri dissolved the Eighth Circuit's injunction against the SAVE Plan Final Rule by dismissing *Missouri*, and assumes there was nothing the Eighth Circuit could do about it. That is wrong.

#### i. The Eighth Circuit's Order Undoing the District Court's Dismissal of *Missouri* Applies Retroactively

A "controlling interpretation of federal law … must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the issuing Court's] announcement of the rule." *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97 (1993). Courts may not consider "'the particular equities of [individual parties] claims' of actual reliance on an old rule and of harm from a retroactive application of the new rule." *Id.* (citation omitted).

Here, the event purportedly creating Plaintiffs' entitlement to loan forgiveness was the *Missouri v. Trump* district court's dismissal of that action, which dissolved the PI preventing Defendants from administering the SAVE Plan Final Rule. The Eighth Circuit's court's summary reversal of that dismissal confirmed that the PI should have remained in place—and as a matter of law, did remain in place—until the moment the district court ordered vacatur. "If a court of appeals overrules a district court, then that district court decision is rendered a 'legal nullity' and 'requires that it be treated thereafter as though it never existed.'" *Children's Hosp. Ass'n of Tex. v. Azar*, 507 F. Supp. 3d 249, 255 (D.D.C. 2020) (quoting *Khadr v. United States*, 529 F.3d 1112, 1115-16 (D.C. Cir. 2008)); *see also id.* at 257 ("[T]he D.C. Circuit's determination that the Final Rule was valid requires the conclusion that it was always valid…."). As a matter of law, since June 2024, Defendants have *never* had authority to cancel loans under SAVE, and no entitlements to loan forgiveness could have "vested" under SAVE. Similarly, since July 2024, Defendants have *never* had authority to use SAVE to set Plaintiffs' monthly

32

loan payments. And since April 2025, Defendants have *never* had authority to offer what Plaintiff calls "IDR buyback" (FAC ¶¶ 23, 53 n.3, 90) under the SAVE Plan Final Rule.[9]

Even if the Court feels the relevant event was not the March 9 reversal of the dismissal order but the March 10 vacatur, *Harper* would preclude relief. The Eighth and D.C. Circuits agree that retroactivity applies with equal force to judicial vacatur of agency rules. "[T]he decision of a federal court must be given retroactive effect regardless of whether it is being applied by a court or an agency," and an agency may not "decline to apply a federal court decision retroactively." *National Fuel Gas Supply Corp. v. FERC*, 59 F.3d 1281, 1289 (D.C. Cir. 1995); *see also Burlington Res. Oil & Gas Co. v. U.S. Dep't of Interior*, 21 F. Supp. 2d 1, 6 (D.D.C. 1998) (applying a Tenth Circuit ruling retroactively in this district). The Eighth Circuit follows the same rule: "invalidation of the [prior] rule applies retroactively." *United States v. Goodner Bros. Aircraft, Inc.*, 966 F.2d 380, 385 (8th Cir. 1992).

ii.    Plaintiffs Are Not Entitled to Equitable Non-Retroactivity

"[W]here *Harper* is applicable, a remedy other than retroactive application of a prior [judicial] decision can be awarded only in four specific circumstances. '[A] court may find (1) an alternative way of curing the constitutional violation, (2) a previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief, [] (3) as in the law of qualified immunity, a well-established legal rule that trumps the new rule of law, which general rule reflects both reliance interests and other significant policy justifications, or (4) a principle of law ... that limits the principle of retroactivity itself.'" *National Fuel*, 59 F.3d at 1288 (quoting *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 759 (1995)). In short, only the "most compelling" reliance interests could possibly justify nonretroactivity. *Id.* Here, the only possible equitable consideration would be the third prong, "reliance interests and other significant policy justifications." But even that rule would not apply to Plaintiffs, who incurred no

---

[9] Plaintiffs briefly gesture to a separate principle counseling against retroactive application of agency rules and Acts of Congress, but as one of their cases confirms, that principle does not apply to the Eighth Circuit's *judicial* decision. *Compare* FAC ¶ 96 (citing *Bowen*, 488 U.S. at 208 (agency rules) and *Landgraf v. USI Film Prods.,*, 511 U.S. 244, 265, 269-70 (1994) (statutes)) *with Landgraf*, 511 U.S. at 279 & n.32 (contrasting statutes with judicial decisions and reaffirming that *Harper* "established a firm rule of retroactivity" for "intervening *judicial* decisions").

reliance interests in a plan that (even by their own theory) was enforceable for only 11 days, and which Defendants did not make available to anyone else.

*First*, a litigant cannot accrue reliance interests in a judicial decision that lasted for 11 days before its summary reversal. Defendants cannot even process a loan discharge in 11 days.[10] More broadly, SAVE was not the status quo, and false hope cannot create a reliance interest. *See Edwards v. Vannoy*, 593 U.S. 255, 272 (2021). The district court dismissed *Missouri* in February 2026, a year and a half after it first enjoined forgiveness under SAVE, and ten months after it enjoined the SAVE Plan Final Rule in full. SAVE debuted in July 2023, meaning that SAVE discharges took place for only one year. In the short history of SAVE, forgiveness was banned more often than not.

The plaintiff states promptly acted to challenge that ruling and to preserve their interests. They obtained a reversal within 11 days. Reliance on the district court's order, in those circumstances, would have been ill-advised. Indeed, Plaintiffs do not suggest that they actually relied on the order, other than spending time on the usual customer service inquiries to set up a lawsuit. *See* FAC ¶¶ 101, 108, 115, 124 (three of the four Plaintiffs reached out to customer service three days before filing suit, and the fourth reached out five days before).

The buyback borrowers (Grunseth and Boykin) present a particularly weak case for relief. When they took out student loans, they signed up on the understanding that they would make payments for at least 20 years before obtaining forgiveness. *See* FAC ¶¶ 98 (Grunseth took out her loans in 2014); 105 (Boykin took out his loans around 2013). And their projected monthly payments are relatively manageable: $76/month for Grunseth and $124/month for Boykin. ECF 19-4 ¶ 7 (Grunseth); ECF 19-6 ¶ 6 (Boykin). Also, Boykin switched to a new plan in January 2025—that is, *before* the Eighth Circuit expanded the PI to block the entire SAVE Plan Final Rule. FAC ¶ 105. He thereby accepted that he would not be able to obtain the benefits of either SAVE or REPAYE.

---

[10] When the agency notifies a borrower she is discharge-eligible, it provides an opt-out period so she can decide whether to accept or reject it. Status Report of January 14, 2026 at 3, *AFT v. ED*, ECF 60, attached as **Exhibit N** to the Shi Decl.

34

Plaintiffs respond that they have reliance interests in the survival of the plans as a whole because they raised their discretionary spending once REPAYE (for Havens) and SAVE (for Havens and Grunseth) lowered their monthly payments. PI Motion at 18. But that argument makes the same mistake as the rest of the PI Motion: the benefits they point to were the result of a monthly payment formula that has been enjoined since July 2024. Those interests might have been appropriate to consider in the *Missouri* case, but they are not relevant here, as the Eighth Circuit enjoined the SAVE Plan's monthly payment formula notwithstanding any such reliance interests.

*Second*, equity supports applying the Eighth Circuit's order retroactively, because equity is not a tool to subvert appellate jurisdiction—and Plaintiffs' "irreversible vesting" argument would intrinsically subvert appellate jurisdiction.

Because "a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby," *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 145 (1919), appellate courts have vehemently criticized litigants' attempts to circumvent their jurisdiction by seeking immediate and irreversible compliance with district court judgments.

In *Vermont*, for example, the appellate panel outlined that a party moving for a stay should receive time to litigate that stay—at least where only financial assets are at stake. The district court had ordered the federal government to pay Vermont $5 million in federal highway subsidies, but Congress then undercut the district court by changing the subsidy formula. 638 F.2d at 484. Vermont argued that Congress' action was legally irrelevant and that the money was due by operation of law as soon as the district court entered its injunction, notwithstanding the Government's stay motion. The Second Circuit disagreed. It said that even assuming "the district court's final order and judgment did create a definite and enforceable duty to obligate," the appellate court was entitled to "a reasonable opportunity to decide the [stay] motion." If not, the Second Circuit's jurisdiction to enter a stay pending appeal would be "futile." *Id.* at 485. And, it observed, an appellate stay order is "not intended to be a futile act." *Id.* (citing *Griffin v. County School Board*, 363 F.2d 206, 210-12 (4th Cir. 1966)).

Plaintiffs' argument stretches even further than that, and would nullify even most district court stays. Taking their theory at face value, even if the district court had granted the plaintiff states' motion for a stay pending appeal, that stay would have been futile too, as that motion was not filed until the next business day. The *only* way to avoid permanent loan forgiveness would have been for the district court to preemptively grant a stay pending appeal in its order dismissing the case.

As it stands, the complaint effectively asks this Court to overrule the Eighth Circuit. Nothing in law or equity requires such an illogical result.

### 3.     Judicial Comity Counsels Against Equitable Relief, and Would Even Support a Stay of Proceedings or Dismissal

In the alternative, the Court should exercise its discretion to deny equitable relief or to stay or dismiss the case on grounds of judicial comity. "When an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases." *Bergh v. Washington*, 535 F.2d 505, 507 (9th Cir. 1976). A district court has various tools at its disposal, including a stay of the case; dismissal; or a transfer. *See UtahAmerican Energy, Inc. v. Dep't of Labor*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) (citation omitted). The comity interests in this action are concrete and unmistakable. In *Missouri v. Trump*, the Eighth Circuit summarily reversed the decision on appeal 99 minutes after the State of Missouri told it about this lawsuit.

Plaintiffs, for their own part, are openly planning to lock horns with the Eighth Circuit—but they should do so on its own turf. If the *Missouri* court grants Plaintiffs' pending motion to intervene, Plaintiffs will try to overturn the Eighth Circuit-directed vacatur of (most of) the SAVE Plan Final Rule. *See Missouri*, ECF 106-1. And even if the *Missouri* court denies the motion to intervene, Plaintiffs could appeal that denial to the Eighth Circuit. "It 'is the basic doctrine of equity jurisprudence that courts of equity should not act ... when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.'" *Klayman v. Rao*, 49 F.4th 550, 553 (D.C. Cir. 2022) (quoting *Younger v. Harris*, 401 U.S. 37, 43-44 (1971)). For example, the availability of appeal in a separate forum constitutes an adequate remedy of law, thereby precluding equitable remedies in this

36

forum. *Wilson v. Schnettler*, 365 U.S. 381, 385 (1961). Thus, the *Missouri* litigation gives Plaintiffs "a remedy at law adequate to address any errors in the [Eighth Circuit's] judgments." *Klayman*, 49 F.4th at 553 (citing *Wilson*, 365 U.S. at 385) (where the plaintiff collaterally attacked two adverse decisions by suing the judges who ruled against him, equitable relief was unavailable, as the plaintiff had a "right to appeal … and to petition for review in the Supreme Court" in the preceding two cases).

Judicial comity makes this case a particularly poor candidate for equitable relief. Litigation in one federal forum should not be used to collaterally attack the decision of another federal forum; but today, that is the only remaining purpose these claims could serve. The D.C. and Eighth Circuits both have a "general policy against concurrent federal litigation," which could "generate contradictory results that could, in turn, generate dueling appeals." *Missouri ex rel. Nixon v. Prudential Health Care Plan, Inc.*, 259 F.3d 949, 953 (8th Cir. 2001) (first quote); *UtahAmerican Energy*, 685 F.3d at 1124 (second quote). In plain English, "Plaintiffs may not pursue multiple federal suits against the same party involving the same controversy at the same time." *Prudential Health Care Plan*, 259 F.3d at 954.

Instead of parallel lawsuits in separate fora racing to the finish line, the court that acquires jurisdiction first generally "should be allowed to proceed with [its case] without interference from other courts under suits subsequently instituted." *UtahAmerican Energy*, 685 F.3d at 1124 (citation omitted). Here, the court with priority is the Eastern District of Missouri. That court has been handling challenges to the SAVE Plan Final Rule since April 2024. It enjoined the loan-forgiveness provisions at the heart of this case back in June 2024. And it received the parties' joint motion for vacatur three months before Plaintiffs filed this suit. *See* Compl., *Missouri*, ECF 1 (filed Apr. 9, 2024); *Missouri v. Trump*, 738 F. Supp. 3d at 1155-56 (June 24, 2024); Joint Motion for Entry of Final Judgment, *Missouri*, ECF 91 (filed Dec. 9, 2025); Compl., ECF 1 (filed Mar. 9, 2026). The two cases are "'mirror-image' actions." *Stone & Webster, Inc. v. Georgia Power Co.*, 965 F. Supp. 2d 56, 64 (D.D.C. 2013), *aff'd*, 779 F.3d 614 (D.C. Cir. 2015) (dismissing the later-filed action). In *Missouri*, the Plaintiff States sued to enjoin and to vacate the SAVE Plan Final Rule. Compl. ¶¶ 178, 204 & Prayer for Relief ¶¶ (d)-(e), *Missouri*, ECF 1. In *Havens*, the plaintiff borrowers sued to enforce the SAVE Plan Final Rule. Compl. ¶ 7 ("By dismissing the [*Missouri*] lawsuit, the Court removed any legal barrier preventing borrowers from

37

full access to the benefits of the [SAVE Plan Final Rule], including the immediate, automatic discharge of debts for eligible borrowers."). Both cannot be right—which is why the *Havens* plaintiffs moved to intervene in *Missouri*. Letting Plaintiffs' irreversible-vesting claims proceed will risk "generat[ing] contradictory results." *UtahAmerican Energy*, 685 F.3d at 1124.

For similar reasons, if Plaintiffs are allowed to intervene in *Missouri*, they would be judicially estopped from presenting these claims here. In *Missouri*, Plaintiffs told the district court they must be allowed to intervene because they have "no recourse outside of [the *Missouri*] proceeding." Defs.' Reply in Supp. of Motion for Extension of Time to Respond to Pls.' Compl. at 2, ECF 11 (quoting *Missouri* Mem. in Supp. of Granting Mot. for Leave to Intervene at 17-18, filed as an exhibit in this action at ECF 11-1). If the *Missouri* court grants the motion, "judicial acceptance of an inconsistent position in a later proceeding" may "create 'the perception that either the first or the second court was misled[.]'" *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (citation omitted). Thus, judicial estoppel would prevent Plaintiffs from repleading these alternative theories in this forum. *See, e.g.*, *Davis v. District of Columbia*, 925 F.3d 1240, 1255-57 (D.C. Cir. 2019).

## III.    The Balance of Equities and the Public Interest Favor the Government

In analyzing the balance of the equities, courts "weigh[] the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024). Here, ordering Defendants to reinstate REPAYE and to put the SAVE transition on hold will significantly harm Defendants and the public by unsettling an area of the law that urgently needs stability, in light of recent instability, the long-running administrative forbearance for SAVE borrowers, and Congress' statutory timeline to sunset the ICR plans. "[C]onsideration of these factors alone requires denial of the requested injunctive relief." *Winter*, 555 U.S. at 23.

For Plaintiffs, when the tax claims (which lack standing) are removed, little is at stake. A dispute over $1,320, paid over two years, is a thin reed on which to hang universal relief. It is particularly unsuited for emergency relief, as the agency will reimburse Plaintiffs for any overpayments if this Court reinstates REPAYE on the merits.

By contrast, for the public and Defendants, reinstating REPAYE would throw the *Missouri* settlement into doubt, causing major collateral damage to the nearly three million borrowers currently enrolled in PAYE and Original ICR—programs that still exist *because of* the *Missouri* settlement. Plaintiffs complain that it is unfair for the agency to continue offering those plans, which were "authorized under the same statutory authority" (that is, the ICR statute) that *Missouri v. Trump* rejected. PI Motion at 16. But that was the best deal that the Government was able to get. To the extent there is any inconsistency in the current status quo—in that two ICR plans remain alive, at least until 2028— it is *favorable* to borrowers.

Defendants and the public also have strong interests in complying with Congress' July 1, 2028 deadline to complete the ICR transition. Whenever the Government is "enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 835 (2025) (citation omitted). And third parties can *benefit* from a government action, even if the plaintiffs do not. *Cf. Nken*, 556 U.S. at 436 (explaining that the public interest in acting against a "particularly dangerous" person counts in the Government's favor). Here, this legislation affects the public, so these two considerations intertwine.

An injunction against the SAVE transition would be problematic even if the Court enjoined the transition *without* reinstating REPAYE. The OBBBA's impending repeal of the ICR statute will affect not just the seven million SAVE borrowers, but also the three million Original ICR and PAYE borrowers, who may also need to move to new plans before July 1, 2028, lest they be involuntarily reassigned to RAP themselves. The agency has authority to move SAVE borrowers onto the 10-Year Standard plan, *right now*; it is proceeding in batches because it wants to give borrowers the opportunity to choose. But there are seven (or ten) million people who need to make that same choice. Long application backlogs might be on the horizon. Enjoining the SAVE transition at this time would kick the can down the road, delaying the possibility of disruption now for the certainty of disruption later. It would also burden the taxpayers who underwrote SAVE borrowers' student loans, as the borrowers would remain in forbearance and would thus not be repaying their loans under any operative repayment plan (or, indeed, any plan at all).

Finally, as long as it is possible to craft party-specific relief, "the balance of equities does not counsel against" denying a broader preliminary injunction "because [Plaintiffs] will remain protected by the preliminary injunctions to the extent necessary and appropriate to afford them complete relief." *CASA*, 606 U.S. at 861. In other words, a programmatic injunction cannot justify itself by the fact that it is programmatic, and a proposed injunction's purported benefits on nonparties is not a standalone basis to make an injunction broader than it needs to be.

**IV. Any Relief Should Be Limited to the Named Plaintiffs and Should Only Keep Them in SAVE, Rather than Reinstate REPAYE on a Temporary Basis**

**A. *Trump v. CASA* Directs Courts to Limit Injunctive Relief to the Parties**

Under *Trump v. CASA*, universal injunctions are heavily disfavored. "[T]he question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." 606 U.S. at 852. Once a party has received complete relief, providing relief to nonparties "would not render [the party's] relief any more complete." *Id.* at 853.

The borrower-specific nature of the student loan system confirms that the Court should award, at most, borrower-specific relief. Congress chose to give borrowers a choice of repayment plans, which have their own pros and cons. The injuries in student loan lawsuits are often financial and turn on the specific inputs into the monthly payment formula, such as income, family size, loan balance, time in repayment, personal savings, and the availability of Public Service Loan Forgiveness. Reinstating REPAYE might not be a good idea for every borrower. Indeed, Defendants have already identified one borrower (Havens) who would pay much more under REPAYE than an existing plan. The Court should not enter relief for people who did not ask for it.[11]

---

[11] Consider the seven million borrowers still enrolled in SAVE. Plaintiffs say they want REPAYE reinstated so they can make progress towards loan forgiveness. *See* PI Motion at 22. Many might disagree. Following vacatur, a borrower who is still enrolled in SAVE after two years in forbearance might just value the forbearance (which, in the short term, is free) more than progress towards loan forgiveness. Such borrowers would find REPAYE's reinstatement an unwelcome surprise.

At the very least, because the agency is ready and willing to compensate Plaintiffs for any short-term financial injuries caused by increased monthly loan payments, any preliminary injunction should be limited to Havens and Robeson, the only two Plaintiffs who have identified anything resembling an irreversible large-dollar consequence (taxes) of transferring out of the SAVE Plan. Yet even then, the tax injuries have the most intractable standing defects. And respectfully, the Court should not turn the loan forgiveness system upside down to benefit two borrowers who sit at the nexus of multiple edge cases: a one-time tax holiday prompted by an unprecedented pandemic, and a failure to take a one-time offer from the agency they are now suing.

### B.    *Trump v. CASA* **Directs Courts to Explore Alternatives to Programmatic Relief**

Under *Trump v. CASA*, even complete relief is not an absolute requirement. Rather, "to say that a court *can* award complete relief is not to say that it *should* do so." 606 U.S. at 853-54. In other words, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction," and "a federal judge . . . is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982); *see also American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518-59 (D.C. Cir. 2020) (ordering limited relief even though it "does not provide the Shippers with the complete relief they sought"). Here, the Court can and should direct Plaintiffs to explore options for individually tailored relief before resorting to a universal injunction.

For Robeson and Havens' dischargeable loans, before issuing a REPAYE-based injunction, the Court could neutralize their REPAYE-based irreparable harm theory by issuing a temporary stay of the SAVE transition applicable to them only. That theory assumes that moving to a new plan will lock in a 2026 discharge, and thus tax liability. Even a PI limited to the SAVE transition is not justified, but such a PI will buy time for the Court to decide this case on the merits. It will also buy time for Plaintiffs to explore alternative solutions with the IRS. Defendants maintain that Plaintiffs should have consulted with the IRS before moving for emergency relief against a different agency, and that their failure to do so divests them of standing. But if the Court disagrees on standing, even belated alternatives would be preferable to a universal injunction blocking the SAVE transition or restoring

41

REPAYE. Plaintiffs respond that "[a] stay postponing the effective date of [the SAVE transition] cannot logically be confined to four borrowers," but they provide no authority for that contention. PI Motion at 24. In fact, as a practical matter, by moving in batches, the agency is postponing the effective date of the SAVE transition for most SAVE borrowers at this very moment.

      **C.**        **The Traditional Equitable Principles *CASA* Outlined Apply to APA § 705**

In response, Plaintiffs "principally" argue that they can sidestep *CASA* by packaging their claim as a request for an APA § 705 stay. PI Motion at 23 (titled "The Requested § 705 Stay Is Not Subject to the Limits on Universal Injunctions"). That law says, in full:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705. Plaintiffs read too much into § 705's text. Whatever the APA's scope vis-à-vis *CASA*, the statutory text contains a built-in limitation: the stay must be cabined to achieve only what is "necessary to prevent irreparable injury." Here, Defendants have explained that the injuries in this case are primarily financial and that irreparable harm is speculative (the tax and interest-subsidy injuries), nonexistent (the monthly payment formula injuries), or both.

In any case, *CASA* naturally informs the § 705 analysis. That case did not construe the APA, 606 U.S. at 847 n.10, but it *was* a preliminary injunction case, and "[t]he factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *Immigrant Defenders Law Center v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025) (partially granting the Government's motion for a stay pending appeal post-*CASA* and narrowing the relief ordered by the district court). And even before *CASA*, district courts retained discretion to craft plaintiff-specific relief in APA cases, denying programmatic relief when "an injunction that applies only to the plaintiff[s] would provide complete relief to them." *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). For example, in *State of Nebraska Dep't of Health & Human*

*Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326 (D.C. Cir. 2006), the D.C. Circuit vacated overbroad APA relief. It approvingly cited a holding that the "district court should not have enjoined [an] agency from applying [a] challenged regulation to any party when '[a]n injunction covering [plaintiff] alone adequately protects it from the feared prosecution.'" *Id.* at 330 (quoting *Virginia Society of Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001), *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012)). The Court can do the same thing here.

In response, Plaintiffs cite a single case, *Cabrera v. U.S. Dep't of Labor*, 792 F. Supp. 3d 91 (D.D.C. 2025), which said a court *could* authorize "wholesale, rather than party-specific, stays of agency action." *Id.* at 106. But that is not necessarily inconsistent with *CASA*, which acknowledged that sometimes, complete relief "incidentally" benefits nonparties. 606 U.S. at 851. The relevant question under both *CASA* and § 705 is whether programmatic relief is *necessary* to provide complete relief to the parties. For the foregoing reasons, it is not.

## V.    If the Court Issues Injunctive Relief, the Court Should Issue a Stay Pending Appeal and Require Plaintiffs to Post Security

The Court should deny a preliminary injunction. However, if the Court enters injunctive relief, the Court should issue a stay pending appeal and order Plaintiffs to post security. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). For the reasons explained above, Plaintiffs are not likely to succeed on the merits and Defendants will be irreparably injured absent a stay. *See id.* The public interest strongly favors giving effect to a statute enacted by the American people's democratically elected representatives. *See id.* Those factors outweigh any injury Plaintiffs might suffer. A stay pending appeal is warranted if the Court issues injunctive relief.

The Court should also require Plaintiffs to post an appropriate bond commensurate with the amount of loan forgiveness, lost tax revenue from backdated loan discharges, and decreased monthly payments triggered by Plaintiffs' requested relief. As previously noted, the Supreme Court has long held that "a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." *Arkadelphia Milling*, 249 U.S. at 145. Thus, a district court may issue preliminary injunctive relief "only

if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." FED. R. CIV. P. 65(c). The D.C. Circuit has recently "clarif[ied] that injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump,* No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam).

Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). Here, the financial exposure of a programmatic injunction reinstating REPAYE could be substantial. Upon promulgating REPAYE in 2015, the Department of Education estimated that the rule "will have a net budget impact of $15.4 billion" for a 32-year cohort of borrowers. 80 Fed. Reg. at 67228. Without the protection of an injunction bond, there may be no way to recover the funds lost to United States taxpayers if this Court or appellate courts were later to find that the agency was wrongfully enjoined. *National Institutes of Health v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025) (staying district court injunction because plaintiffs did not say they would "repay grant money if the Government ultimately prevail[ed]" during appellate process); *Department of Education v. California*, 604 U.S. 650, 651-52 (2025) (staying district court injunction requiring payment of federal funds in part because the district court "declined to impose bond").

## CONCLUSION

The Court should deny the Motion for Preliminary Injunction. The Court should dismiss the First Amended Complaint without prejudice for lack of jurisdiction, or in the alternative with prejudice for failure to state a claim.

Date:   July 14, 2026                    Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHELLE R. BENNETT
Assistant Branch Director
Federal Programs Branch

*/s/ Winston Shi*
WINSTON SHI (NY Bar No. 5747068)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: 202-880-0387
Email: winston.g.shi@usdoj.gov

*Counsel for Defendants*