**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HEATHER HAVENS, *et al.,*<br><br>    *Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et al.,*<br><br>    *Defendants.* | Civil Action No. 1:26-cv-816-LLA |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY
INJUNCTION OR STAY AND OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT.................................................................................................................. 3

I.    Plaintiffs Are Likely to Succeed on the Merits ............................................................ 3

    a.    No Subsequent Action has Lawfully Repealed or Vacated REPAYE ................................. 4

    b.    When a Rule is Vacated, the Prior Rule Is Restored ............................................. 5

    c.    Agencies Cannot Repeal a Valid Final Rule Due to Litigation Risk Without Taking
        Administrative Action ...................................................................................... 8

II.    Plaintiffs have Standing................................................................................11

III.    Plaintiffs Face Significant Irreparable Harm ............................................................ 12

    a.    Defendants do not Address Lost Eligibility Toward IDR Caused by Shadow Repeal of
        REPAYE and Forced Repayment Plan Transfer ................................................. 13

    b.    Increased Monthly Payments due to the Shadow Repeal of REPAYE are Irreparable........ 13

    c.    Lost Interest Subsidy Will Result in an Increased Loan Balance ......................................... 15

    d.    Absent a Preliminary Injunction, Defendants will Issue a 1099-C To Plaintiffs Havens and
        Robeson, Irreparably Harming Them....................................................................... 16

IV.    Plaintiffs have Vigorously Pursued Relief in the Face of Changing and Unclear Policy........... 23

    a.    Plaintiffs Sought Relief Before the Harm – Not on Its Eve ................................................. 23

    b.    Plaintiffs' Timing Reflects Defendants' Conduct, Not the Absence of Irreparable Harm..... 26

    c.    Potential that Future Relief in this Case May Moot Certain Claims has no Bearing on the
        Stay Request.................................................................................................. 26

V.    Balance of Equities Strongly Favors an Injunction ................................................. 27

    a.    Millions of Borrowers are Being Denied an Operative Repayment Plan ............................. 27

    b.    Defendants' Concede That Borrowers Will Lose Years of Repayment Progress................. 29

    c.    Defendants' Conduct, not Reinstatement is the Source of disruption ................................. 29

    d.    A Stay Does not "Throw The Settlement Into Doubt" — It Holds the Government to the
        Judgment It Requested. ................................................................................ 32

e.    The OBBBA Transition Must be Executed Through Rulemaking. ...................................... 32

VI.   Comity Does not Prevent this Court from Ruling .................................................................... 33

VII.  The Court Should Deny Defendants Motion to Dismiss because SAVE Benefits Have Already
Accrued                                                                                                                                  36

a.    The IDR Account Adjustment Explains the Temporal Confusion in the Record ............... 36

b.    Plaintiffs are Not Requesting Forward Looking Application of SAVE .............................. 37

c.    *Harper* Answers the Wrong Question ................................................................................ 38

d.    Earned Entitlements and Final Determinations Survive Vacatur and Only Lawful Process
Can Undo Them. ................................................................................................................... 41

VIII. APA Section 705 Operates on the Agency Action .................................................................. 42

a.    A Section 705 Stay Operates on the Agency Action to Preserve the Remedy .................... 42

b.    *CASA* does not Govern Section 705 Cases ........................................................................ 44

IX.   Preliminary Relief that Maintains the Status Quo does not Require Bond .............................. 44

X.    The Court Should Deny a Stay Pending Appeal ...................................................................... 45

CONCLUSION .............................................................................................................................. 45

## TABLE OF AUTHORITIES

**CASES**

*Action on Smoking & Health v. CAB*, 713 F.2d 795 (D.C. Cir. 1983) .................................................. passim

*AFL-CIO v. Chao*, 496 F. Supp. 2d 76 (D.D.C. 2007) ........................................................................6, 9

*Afr. Communities Together v. Lyons*, No. 25-cv-6366 (PKC), 2026 WL 1382944 (S.D.N.Y. May 18, 2026) ...........................................................................................................................................44

*Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584 (D. Md. 2025) ....................................44

*Anglers Conservation Network v. Pritzker*, 809 F.3d 664 (D.C. Cir. 2016) ....................................38

*Arkema Inc. v. EPA*, 618 F.3d 1 (D.C. Cir. 2010) ......................................................................9, 41

*Asylum Seeker Advoc. Project v. U.S. Citizenship & Immigr. Servs.*, 808 F. Supp. 3d 708 (D. Md. 2025) ...44

*Aviel v. Gor*, No. 25-cv-778 (LLA) (D.D.C. Apr. 4, 2025) ...............................................................29

*Beatty v. Trump*, No. 25-cv-4480 (CRC) (D.D.C. Mar. 14, 2026) ....................................................24

*Benisek v. Lamone*, 585 U.S. 155 (2018) .........................................................................................24

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...............................................................................................41

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) .......................................................................33

*Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91 (D.D.C. 2025) ....................................................44

*California v. Grace Brethren Church*, 457 U.S. 393 (1982) ..............................................................22

*Chamber of Commerce of the U.S. v. EPA*, 642 F.3d 192 (D.C. Cir. 2011) ......................................12

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ............................13

*Chicot Cnty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371 (1940) .........................................41

*City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025) ................................................44

*Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) .................................................................9

*Clinton v. City of New York*, 524 U.S. 417 (1998) ..........................................................................20

*Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872, 2025 WL 2192986 (D.D.C. Aug. 1, 2025)....43

*Comm. for a Constructive Tomorrow v. U.S. Dep't of the Interior*, No. 24-cv-774 (LLA), 2024 WL 2699895 (D.D.C. May 24, 2024) ..................................................................................... 11, 24

*Consumer Energy Council of Am. v. FERC*, 673 F.2d 425 (D.C. Cir. 1982) ......................................9

*Cool Fuel, Inc. v. Connett*, 685 F.2d 309 (9th Cir. 1982) ................................................................22

*In re Crosby*, 261 B.R. 470 (Bankr. D. Kan. 2001) .........................................................................20

*Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) ....................................................................11

*Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391 (D.D.C. 2020) ............................................24

*Davis v. Michigan Dep't of Treasury*, 489 U.S. 803 (1989) .............................................................38

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ......................................5

*District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020) ..............................19

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017) ................................................................................................................................................11

*Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55 (D.D.C. 2004) ...............................................................29

*Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025) ............................................... 24, 25

*Flora v. United States*, 362 U.S. 145 (1960) ..................................................................................23

*Gardner v. United States*, 211 F.3d 1305 (D.C. Cir. 2000) ............................................................22

*Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750 (D.C. Cir. 1987), aff'd, 488 U.S. 204 (1988) ...............3, 6

*Gordon v. Holder*, 632 F.3d 722 (D.C. Cir. 2011)..........................................................................24

*Green v. City of St. Louis*, No. 4:15-cv-1433-RWS, 2022 WL 4119853 (E.D. Mo. Sept. 9, 2022) ..........33

*Gu v. U.S. Dep't of Treasury*, No. 25-cv-2739 (LLA), 2025 WL 3089260 (D.D.C. Nov. 5, 2025)..........19

*Guthrie v. Sawyer*, 970 F.2d 733 (10th Cir. 1992).........................................................................22

*Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973 (D.C. Cir. 2016) .....................................................11

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989)................................................................42

*Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993) .........................................38, 39, 40

*Hilton v. Braunskill*, 481 U.S. 770 (1987)....................................................................................45

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022).........................................................29

*Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008)..............................29

*Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564 (D.C. Cir. 2022).........................9

*Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847 (D.C. Cir. 1987) ..................................7

*Iowa v. Wright*, 154 F.4th 918 (8th Cir. 2025)...............................................................................10

*L.C. v. Trump*, No. 26-cv-688 (RJL) (D.D.C. May 13, 2026) .......................................................24

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................................11

*Make the Rd. N.Y. v. Noem*, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)...................................44

*Make the Road New York v. Mullin*, 179 F.4th 16 (D.C. Cir. 2026) ..............................................42

*McDermott ex rel. NLRB v. Ampersand Publ'g, LLC*, 593 F.3d 950 (9th Cir. 2010)....................24

*McGowan v. Maryland*, 366 U.S. 420 (1961) ...............................................................................11

*Menorah Med. Ctr. v. Heckler*, 768 F.2d 292 (8th Cir. 1985) ................................................ 3, 10, 40

*Michigan v. EPA*, 576 U.S. 743 (2015) ..........................................................................................5

*Missouri v. Trump*, 128 F.4th 979 (8th Cir. 2025) ................................................................. passim

*Montefiore Med. Ctr. v. Kennedy*, 2025 WL 2801237 (D.D.C. Sept. 30, 2025) ...............1, 3, 6, 41

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)..........................5

*Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100 (D.D.C. 2025).....................................27

*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826 (D.C. Cir. 2006) .......18

*Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227 (D.C. Cir. 1992).........8

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998)....................................42

*Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7 (D.D.C. 2014)..........................................29

*Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5 (D.D.C. 2017).............................................9

*Neguse v. U.S. Immigr. & Customs Enf't*, 813 F. Supp. 3d 45 (D.D.C. 2025) ..........................................44

*New Hampshire v. Maine*, 532 U.S. 742 (2001) .............................................35

*Nken v. Holder*, 556 U.S. 418 (2009)..........................................42, 45

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)..........................................38

*Oceana, Inc. v. Evans*, 389 F. Supp. 2d 4 (D.D.C. 2005) ..........................................3, 6

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017)..........................................9

*Padgett v. Vilsack*, No. 24-cv-2954 (LLA), 2024 WL 4006050 (D.D.C. Aug. 30, 2024) ..........................................22

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ..........................................8

*Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433 (D.C. Cir. 1989) ..........................................18

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ..........................................27

*Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972)..........................................41

*Reuters Ltd. v. FCC*, 781 F.2d 946 (D.C. Cir. 1986) ..........................................8

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ..........................................5

*Sierra Club v. Jewell*, 764 F.3d 1 (D.C. Cir. 2014)..........................................11, 21

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983)..........................................1, 6, 7, 8

*Terrace v. Thompson*, 263 U.S. 197 (1923)..........................................21

*Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014)..........................................24, 38

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ..........................................42, 44

*United States v. Palomar-Santiago*, 593 U.S. 321 (2021)..........................................41

*United States v. Ritchie Special Credit Invs., Ltd.*, 620 F.3d 824 (8th Cir. 2010) ..........................................33

*United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ..........................................3, 6

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) ..........................................4, 39, 42

*Watson v. Sutherland*, 72 U.S. (5 Wall.) 74 (1866) ..........................................21

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)..........................................12

**STATUTES**

5 U.S.C. § 551(5) ..........................................8

5 U.S.C. § 553 ..........................................4

5 U.S.C. § 702 ..........................................13, 22

5 U.S.C. § 705 ..........................................passim

5 U.S.C. § 706(1) ..........................................38

20 U.S.C. § 1087e(d) ..........................................10, 32

20 U.S.C. § 1098a ................................................................................................................4

26 U.S.C. § 61(a)(11) ........................................................................................................21

26 U.S.C. § 108(a)(1) ........................................................................................................20

26 U.S.C. § 6213 ......................................................................................................... 22, 23

## REGULATIONS AND ADMINISTRATIVE MATERIALS

88 Fed. Reg. 43,820 (July 10, 2023) ................................................................................10

89 Fed. Reg. 90,221 (Nov. 15, 2024) ..............................................................................10

90 Fed. Reg. 3,695 (Jan. 15, 2025) ..................................................................................10

91 Fed. Reg. 42,186 ..................................................................................................... 25, 30

**INTRODUCTION**

No lawful action has repealed the 2015 Revised Pay as You Earn (REPAYE) repayment plan nor justified the Department of Education involuntarily changing the repayment plans of nearly 7 million borrowers. These actions, once implemented, will trigger a series of irreversible, cascading effects on Plaintiffs costing them tens of thousands of dollars in unlawful monthly payments and tax consequences, requiring years of additional repayment, and threatening their ability to finance their basic needs now and into retirement. The Court should act to halt these actions to preserve the status quo – nearly 7 million borrowers previously in SAVE are now in REPAYE – while the litigation progresses to ensure the Department's hasty action to implement its preferred policy agenda does not bulldoze over Plaintiffs', and the public's, interest in a lawful, affordable, and fair transition away from the Saving on a Valuable Education (SAVE) repayment plan.

The Defendants' merits defense rests on a single misread case. Defendants' lead case is not only unsupported by the body of DC Circuit case law but has already been considered and rejected by this Court. M*ontefiore Med. Ctr. v. Kennedy*, No. 24-cv-1810 (LLA), 2025 WL 2801237, at \*16 & n.11 (D.D.C. Sept. 30, 2025) (rejecting the government's regulatory-vacuum premise as one that "flout[s] 'basic tenets of administrative law,'" and resolving the asserted tension between *Small Refiner* and *ASH II* in favor of the latter). The truth is, no Court has made any finding about the lawfulness of the 2015 Rule which established REPAYE, and Defendants' argument based on the Eighth Circuit's preliminary injunction opinion which preliminarily evaluated, at most, the forgiveness provisions of REPAYE, somehow created a legal scenario where the Department could choose what portions of the REPAYE plan or 2015 Rule to enforce, or not, without any rulemaking or invoking any exceptions to the rulemaking process.

Defendants self-harm argument is factually impossible as this case challenges actions taken after the vacatur of the SAVE Final Rule, which came 3 months after the government's 'deal' expired. And they do not dispute that the controlling statute and regulations require borrowers to affirmatively

1

choose what available repayment plan they are in, rather than having the choice made for them by Department of Education officials.

In response to this motion, Defendants seek to minimize and brush away the lived experience of millions of borrowers caught in a system that is failing to deliver what the law requires. Even what may appear to be small dollar figures on their face represent real financial tradeoffs for Plaintiffs. Unnecessary tradeoffs, as at least two of these Plaintiffs were credited with enough payments for discharge in 2024 by the Department's own account, and the other two could also get discharge based on the buyback credit they have already accrued.

Of course, the Department could end REPAYE and transition borrowers to other repayment plans; but that would require formal APA rulemaking to ensure that the interests of Plaintiffs and the public at large were considered in the process. Defendants acknowledged as much in their settlement in Missouri, (committing to "pursue negotiated rulemaking to effectuate this settlement"). They now hold up the same settlement as a rationale for shadow repealing REPAYE, in exchange for a group of State Attorneys General agreeing to hold off on a future lawsuit about *entirely different* repayment plans – a commitment which is not in the settlement and reads more as a veiled threat than a legal argument.

If the Department's actions are allowed to go forward, there is no remedy for Plaintiffs. Forced transfer off REPAYE will immediately result in increased monthly payments and trigger a new effective date for IDR discharge eligibility under the Department's own accounting.

Defendants are on the precipice of costing millions of borrowers billions of dollars in unlawful monthly payments, tax payments, and interest accrual, while refusing to follow the bare minimum APA requirements on the belief that a consent vacatur of a 2023 rule gives them broad discretion to reshape decades of regulations. This Court has the authority to stop this and it should enjoin the shadow repeal of REPAYE and forced repayment plan transfer to limit the permanent damage caused by Defendants' actions.

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits

As Plaintiffs explained in their opening memorandum, ECF No. 19-1, at 5 ("PI Mot."), and alleged in the Amended Complaint, ECF No. 18 ¶ 71 ("FAC"), that the legal consequence of the *Missouri* vacatur was fixed the moment it issued: the 2015 REPAYE regulations sprang back into effect by operation of law. Order at 1–2, *Missouri v. Trump*, No. 4:24-cv-00520-JAR (E.D. Mo. Mar. 10, 2026), ECF No. 102 ("Vacatur Order") (attached as Hinkle Decl. Ex. 3, ECF No. 19-2). That has been the settled rule of this Circuit for more than forty years. "To 'vacate' . . . means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to deprive of force.'" *Action on Smoking & Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983) (per curiam) ("*ASH II*"). Because a vacated amendment is "deprive[d] of force," it never lawfully displaced its predecessor: vacatur "ha[s] the effect of reinstating the rules previously in force," and the reinstated rules "cannot again be revoked without new rulemaking" under the APA. *Id.* at 797–98. The D.C. Circuit reaffirmed that holding four years later. *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987) ("[t]his circuit has previously held that the effect of invalidating an agency rule is to 'reinstat[e] the rules previously in force.'") (quoting *ASH II*), *aff'd*, 488 U.S. 204 (1988). Other courts of appeal agree. *See Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 297 (8th Cir. 1985); *Oceana, Inc. v. Evans*, 389 F. Supp. 2d 4, 7 & n.2 (D.D.C. 2005) (collecting decisions from seven circuits).

Vacatur "automatically resurrect[s]" the prior rule. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). This Court itself applied that rule last year in rejecting the government's claim that vacating a replacement leaves the agency with " no policy in place," Montefiore, 2025 WL 2801237, at \*16 & n.11. Indeed, this Circuit's remand-without-vacatur practice exists precisely because vacatur carries this consequence. The only instrument that ever displaced the 2015 REPAYE regulations was the SAVE Rule, and in March 2026, at Defendants' own request, the

Eastern District of Missouri vacated it. From that moment REPAYE was again the operative regulation, not because any court ordered its revival, but because that is what vacatur *is*.

### a.   No Subsequent Action has Lawfully Repealed or Vacated REPAYE

This part of the argument is not complicated. There is no court action which vacated the REPAYE rule and the Department has taken no lawful action to do so itself. It has neither engaged in negotiated rulemaking nor justified an exception to the process. *See* 20 U.S.C. § 1098a (requiring negotiated rulemaking for Title IV student-assistance regulations); 5 U.S.C. § 553. It is well settled law that no matter how persuasive and well-reasoned a preliminary injunction opinion is, it does not and cannot have the effect of vacating a valid Final Rule. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (explaining that the view equating the preliminary-injunction inquiry on likelihood of success with underlying merits is wrong, "because it improperly equates 'likelihood of success' with 'success,' and what is more important, because it ignores the significant procedural differences between preliminary and permanent injunctions").

That rule is in particular force here where the Eighth Circuit only addressed one aspect of the REPAYE repayment plan. *See Missouri v. Trump*, 128 F.4th 979, 998 (8th Cir. 2025) (limiting its holding to "the portion of" the prior rule the federal officials sought to revive — the loan-forgiveness provisions).[1] Defendants do not assert otherwise. Rather, they argue that they bargained away this benefit in a negotiation with the state of Missouri. Defs.' Mem., ECF No. 25-1, at 25–26 ("Mem."). Settlement does not replace rulemaking, and preliminary injunctions do not replace vacatur.

Contrary to the Defendants' representations in their opposition, no court ever adjudicated the 2015 REPAYE regulation's validity. History was more complicated. Initially the Eastern District of

---

[1] The same Final Rule that created REPAYE also amended a range of unrelated loan-repayment terms including identifying eligible recipients for interest-rate limits under the Servicemembers Civil Relief Act; capping collection costs; and amending which periods count toward loan forgiveness. Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 80 Fed. Reg. 67,204, 67,237 (Oct. 30, 2015) (codified at 34 C.F.R. pts. 668, 682, 685) (34 C.F.R. § 682.208(j)(1)–(2)).

Missouri enjoined the agency from forgiving loans under SAVE but allowed the SAVE monthly payment formula to continue. In response, the Department reverted to the terms of discharge under REPAYE and attached it to the other provisions of SAVE which were unaddressed by the initial injunction. This action was dubbed the "Hybrid Rule." In other words, this hybrid plan used the lower SAVE monthly payment calculation and combined it with the longer REPAYE discharge thresholds. The court then found that Hybrid rule shares the same legal defect as the original SAVE rule. *Missouri*, 128 F.4th at 998. The court never analyzed REPAYE alone, it concluded that its forgiveness provisions could not be reinstated alongside the SAVE monthly payments and enjoined the Hybrid Rule – in a single paragraph of analysis in the opinion.

Even crediting Defendants' reading of *Missouri* in full, the argument proves far less than they need. The panel's "special circumstances" holding was expressly limited to "the portion of the old rule the federal officials seek to revive" and the relief it granted was an injunction against forgiving loans. 128 F.4th at 998. It said nothing about REPAYE's payment-calculation, interest-subsidy, or enrollment provisions, and no court ever has issued a final judgement on any portion of REPAYE. On Defendants' own theory, then, vacatur revives REPAYE minus (at most) forgiveness. That partial revival is fatal to their motion on its own: Defendants insist Plaintiffs' claims "turn on whether REPAYE is actually defunct," Mem. 29, but the provisions setting Plaintiffs' monthly payments, subsidizing their accruing interest, providing credit toward IDR discharge, and governing their enrollment are not defunct on any reading of *Missouri*. It is Defendants' refusal to administer *those* provisions that inflict the monthly injuries described below. Plaintiffs are likely to succeed on their claims as to those provisions even under Defendants' generous reading of the preliminary holding in *Missouri v. Trump*.

### b.  When a Rule is Vacated, the Prior Rule Is Restored

Agency action "must be judged" on the grounds "upon which the record discloses that its action was based," *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), because judicial review "is limited to 'the

grounds that the agency invoked when it took the action,'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)) and the agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In *Montefiore Medical Center v. Kennedy*, the Secretary of Health and Human Services defended a retroactive rule on the ground that, absent it, the agency would have "no policy in place" to make statutorily required payments. Montefiore, 2025 WL 2801237, at *16. The government argued that vacatur of the prior rule's replacement had left a regulatory vacuum. Id. at *15-*16. This Court rejected the premise as one that "flout[s] 'basic tenets of administrative law'" because "the effect of invalidating an agency rule is to 'reinstat[e] the rules previously in force,'" *id.* at *16 (quoting *Georgetown*, 821 F.2d at 757), and vacatur "automatically resurrect[s]" the predecessor, *id. (quoting United Steel, 925 F.3d at 1287).* Nor is the tension Defendants manufacture from *Small Refiner* an open question in this courtroom: acknowledging that "[t]wo judges in this district have 'identified tension'" between *ASH II* and *Small Refiner*, this Court explained that the *ASH II* view "enjoys support" from the D.C. Circuit's later decision in *Georgetown* "and is consistent with the unanimous body of law from other circuits." *Id.* at *16 n.11 (citing *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 83 n.1 (D.D.C. 2007); *Oceana*, 389 F. Supp. 2d at 7 n.2). Defendants' position, that the *Missouri* vacatur left a void the Department may fill or not at its pleasure, is the argument this Court considered and rejected eleven months ago.[2]

---

[2] In addition to the cases discussed above, the District Court has consistently found revival of prior regulatory regimes following the vacatur of a rule in a range of fact patterns. *See, e.g., Nat'l Parks Conservation Ass'n v. Jewell, 62 F. Supp. 3d 7, 21 (D.D.C. 2014)* (finding "vacatur would result in the reinstatement of the [prior rule]" in challenge to 2008 rule that revised a 1983 rule regarding stream protection); *AFL-CIO v. Chao, 496 F. Supp. 2d at 85 (here […] a court vacated the agency rule at issue, thus taking the rule off the books and reinstating the prior regulatory regime. In order to deviate from that regime and repromulgate the rule held invalid by the court, the agency had to engage in a "new rulemaking in accordance with the [APA].") (citing ASH II, 713 F.2d at 798); *Envtl. Def. v. Leavitt, 329 F. Supp. 2d 55, 64 (D.D.C. 2004)* (a statutorily required rule was vacated leaving no rule in place and concluded the prior status quo provided the "court with jurisdiction to compel EPA to promulgate regulations…").

Defendants' opposition to the merits rests largely on their interpretation of *Small Refiner*. In their telling, the case stands for the proposition that agencies are free to disregard prior rules if those rules share the same legal defect as the vacated rule. From there, they argue the agency elected to end REPAYE, then the forced transition off SAVE is reasonable if not mandatory, and therefore selecting July 1, 2026, was also not arbitrary and capricious. However, the crux of that reasoning falls because Defendants misunderstand the relevance of *Small Refiner*. Leaving defendants only opposition to the merits a tenuous view that the agency had discretion to repeal REPAYE outside of the regular APA process based on a "strongly persuasive" preliminary injunction ruling that did not address the bulk of the REPAYE provisions.

Defendants' selective quotation from *Small Refiner* leaves out the operative phrase which explains the court's reasoning and the clear distinction with the present matter. The quote in full reads:

> We believe the better course is generally to vacate the new rule without reinstating the old rule. This **avoids any problem of the court overstepping its authority**, and leaves it to the agency to craft the best replacement for its own rule. Failure to reinstate the old rule creates a temporary regulatory vacuum, but the court's power to delay the mandate in a case for a reasonable period, plus the agency's limited power to issue a replacement on an emergency basis without notice and comment, should usually suffice to avoid untoward consequences. *Small Refiner Lead Phase-Down Task Force v. EPA,* 705 F.2d 506, 545 (D.C. Cir. 1983) (emphasis added).

When describing the practice of vacating a rule without reinstating the old rule, the *Small Refiner* court is explicitly referring to its own authority. That is, the case does not authorize an agency to modify regulations outside of the APA framework and indeed recognizes the interplay between the two sources of authority. When describing "the better course," the *Small Refiner* court was speaking of its own remedial authority on direct review. The court vacated only the new interim standard while expressly declining to vacate "EPA's conclusion that the old standard should be replaced," and it stayed its mandate so EPA could adopt an emergency replacement through the process the opinion itself describes. *See Indep. U.S. Tanker Owners Comm. v. Dole,* 809 F.2d 847, 855 (D.C. Cir. 1987) (exercising the court's "power to withhold issuance of our mandate . . . to allow the Secretary to undertake further proceedings to address the problems"). In other words, courts, using their equitable

7

authority, can adjust the terms of vacatur to fit the specific facts, but this does not authorize an agency to interpret vacatur of the rule.

Later, Defendants concede that the holding in *ASH II* – revival of the prior rule after vacatur – "is normally what happens" but go on to assert that the conclusion of *ASH II* is cabined to situations where a vacated rule was, "designed to undo the old rule." Mem. 26–27. But *ASH II* draws no such distinction. Revival of the prior rule following vacatur was the central holding in the case and cabining that holding as defendants suggest would be a nearly impossible standard to apply in practice. Regulations often contain a mix of amendments, revocations, and new protections embedded in a single rulemaking. If that rulemaking is procedurally flawed, the entire rule is vacated but under Defendants theory some provisions within a rule may snap back while others would leave a vacuum. This would be impossible for agencies and courts to administer.

Here, the vacatur was clear and unambiguous. Defendants did not ask the court to vacate the REPAYE rule, and the court did not take such action. In fact, Defendants acknowledged the lawful method of eliminating REPAYE in the settlement agreement, and one which aligns perfectly with *Small Refiner* – formal rulemaking. Defendants did not do that. Settlement Agreement ¶ 12, Hinkle Decl. Ex. 2 (committing to "pursue negotiated rulemaking to effectuate this settlement," including consideration of "a formal and complete repeal of the SAVE Plan Final Rule"). If Defendants believed that the REPAYE rule was unlawful at the time, they could have started rulemaking once they announced the Settlement and asked the court to vacate the rule but to stay that ruling until the new rule was finalized. That is what *Small Refiner* authorizes. But the Department did not, so *ASH II* controls.

### c. Agencies Cannot Repeal a Valid Final Rule Due to Litigation Risk Without Taking Administrative Action

Repealing a rule is itself rulemaking: the APA defines "rule making" to include "repealing a rule," 5 U.S.C. § 551(5), and an agency accordingly must "use the same procedures when [it] amend[s]

8

or repeal[s] a rule as [it] used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). Until then, "[a] precept which lies at the foundation of the modern administrative state is that agencies must abide by their rules and regulations." *Reuters Ltd. v. FCC*, 781 F.2d 946, 947 (D.C. Cir. 1986); *accord Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992) (agency is bound to administer its own rules until it lawfully amends or repeals them).

Defendant's view needlessly complicates the "simple either/or choice" that the APA requires and which the relevant caselaw is based. After an agency rule is vacated, agencies can follow, "either notice-and-comment procedures or the good-cause exception," and where they do not, the attempt to modify the prior rule, "must be vacated." *AFL-CIO v. Chao*, 496 F. Supp. 2d at 84.

An agency cannot evade this obligation by undoing a rule indirectly: suspending a rule, declining to administer it, or otherwise treating it as a nullity is tantamount to amending or revoking it and requires the same notice-and-comment process. *Clean Air Council v. Pruitt*, 862 F.3d 1, 6–9 (D.C. Cir. 2017); *see also Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) (enjoining suspension of a rule undertaken without notice and comment); *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5 (D.D.C. 2017) (vacating delay of a rule's implementation for the same defect). The requirement "ensures that an agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal." *Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564, 568 (D.C. Cir. 2022) (quoting *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982)).

Parties agree that the Department of Education repealed REPAYE without rule making or a good cause finding, but rather it did so by settlement with the plaintiff states in *Missouri*. Mem. 25. *See also* Settlement Agreement ¶ 11. Defendants explain that they did not violate the law by "accounting for [*Missouri v. Trump*] precedent and the litigation risk it presented." Mem. 25.

The D.C. Circuit rejected the premise that an agency's assessment of its legal exposure substitutes for rulemaking. In *Arkema Inc. v. EPA*, the agency changed course in response to what it

9

insisted the governing statute had required all along. The court held that even a correct reading of the law does not license bypassing the process because while an agency "is certainly entitled to change its mind and institute a program that forbids [the prior practice] in the future," it can only do so through the procedures Congress prescribed. 618 F.3d 1, 39 (D.C. Cir. 2010). In other words, an agency's new understanding of the terms of a statute may supply the *motive* for a policy change but it cannot supply the *instrument*.

The Department's own conduct proves it knows the difference. The Eighth Circuit's injunction left borrowers without access to any income-contingent plan because the SAVE Final Rule prevented new enrollment in other ICR plans after July 1, 2024.[3] *Improving Income Driven Repayment,* 88 Fed. Reg. 43,820 (July 10, 2023). The Department recognized that since it was also prohibited from implementing the SAVE repayment plan (the only other ICR based plan), it was not offering any ICR plan and was therefore not in compliance with the HEA's requirements to offer an ICR based plan, 90 Fed. Reg. 3,695, 3,696 (Jan. 15, 2025); *see* 20 U.S.C. § 1087e(d)(1)(D). In response, the Department did not fix the problem by press release or by declining to enforce the SAVE Rule's enrollment restrictions. It amended the rule. The Department published an interim final rule in the Federal Register, 89 Fed. Reg. 90,221 (Nov. 15, 2024), followed by public comment and a final rule adopting the change, 90 Fed. Reg. 3,695. When litigation risk counseled reopening PAYE and ICR, the Department proceeded by rule. When the same litigation assertedly counseled eliminating REPAYE, it proceeded by settlement covenant and silence.

Finally, the Eighth Circuit – the court whose rulings Defendants invoke and whose vacatur is at question in this matter – has recently confirmed its understanding that vacatur restores the previous regulatory regime. In *Iowa v. Wright,* the court held that upon vacatur of the Department of Energy's 2024 fuel-economy rule, the prior "2000 rule remains valid and will spring back into effect," quoting

---

[3] Originally the goal of that regulation was to streamline repayment by reducing the number of repayment plan options.

the same *Menorah* framework the *Missouri* panel applied. 154 F.4th 918, 952 (8th Cir. 2025). Moreover, it did so in the face of the federal government's "same defect" argument. The government argued that the prior rule contained the very feature the panel just held unlawful. The court vacated anyway: a shared defect does not block operation-of-law revival, because prior rules remain valid "until ... invalidated by a court," and no court had ever invalidated the 2000 rule. *Id.* at 952–53.

*Iowa* was published on September 5, 2025, just six months before the SAVE vacatur. When the courts in *Missouri* entered that vacatur at the government's request, the law of their own circuit already fixed its consequence: REPAYE sprang back. Defendants' position in the opposition to the motion for stay and preliminary injunction is merely a strategic litigation decision to rationalize a facially unlawful set of actions.

## II.    Plaintiffs have Standing

Plaintiffs easily meet the Court's standard at the preliminary injunction stage that Plaintiffs show a "substantial likelihood of standing." *Comm. for a Constructive Tomorrow v. United States Dep't of the Interior*, No. CV 24-774 (LLA), 2024 WL 2699895, at *3 (D.D.C. May 24, 2024); *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017).

Defendants agree Plaintiffs face $1,320 in additional student loan repayment costs over the coming two years. *See also* Havens Decl. ¶ 15, ECF No. 19-3 (lowest available payment without REPAYE is $196 more per month); Boykin Decl. ¶ 6, ECF No. 19-6 ($41 more per month); Hinkle Decl. Exs. 6, 9 (Loan Simulator results). "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (citing *McGowan v. Maryland,* 366 U.S. 420, 430–431 (1961). In addition, Defendant's acknowledge that absent court directed relief, they will issue 1099-C forms if Plaintiffs are forced to change repayment plans. These future tax liabilities are "concrete and particularized," harm. *Sierra Club v. Jewell*, 764 F.3d 1, 7 (D.C. Cir. 2014). Havens Decl. ¶ 11 (tax on a $64,000 discharge would force a penalized early 401(k) withdrawal); Robeson Decl. ¶ 6, ECF No. 19-5 (tax burden would threaten her ability to maintain

11

stable housing). These are the "concrete and particularized," "actual or imminent" injuries Article III requires, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) — and "plaintiffs have long been empowered to challenge the rescission of government benefits in federal court." *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 978 (D.C. Cir. 2016).

Plaintiffs face a "substantial probability of injury" if the Department is not enjoined from its shadow repeal of REPAYE and involuntary repayment plan transfers which is sufficient to establish imminent injury. *Chamber of Commerce of the U.S. v. EPA,* 642 F.3d 192, 200 (D.C.Cir.2011) (alterations and internal quotation marks omitted).

## III.    Plaintiffs Face Significant Irreparable Harm

Plaintiffs face four distinct irreparable harms if Defendants' actions are not stayed. Initially, Plaintiffs face immediate harm in the increased costs of repayment due to Defendants' shadow repeal of REPAYE; and Defendants do not dispute the amount - $1,320 over two years. Defendants only dispute whether those losses count. Second, Plaintiffs Havens and Grunseth are already losing eligibility toward loan discharge under REPAYE each month the Defendants fail to honor the terms of the REPAYE plan they are currently enrolled in. Havens Decl. ¶¶ 8–9; Grunseth Decl. ¶¶ 8–9, ECF No. 19-4. Third, Plaintiff Havens will lose access to the REPAYE interest subsidy which will reduce her unpaid accrued interest by 50 percent. *See* Havens Decl. ¶¶ 7, 13. Finally, Plaintiffs Havens and Robeson face the immediate harm of either paying thousands of extra dollars in student loan payments under a standard plan or accepting loan discharge and receiving a 1099-C form from the Department of Education following a forced change in repayment plans. Havens Decl. ¶¶ 9–11; Robeson Decl. ¶¶ 3, 6. Each of these harms accrues monthly and is unrecoverable. They are "certain and great," "actual and not theoretical," and imminent. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

12

Defendants' opposition focuses almost exclusively on the significant tax consequences, acknowledging that at least two Plaintiffs will face higher monthly payments and lost periods of eligibility toward IDR discharge.

### a. Defendants do not Address Lost Eligibility Toward IDR Caused by Shadow Repeal of REPAYE and Forced Repayment Plan Transfer

Had Defendants enforced the REPAYE plan, Plaintiffs and millions of other similarly situated borrowers would already be enrolled in REPAYE and earning credit toward IDR loan discharge. For many of these borrowers the monthly payment was $0, functionally ensuring this month and subsequent months would already be considered eligible, bringing borrowers closer to IDR discharge. See, e.g., Robeson Decl. ¶ 2 (2025 adjusted gross income of approximately $8,000). Rather than forcing seven million borrowers through a new repayment plan application, the Department could have simply reinstated REPAYE's terms by administering the revived 2015 plan, and the millions of borrowers in forbearance today would already be earning credit toward income driven repayment discharge.

Every month the Department delays, Plaintiffs are deprived of making qualifying payments toward IDR under a repayment plan that only requires payments of ten percent of their discretionary income. Havens Decl. ¶ 8; Grunseth Decl. ¶ 8; Boykin Decl. ¶ 3; Southern Decl. ¶ 8. And once lost, these periods that are ineligible for IDR discharge, "cannot be reopened." *Missouri*, 128 F.4th at 996–97.

Even though REPAYE is set to sunset in July 2028, losing credit toward discharge under that program is still harmful because under existing regulations, payments made under REPAYE also count toward loan discharge under other repayment plans including IBR, ICR, PAYE, and RAP.

### b. Increased Monthly Payments due to the Shadow Repeal of REPAYE are Irreparable

Defendants' assurance that "the agency will refund any such overpayments at final judgment," Mem. 15; Second Decl. of Anthony Lowery ¶ 5 (July 29, 2026) ("Lowery Decl."), does not make

13

Plaintiffs' injuries reparable, because a litigation promise is not a remedy. The irreparable-harm inquiry asks whether "adequate compensatory or other corrective relief will be available at a later date, *in the ordinary course of litigation.*" *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006) (emphasis added). No such relief is available here: the APA does not waive sovereign immunity for money damages, 5 U.S.C. § 702, and Defendants identify no statute, regulation, or order entitling Plaintiffs to the refund their declarant describes. All they point to is a two-sentence commitment this Court could not enforce, from an agency whose account of its own legal obligations is incomplete, based on a declaration with clear errors. *See infra* § V.c; Suppl. Haines Decl. ¶¶ 6–12 & Ex. A; Suppl. Hayes Decl. ¶¶ 6–9; Suppl. Lomheim Decl. ¶¶ 6–12 & Ex. A; Suppl. Smith Decl. ¶¶ 6–13 & Exs. A–B; Suppl. Southern Decl. ¶¶ 6–11 & Ex. A.

The fact that the Department of Education may have some unspecified "administrative tools" to remedy financial loss is of no consequence. Lowery Decl. ¶ 5. Nearly every agency has tools that would allow them to make payments to an individual, but the point here is that there is no authority under the law that could compel that result if Plaintiffs are successful in this action. The Department could simply refuse to issue refunds and claim the court is prohibited from requiring them to provide financial relief because of sovereign immunity. Equity does not require Plaintiffs to endure an assertedly unlawful deprivation now on the strength of Defendants' representation that they will make it right later.

Plaintiffs are not aware of any administrative tool which gives the Department authorization to issue refunds in this circumstance and Defendants do not provide details. Defendants are only authorized to provide refunds *after* a loan discharge for payments made in excess of the required number (either under IDR or PSLF).[4] That tool would not provide complete relief. These refunds are

---

[4] The Department of Education is also authorized to provide refunds following certain other discharges like closed school, total and permanent disability, or borrower defense to repayment. Although this history of effectuating these refunds is fraught with failures and delays.

14

only authorized once borrowers reach the loan discharge threshold, something that could happen for Plaintiff Boykin or Grunseth years after the resolution of this case and reaches none of the increased monthly payments, interest rate subsidy, or tax injuries. *See* Boykin Decl. ¶ 3 (117 of 132 required payments); Grunseth Decl. ¶¶ 8–9 (105 of 120).

Regardless, the offer to later refund excess payments is insufficient to show the harm is reparable. It does not remedy the time value of money paid, which for Plaintiffs is quite high. Plaintiffs Havens and Boykin have other outstanding financial obligations the money could be used for which carry significant short-term costs. Havens Decl. ¶¶ 13, 16 (rising rent, insurance, and utilities; halting retirement contributions and credit-card paydown); Boykin Decl. ¶ 7 (debt-financed purchases and risk of losing transportation or defaulting on credit cards). None of these injuries are recoverable through the APA suit or the Departments' administrative tools.

### c. Lost Interest Subsidy Will Result in an Increased Loan Balance

Defendants correctly characterize the mechanism by which interest accrues during periods of IDR repayment. Many borrowers do not pay enough to cover accrued interest and under REPAYE the government subsidizes that negative amortization by paying half of the accrued interest each month indefinitely. This is quantifiably better than the other repayment plans that result in the same low monthly payment. For example, PAYE provides an interest subsidy for the first three years in the plan but after that point in time the subsidy goes away.

Defendants, however, argue that increasing loan balances only "come into play" based on two triggering events – loan discharge or interest capitalization. This framing is a misunderstanding of Article III standing and fundamental concepts of harm. When interest accrues, borrowers' debt increases by operation of contract and law and it requires no additional action or outcome. Interest accrual is a legally enforceable obligation to pay additional money and conversely the government's subsidization of that accrual is a direct benefit.

15

Finally, the Supreme Court rejected a similar attempt to characterize the revival of non-certain tax obligations as too speculative to warrant injunctive relief in *Clinton*. The Court rejected this argument because the administrative action revived the *contingent liability*. Here, the liability is not even contingent. Additional interest accrual is an immediate liability that is created by operation of law and the only contingent aspect is when exactly the government could force borrowers to pay under that obligation.

### d. Absent a Preliminary Injunction, Defendants will Issue a 1099-C To Plaintiffs Havens and Robeson, Irreparably Harming Them

Parties agree that loan discharge following the forced (or coerced) transfer to a new repayment plan will result in Defendants issuing a 1099-C tax form based on an effective date in 2026 or later. Filing the form is the injury itself and is redressable by this court.

Defendants argue that there is no irreparable harm because 1) this consequence is self-inflicted, 2) IRS is responsible for the determination of tax liability, and 3) plaintiffs could pursue claims for these consequences in Tax Court making the harms reparable. These responses mischaracterize the law and reflect the Defendants' fundamental misunderstanding about the circumstances its actions have placed Plaintiffs in.

#### i. *Timeline and Nature of the 'Offer' Shows Injuries are not Self-Inflicted*

This case challenges conduct that only occurred in the aftermath of the March 10 vacatur of the SAVE Final Rule. It is factually impossible for the judge's order in AFT to be a "deal" to address harms caused by a different agency action that occurred months later. *Compare* Order, *Am. Fed'n of Teachers v. U.S. Dep't of Educ.*, No. 1:25-cv-00802-RBW (D.D.C. Oct. 23, 2025), ECF No. 55, Hinkle Decl. Ex. 1 ('AFT Order'), *with* Vacatur Order (Mar. 10, 2026).

By December 31, 2025, when the government's "offer" closed, the SAVE Final Rule had not been vacated and none of the critical details about implementation were public. AFT Order at 2 (provision limited to borrowers who "appl[y] to transfer to one of the IBR, Original ICR, or PAYE

16

plans on or before December 31, 2025"). What was public was a settlement offer signed December 9, 2025, that specified the Department of Education would engage in negotiated rulemaking to effectuate the terms of the agreement and submit the agreement to Judge Ross for approval. Settlement Agreement ¶¶ 8, 12. Two actions that would have provided Plaintiffs with information necessary to evaluate their best course of action. Defendants took neither of these actions let alone by December 31, 2025, when the "deal" closed.

Plaintiffs likewise had no way to know that a judicial order in the AFT case had any capacity to address the harm they face today. Rather, in a footnote, Defendants explain that the AFT agreement "did not fly under the radar" and cite to two articles from Forbes.com and the New York Times. No reasonable borrower would understand that court order to somehow provide an offer to eliminate the harms caused by a proposed settlement in an unrelated case in a different district. Defendants did not notify plaintiffs or others of the court's order. *See* Hinkle Decl. Ex. 4 (March 27, 2026, guidance directing borrowers to leave SAVE without any mention of tax consequences). Defendants never informed Plaintiffs that they had satisfied the required IDR payments for loan cancellation under alternative plans or that failing to apply for a new IDR plan by December 31, 2025, would result in tax consequences. Havens Decl. ¶ 10 (agent stated any eligible discharge "would be processed automatically," then that she "would have to apply for a different income-driven repayment plan"); Robeson Decl. ¶ 5; Grunseth Decl. ¶ 10.

     *ii. Plaintiffs' Injuries are not Self-Inflicted Under the Appropriate Analysis of Standing OR Irreparable Harm*

Finally, defendants cannot escape standing or irreparable injury by pointing to a deal that would have forced plaintiffs to sacrifice other rights they were entitled to – namely loan cancellation or repayment under SAVE or REPAYE. Accepting the 'deal' would have sacrificed the very rights this case seeks to vindicate. Receiving loan discharge under SAVE could result in refunds of the payments they made beyond the required number for example, but by applying for a different

17

repayment plan Plaintiffs would have reset their effective date, eliminating any chance of refunds for payments made in excess for what was required. For example, Robeson made 325 of a required 216 but applying for a new repayment plan has the effect of eliminating any potential refunds. Havens Decl. ¶ 9; Robeson Decl. ¶ 3; *see* AFT Order at 3 (borrowers "shall continue to be reimbursed for any payments made on the loan after the final payment that qualified them for a discharge"). And for Plaintiff Havens, additional payments would remain after the discharge of two of her four loans and choosing the 'deal' would force her to have immediately begun making payments under a more expensive plan than she was entitled to.

Under the traceability analysis, harm is self-inflicted if the plaintiff's injuries were "so completely due to the [complainant's] own fault as to break the causal chain." *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438, (D.C. Cir. 1989) (citations omitted). Defendants side-step this framing by relying on a characterization of Plaintiffs' actions as a but-for link in the injury analysis. However, this is insufficient. There is often a range of actions any given plaintiff could have taken to avoid an injury, but it does not mean that failing to take those actions was a substantial cause of the injury. Only where the harm is "largely of its own making," does that injury fail to satisfy Article III standing. *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).

In *Nat'l Family Planning*, plaintiffs did not show that the government's action, "would really burden a grantee," or that any of the organizations 4,000 members, "encountered the slightest hint," that its funding was threated. The self-inflicted injury was merely uncertainty around the potential conflict of regulation and statute that could have been resolved by asking the government for clarification. Here, there is no uncertainty. The Department has told Plaintiffs they are ineligible for benefits under SAVE and REPAYE and continue to keep Plaintiffs in a forbearance because of the shadow repeal of REPAYE. It has affirmatively removed REPAYE from the repayment plan options and notified the public, and Plaintiffs Havens directly, that they must apply for a different repayment or they will be moved off of their current repayment involuntarily. Hinkle Decl. Ex. 4; Suppl. Robeson

18

Decl. ¶¶ 6–7, ECF No. 22 (online IDR application presents RAP but no means to request REPAYE); Notice of Recent Agency Action & Suppl. Authority, ECF No. 21, Ex. B (ECF No. 21-2), Item 2; Suppl. Hinkle Decl. ¶¶ 4–5 & Exs. 12–13. Plaintiffs are not responsible for any of these actions or the injury they face in the interim.

Defendants are responsible for policy and administration of the SAVE Final Rule vacatur. Plaintiffs have no control over how the Department accounts for the effective date of loan discharge, whether it provides discharge under a revived REPAYE repayment plan, or whether it issues a 1099-C; and the Department never communicated any of those policies prior to December 31, 2025, when the 'deal' closed. Unlike in *Gu*, Plaintiffs have taken no affirmative steps to create additional costs or injury, and they never turned down an offer of the remedy they now seek. *Gu v. United States Dep't of Treasury*, No. CV 25-2739 (LLA), 2025 WL 3089260, at *4 (D.D.C. Nov. 5, 2025). The Department never offered or publicized any method for Plaintiffs to seek tax-free discharge on their loans while remaining in the legally operative REPAYE or SAVE repayment plan. When the 'deal' was available, SAVE remained on the books.

In the context of a preliminary injunction analysis, self-inflicted, "generally means curable by the moving party without an injunction." *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 35 (D.D.C. 2020). Critically, this analysis focuses on the relief available to plaintiffs at the time the court is considering the preliminary relief. Here, there is no action plaintiffs could take to avoid tax consequences today. Either they apply for a new repayment plan, resetting their eligibility date or they wait and are forced into a standard repayment plan where they would have to make decades of unaffordable payments.

   *iii. Defendants Concede That They Will Issue 1099-C Forms After Involuntarily Transferring Havens and Robeson off of REPAYE*

Parties agree that if plaintiffs remain in their current plan REPAYE and have their loans discharged under that program, "Defendants would not report the discharges to the IRS as taxable income." By choosing to shadow repeal REPAYE and force borrowers onto another repayment plan, Defendants are choosing to report discharges as taxable income to the IRS despite the fact that plaintiffs and similarly situated borrowers were actually eligible for loan discharge during the tax-free period years earlier.

Rather, Defendants argue that they do not actually know whether those discharges would be considered taxable income by the IRS and assuming that issuing the 1099-C would result in tax liability is little more than speculation about the IRS's view. In their description, whether a 1099-C is filed is of little consequence for borrowers because only the IRS is capable of making those final determinations. That is simply not true. The Supreme Court has already rejected precisely this view: an injury is not 'speculation' about a second agency's views when the defendant's own act is what created the liability that agency will act upon. In addition, issuing the 1099-C form is the irreparable injury itself. *See Clinton v. City of New York*, 524 U.S. 417, 425–26, 430 (1998) (finding "the plaintiffs "suffered an immediate, concrete injury the moment" the President acted, because "[t]he revival of a substantial contingent liability immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor.")

The consequences of a Form 1099-C attach upon filing, not upon any later determination by the IRS. *See, e.g.*, *In re Crosby*, 261 B.R. 470, 474 (Bankr. D. Kan. 2001). In *Crosby*, a credit union filed 1099-C under a mistaken reading of the reporting regulations, then insisted that its filings were of no real consequence to the debtors. The court disagreed: filing the forms was "analogous to assigning the debts to the IRS." *Id.* Without the forms, the debtors "would not have had to report the discharge of indebtedness income to the IRS and pay tax on it," and "[e]ven if the debtors did not report the income

20

and pay the tax, or reported it and claimed an exclusion under 26 U.S.C.A. § 108(a)(1), the IRS could audit their returns and, because of the 1099-C's, possibly impose additional tax and penalties." *Id.* Those "actual (or at least potential) tax consequences of the form" were concrete enough that the court barred the creditor from enforcing its claims at all until it corrected or withdrew the filings. *Id.* at 474–75. Even a corrected information return, if one ever came, would operate only prospectively. It would not recall the original from the IRS's systems, excuse the borrower's interim reporting obligations, or reimburse the costs of disputing a liability the borrower never should have faced. And because sovereign immunity bars any damages against the Department, those interim costs are lost for good.

### iv.   *Tax Court Cannot Resolve the Injury*

Absent an injunction, Defendants' unlawful conduct will manufacture a genuinely taxable event, therefore it is Defendants' conduct at issue, not the IRS'. Plaintiffs future tax liabilities are "concrete and particularized." *Sierra Club,* 764 F.3d at 7. That is, they flow directly from Defendants' conduct, and do not rely on some indeterminate intervening event. There is no speculation that once the 1099-C is issued, tax consequences will follow.

An adequate remedy at law must be capable of redressing the injury as completely and practically as equity would. *Terrace v. Thompson*, 263 U.S. 197, 214 (1923); *Watson v. Sutherland*, 72 U.S. (5 Wall.) 74, 78 (1866). Plaintiffs, however, do not contend that any tax has been or will be *miscalculated.* In fact, the IRS would be correct to require payment of taxes for the loan discharge. A forced repayment plan change will reset the effective date resulting in a debt discharged in 2026, which would accurately be treated as gross income, 26 U.S.C. § 61(a)(11), because Congress's exclusion for student-loan discharges expired for discharges after December 31, 2025. If the discharge follows a voluntary or forced change in repayment plan, the resulting assessment will be *correct* under the Departments current policy.

Defendants cite *Gardner* for the proposition that that a taxpayer may "institute a refund suit after payment of taxes," but that argument was rejected in that opinion. The quote comes from the D.C. Circuit's description of the Ninth Circuit's rule in *Cool Fuel, Inc. v. Connett*, 685 F.2d 309 (9th Cir. 1982), a rule the D.C. Circuit examined and declined to follow. *Gardner v. United States*, 211 F.3d 1305, 1311 (D.C. Cir. 2000). The D.C. Circuit rejected that approach when determining whether equitable relief was appropriate under 26 U.S.C. § 6213(a) and adopted the Tenth Circuit's reasoning from *Guthrie v. Sawyer,* 970 F.2d 733, 736–37 (10th Cir.1992): "[i]f the availability of a refund suit *after* payment prohibits the taxpayer from obtaining an injunction to protect his right to litigate first, that right is virtually meaningless," and refused to believe "that Congress intended to give with one hand and take back with the other." *Id.* at 1311–12 (quoting *Guthrie,* 970 F.2d at 736).

*California v. Grace Brethren Church* provides little help for Defendants either. It construed the Tax Injunction Act's bar on federal-court interference with *state* tax administration, and the state refund action it found adequate offered complete relief because the plaintiffs there challenged the lawfulness of the tax itself. 457 U.S. 393, 407–17 & n.29 (1982). Here, there is no interpretation of the Tax Injunction Act, no comity concern, and no claim that any tax is unlawful.

Defendants answer Plaintiffs' showing that "money damages are not available under the APA" by demanding more: Plaintiffs, they say, "must rule out" unspecified "administrative options for financial relief" and litigation in the Tax Court or a refund suit. Mem. 18–19. For that burden they cite this Court's decision in *Padgett v. Vilsack,* No. 24-cv-2954 (LLA), 2024 WL 4006050 (D.D.C. Aug. 30, 2024). But *Padgett* only confirms that Plaintiffs have already carried their burden. The movant there "failed to make the required showing" because he made no showing: he never responded at all to the government's argument that his loss of an $80,000 bird consignment was "remediable via a monetary payment." *Id.* at *4. And this Court explained exactly what would have sufficed: "Mr. Padgett could have refuted that in his reply—for example, by noting that monetary damages are not available in an

22

APA suit, see 5 U.S.C. § 702 (allowing for relief 'other than money damages')—but he did not." *Id.* That is the argument Plaintiffs made. PI Mot. 20.

Even indulging the assumption that some tax forum could entertain Plaintiffs' grievance, the "remedy" would be neither complete nor practical. A district-court refund suit requires paying the entire disputed tax first, *Flora v. United States*, 362 U.S. 145, 177 (1960) an illusory path for borrowers whose are struggling to make payments on their student loans. The deficiency route Defendants invoke, 26 U.S.C. § 6213, requires awaiting an IRS notice while penalties and interest accrue, then years of litigation whose costs are themselves unrecoverable. And the Form 1099-C would trigger state income-tax consequences that no federal tax forum can touch. Nor could the Tax Court or a refund court reach the injury even in theory: neither can adjudicate Plaintiffs' APA claims, enjoin the Department, rescind a discharge or the Form 1099-C reporting it, or restore Plaintiffs' enrollment, qualifying payment months, or interest subsidies.

## IV.    Plaintiffs have Vigorously Pursued Relief in the Face of Changing and Unclear Policy

Plaintiffs filed their motion for a preliminary injunction and administrative stay the same day as the Amended Complaint — before Defendants sent a single transition notice to any borrower, and more than three months before the most severe harm, the forced transition of repayment plans, would occur. There is no delay in this case to excuse. What Defendants label delay is the time Plaintiffs spent diligently pursuing every other available avenue of relief for different claims while Defendants withheld the basic information — about the transition's timing, mechanics, and treatment of accrued benefits — that would have permitted an earlier assessment of imminent harm. Rather than suggesting that the harms Plaintiffs face are not irreparable, the litigation has made abundantly clear that Plaintiffs are extremely concerned about how the Defendants' actions will impact them and seeking out every opportunity available to defend their rights.

### a.    Plaintiffs Sought Relief Before the Harm – Not on Its Eve

23

"[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). While an *unexcused* delay in seeking relief may be grounds for denial, *Dallas Safari Club v. Bernhardt,* 453 F. Supp. 3d 391, 403 (D.D.C. 2020), this Court has held that delay is "relevant but not dispositive." *Comm. for a Constructive Tomorrow,* slip op. at 9. The D.C. Circuit is clear on this point: the delay cases, "in no way stand for the proposition that a late filing, on its own, is a permissible basis for denying a preliminary injunction." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). At most, delay "may support a conclusion that the plaintiff cannot satisfy the irreparable harm prong," *id.* at 725 — and even then, "[t]he factor of delay is only significant if the harm has occurred and the parties cannot be returned to the status quo." *Id.* (quoting *McDermott ex rel. NLRB v. Ampersand Publ'g, LLC*, 593 F.3d 950, 965 (9th Cir. 2010)) (alteration in original).

Even if the Court finds some delay, it is excusable in at least two scenarios. First, Delay is excused where the movant was in "diligent pursuit" of other avenues of redress. *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014); *accord L.C. v. Trump*, No. 26-cv-688 (RJL), slip op. at 24-25 (D.D.C. May 13, 2026) (delay "minimal and excusable" where plaintiffs first sought relief through other channels before "turning to the federal courts"). And delay "is also understandable when the 'effects' of the challenged action 'are more acutely felt' as time goes on." *Beatty v. Trump*, No. 25-cv-4480 (CRC), slip op. at 34 (D.D.C. Mar. 14, 2026) (quoting *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 100 (D.D.C. 2025)). Both situations apply here.

If the clock began on March 27, 2026, when the Department first announced a transition plan – Plaintiffs spent the intervening weeks in continuous, documented pursuit of relief: they moved to intervene in *Missouri v. Trump* within days of the final judgment[5]; they took the uncommon step of opposing Defendants' 60-day extension request in this case; and they warned this Court in writing that Defendants' requested schedule "could result in future requests for preliminary relief." ECF No. 10 at

---

[5] Vacatur ordered on March 10, 2026, Vacatur Order, and Motion to Intervene filed on March 13, 2026. Mot. for Leave to Intervene, *Missouri v. Trump*, No. 4:24-cv-00520-JAR (E.D. Mo. Mar. 13, 2026), ECF No. 104.

6-7. A plaintiff "in 'diligent pursuit' of other avenues of redress" does not forfeit preliminary relief by exhausting those avenues first. *Tex. Children's Hosp.*, 76 F. Supp. 3d at 245; *L.C.*, slip op. at 24-25.

If the clock began on June 9, 2026, following the motion to dismiss, Plaintiffs filed their amended complaint and preliminary injunction within weeks. Defendants' motion to dismiss was the first time they stated that they would not honor benefits that accrued under the SAVE Final Rule before vacatur. Until then, Defendants' own communications made the threat of harm impossible to assess. Defendants never publicly explained how long the transition would last or how accrued benefits would be treated. Defendants' website offered no repayment calculator for the new plans until July 1, 2026, and to this day provides no approved paper enrollment form. ECF No. 21. Grunseth Decl. ¶ 5 (no payment calculator for the new RAP plan); 91 Fed. Reg. 42,186 (revised IDR form still pending before OMB, with comment open through August 7, 2026); Notice of Recent Agency Action, Ex. B at 1 ("Form Under Review, Exp. Date: TBD").

Second, because the transition's "effects" would be "more acutely felt" as its phased deadlines approached and it provided additional information about the consequences of their actions, the timing of Plaintiffs' motion is not only excusable but quite prompt. *Fed. Educ. Ass'n*, 795 F. Supp. 3d at 100. In fact, Plaintiffs' timing ensures that the Court addresses the issues when the harm is immediate, as the standard requires.

Under either date, the sequence ends the inquiry: the Amended Complaint and this motion were filed simultaneously, before any borrower notice issued, and more than three months before any forced transition. Where courts treat a filing gap as probative of harm, the telling interval is the one between the complaint and the request for preliminary relief; that is the period when a plaintiff indisputably understands its claims and can judge whether interim protection is needed. Here that interval is zero days.

25

Every case Defendants cite to support their delay argument features either years-long unexplained delay in filing, motions filed months after a complaint is filed, a motion filed on the literal eve of the challenged event, or harm that had already occurred.

### b. Plaintiffs' Timing Reflets Defendants' Conduct, Not the Absence of Irreparable Harm

The timing of this motion, which the Defendants ask the Court to believe reflects absence of real harm, is explained by Defendants' own actions and representations. In seeking an extension of the Court's scheduling order, Defendants assured the Court that no borrower would be forced off the SAVE plan until September 29, 2026, at the earliest. ECF No. 20. Six days later, Defendants sent Plaintiff Havens a 90-day transition notice. Suppl. Hinkle Decl. ¶¶ 4–5 & Exs. 12–13. The party that told this Court there was no urgency, then immediately started the clock on Plaintiffs' forced transition, is poorly positioned to attribute the timing of this motion to anything other than its own conduct. Plaintiffs, by contrast, told the Court in May exactly what would happen if Defendants ran out the schedule, ECF No. 10 at 6-7 — and it did.

Far from suggesting Plaintiffs' harms are reparable, this litigation history "demonstrates only," that Plaintiffs have pursued every procedural avenue available to protect rights Defendants were dismantling on a schedule Defendants controlled and declined to disclose. *Gordon*, 632 F.3d at 725.

### c. Potential that Future Relief in this Case May Moot Certain Claims has no Bearing on the Stay Request

Defendants concede that "Plaintiffs are not required to move for emergency relief on each of their claims at the same time." Mem. 23. That concession leaves their argument resting entirely on the inference that Plaintiffs' vested-benefits allegations are an "assertedly adequate and non-time-sensitive alternative" to preliminary relief. *Id.* "If True," renders this argument irrelevant. *Id.* Irreparable harm is measured by what is happening to Plaintiffs now, not by assuming the movants will ultimately prevail on a claim the same brief spends seven pages asking this Court to dismiss. *See* Mem. 30–36.

Defendants cannot defeat emergency relief by touting the adequacy of a remedy it simultaneously insists is meritless. If Defendants believe Havens and Robeson are entitled to backdated, tax-free discharges, they may moot this portion of the motion at any time by granting them. Instead, they have denied both theories at once; telling Grunseth that SAVE "is not something we acknowledge at the moment," FAC ¶ 103, denying her buyback, *id.* ¶¶ 100–02,  and telling Havens and Robeson their only path is to apply for a different plan, *id.* ¶¶ 116, 125. A contested count in litigation is not an "alternative remedy"; it is the lawsuit.[6]

Even when taken at face value, the argument goes only to tax harm. It says nothing about the other injuries this motion seeks to prevent. The requested § 705 stay, moreover, operates on the challenged agency actions, not claim-by-claim on the parties.

## V. Balance of Equities Strongly Favors an Injunction
### a. Millions of Borrowers are Being Denied an Operative Repayment Plan

Because the government is the opposing party, the balance-of-equities and public-interest factors merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

It is undisputed that roughly seven million borrowers remain enrolled in SAVE, Mem. 39; *accord* Hinkle Decl. Ex. 4 (Department's March 27, 2026, release: 7.5 million borrowers), many entitled to lower payments under the regulation Defendants refuse to administer, FAC ¶ 127, while qualifying months toward discharge slip away unrecoverable each month. The five borrower declarations Plaintiffs submitted illustrate what those numbers mean; payment increases of $126 to $425 per month for borrowers already stretched thin, (Hayes Decl. ¶ 11, ECF No. 26-2; Lomheim Decl. ¶ 12, ECF No. 26-3; Smith Decl. ¶ 11, ECF No. 26), one of whom is already delinquent on a Standard-plan payment she never chose, Hayes Decl. ¶ 8. Defendants themselves concede these declarations are

---

[6] Neither of Defendants' cases helps them. In *American Health Care Ass'n v. Sullivan*, No. 91-1103, 1991 WL 154456, at *1 (D.D.C. May 30, 1991), the alternative remedy already existed and "ha[d] been followed in the past" — it was not an undecided claim in the same lawsuit. And *Lovell v. United States*, 795 F.2d 976, 977 (11th Cir. 1986), rests on the rule that the ability to sue later defeats an injunction now — a rule the D.C. Circuit considered and rejected in *Gardner*, citing *Lovell* by name. *Gardner*, 211 F.3d at 1311–12.

properly considered on the public interest. Mem. 15 n.2 (citing *Cardinal Health*). This Court has recognized that harm of this breadth "tip[s] the public interest heavily in favor" of relief. *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d at 112.

Plaintiffs and Declarants are not *sui generis*, rather they are exemplars of the failure of the regulatory policy. In their supplemental response brief, Defendants argue that these borrowers are merely edge cases and identify certain criteria that would indicate a borrower would benefit from REPAYE compared to the other available repayment options. Borrowers who 1) have loans that are at least 19 years old; 2) have not already had their loans discharged. This is not an edge case; it is exactly the population that the REPAYE rule was designed to help. At the time, the regulation was published, ED estimated that population to be 6 million, costing $8.3 billion for existing cohorts and up to $15.4 billion for loans made through 2025. 80 Fed. Reg. at 67,229.

Defendant's position then suggests, without any data that they could have easily provided, that nearly every borrower with loans over 19 years old has already had their loans discharged in some fashion. There are a host of reasons why many borrowers would not have had their loans discharged at this point, including borrowers who returned to school after taking out loans more than 19 years ago, having simply not been enrolled in an IDR plan for periods of repayment, program failures, or loan default to name a few. The Plaintiffs and Declarants' own examples are not unique, they are the common and why 3.3 million borrowers were enrolled in REPAYE before the SAVE Final Rule. Hinkle Decl. ¶ 13 & Ex. 10 (approximately 3.3 million borrowers repaying approximately $200 billion in Direct Loans were enrolled in REPAYE before the SAVE rulemaking). Defendants could have provided concrete data from its own portfolio to explain to the Court exactly how many borrowers will face higher monthly payments or be forced to repay under a longer timeline for discharge. Defendants know the impact of their shadow repeal of REPAYE; and their silence on the matter is telling.

28

Beyond the difference in monthly payments, many borrowers who are eligible for other payment plans with similar monthly payments as REPAYE are nevertheless injured without access to REPAYE. REPAYE's increased subsidy reduces borrowers accrued interest compared to enrollment in PAYE benefiting borrowers who took out their loans much more recently. Defendants' decision to prolong forbearance while implementing a forced transfer to another repayment plan reduces the number of months every borrower in the SAVE forbearance is accruing toward IDR discharge.

### b. Defendants' Concede That Borrowers Will Lose Years of Repayment Progress

Defendants argue that "[n]o Plaintiff alleges that REPAYE would usefully shorten their payment term." Mem. 19. The sentence is carefully drawn, because the class of borrowers who would be injured in exactly that way indisputably exists. One of them provided a declaration to the Court. Borrowers who took out loans before the PAYE eligibility cutoff are not "new borrower[s]" and cannot use PAYE or New IBR. Southern Decl. ¶ 6. For them, REPAYE is the only plan that discharges undergraduate debt after 20 years; every alternative Defendants now offer runs five or more years longer. *Id.* ¶ 10. Jessica Southern borrowed roughly $24,000 for her undergraduate education between 2002 and 2006, has made 240 qualifying payments, and is therefore due for discharge under REPAYE *now. Id.* ¶¶ 4, 8–9. Without REPAYE she faces "at least 5 additional years of repayment," a minimum of $9,360 in additional payments even under the cheapest plan still accruing discharge credit, and more when that plan sunsets in 2028. *Id.* ¶¶ 10, 12 & n.1. Every borrower who reaches the 20-year mark between now and July 2028 stands in the same position. The public interest does not permit Defendants to run out the clock on discharges Congress's scheme and the Department's own regulation promise.

### c. Defendants' Conduct, not Reinstatement is the Source of disruption

Courts in this District have repeatedly rejected the argument that restoring a longstanding predecessor rule unsettles anything. Vacatur of a replacement rule "restores the status quo before the invalid rule took effect," *Envtl. Def. v. Leavitt*, 329 F. Supp. 2d at 64, and doing so causes little disruption

29

precisely because the regulated community knows the prior regime: reinstating a rule that "governed surface mining activities for over 25 years and with which the regulated community is familiar" was no cause for concern in *Nat'l Parks Conservation Ass'n*, 62 F. Supp. 3d at 20–21, and "[l]ittle confusion or inefficiency will result from reinstating a regulatory regime that was in place from 1978 to 2007," *Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008). REPAYE shares this long history as it was administered continuously from 2016 to 2023, FAC ¶ 7. An order requiring Defendants to keep administering the 2015 rule preserves "the last uncontested status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022); *cf. Aviel v. Gor*, No. 25-cv-778 (LLA) (D.D.C. Apr. 4, 2025) ("Defendants have it backward" — a party seeking to maintain the pre-controversy state seeks to preserve the status quo, not change it). And disrupted expectations "caused by the likely unlawful agency action challenged here" carry no equitable weight. *Missouri*, 128 F.4th at 997..

The confusion in this record runs entirely the other way. In the three weeks after applying for a new IDR plan as the Department requested, one declarant received official communications telling her she was enrolled in two different plans, that her repayment would begin on three different dates — July 12, 2026, August 24, 2026, or November 12, 2028 — and that her monthly payment was $2,186.41, $2,502.12, or $1,602.96. Lomheim Decl. ¶ 9. Another was placed into a Standard-plan payment she never selected and cannot afford, and is now delinquent for the first time. Hayes Decl. ¶¶ 8, 13. Defendants' own call-center agents told borrowers SAVE "is not something we acknowledge at the moment" and professed ignorance of the courts' rulings. FAC ¶¶ 103–04, 126. Whatever "stability" interest Defendants invoke, the instability is of their own making.

Things appear to be going poorly still. Public reporting confirms that one student loan servicer – MOHELA – inadvertently notified thousands of borrowers in the SAVE forbearance that they were

in late-stage delinquency and owed thousands of dollars immediately.[7] And Defendants own declaration suggests the Department has conflicting account information about IDR applications. Its declarant told this Court that the "most recent income statement the agency has on file" for *all* five of the borrower declarants is "$0" — yet each of them submitted complete income documentation, as the Department's own agents and records confirm. Suppl. Haines Decl. ¶¶ 6–12 & Ex. A (FSA agent confirming a W-2 listing $104,528 income was submitted with her December 2024 application); Suppl. Hayes Decl. ¶¶ 6–9 (servicer confirming four W-2s totaling $135,527); Suppl. Lomheim Decl. ¶¶ 6–12 & Ex. A (Department records showing her completed application enrolled her in IBR at $891.39 per month); Suppl. Smith Decl. ¶¶ 6–13 & Exs. A–B (income imported directly from the IRS; $709.89 payment calculated from her 2018 AGI); Suppl. Southern Decl. ¶¶ 6–11 & Ex. A (application submitted using 2022 AGI). And Defendants don't even have an approved IDR enrollment form for the current regulatory environment. 91 Fed. Reg. 42,186; Notice of Recent Agency Action, Ex. B at 1.

Indeed, in denying Plaintiffs' motion for intervention, the Eastern District of Missouri found that "the Department of Education's communications to the public and to borrowers have caused profound confusion in a number of respects[,] including with respect to the length of time borrowers would be allowed to remain enrolled in the SAVE Plan." Mem. & Order Denying Mot. to Intervene at 8, *Missouri v. Trump*, No. 4:24-cv-00520-JAR (E.D. Mo. July 30, 2026), ECF No. 116 ("Order") (attached as Suppl. Hinkle Decl. Ex. 14). That is a judicial finding, on the government's own conduct, of the very confusion documented in Plaintiffs' declarations. Lomheim Decl. ¶ 9; Hayes Decl. ¶¶ 8, 13.

---

[7] Adam S. Minsky, Borrowers Get False Notices That Their Student Loans Are Delinquent, Forbes (Aug. 4, 2026), https://www.forbes.com/sites/adamminsky/2026/08/04/borrowers-get-false-notices-that-their-student-loans-are-delinquent/, Suppl. Hinkle Decl. ¶ 10 & Ex. 18.. Quoting MOHELA statement that "MOHELA is aware that some borrowers have raised concerns indicating they received inappropriate delinquency notifications. Any such matters are thoroughly reviewed and addressed by MOHELA. We encourage borrowers to monitor their account and related correspondence over the coming days for the latest information."

Enjoining the shadow repeal of REPAYE and allowing borrowers already enrolled in that plan to stay until 2028 or a valid rulemaking is conducting will actually simplify the repayment environment and ensure the type of administrative process that properly accounts for those interests.

    d. **A Stay Does not "Throw The Settlement Into Doubt" — It Holds the Government to the Judgment It Requested.**

The government asked the Eighth Circuit to direct vacatur of the SAVE Plan Final Rule, and it received exactly that relief. FAC ¶¶ 68–70. The requested stay does nothing to the *Missouri* judgment; it enforces the settled legal consequence of the vacatur the government itself sought. Nor does it touch PAYE or Original ICR. The "collateral damage" to three million PAYE and ICR borrowers, Mem. 39, is asserted but never explained. Those borrowers could remain in repayment under that plan. Once administratively available, they could apply for REPAYE as the law requires. What the stay would prevent them from delivering, through a settlement commitment to which Plaintiffs and seven million other borrowers were strangers, a repeal they never accomplished through rulemaking. A litigation bargain cannot override the legal effect of a vacatur or extinguish third parties' regulatory rights, and expectations these violations are not equities — they are the violation.

    e. **The OBBBA Transition Must be Executed Through Rulemaking.**

A stay does not prevent an orderly transition on Congress's timeline; it prevents a premature one. Defendants say the agency "has authority to move SAVE borrowers onto the 10-Year Standard plan, right now." Mem. 39. Authority to act is not authority to act unlawfully; every exercise of it remains subject to the APA and to the HEA's allocation of plan choice to borrowers, 20 U.S.C. § 1087e(d). Defendants never dispute this fundamental aspect of the repayment system. And the statute and regulations clearly developed a system where the borrower controls which plans they are enrolled in and when they leave. 20 U.S.C. § 1087e(d)(1) ("[t]he borrower may choose"); *see id.* § 1087e(d)(2), (d)(5)(B) (authorizing the Secretary to select a plan only where the borrower makes no selection or has defaulted). The regulation allows borrowers to enroll in the available plan of their choice. Allowing

the Department the authority to move these borrowers automatically, without rulemaking or process, makes little sense when the balance of the government legal structure would allow borrowers to immediately reenroll in whatever plans are in existence. The proper procedure would be for the Department to write a new rule that provides regulatory authority for the transition of borrowers off of the sunsetting ICR plans and limiting future enrollment to a date certain. As it stands the only date certain in regulations is July 2028 and there is simply no lawful authority to force borrowers off.

Defendants' remaining practicalities favor Plaintiffs. They warn that borrowers in forbearance are "not repaying their loans under any operative repayment plan (or, indeed, any plan at all)," Mem. 39. But that limbo is Defendants' own creation, and the stay *ends* it: reinstating REPAYE returns millions of borrowers to active repayment under an operative plan. The taxpayer interest runs with Plaintiffs. So does administrative efficiency because under a stay, REPAYE enrollees stay where they are and file nothing, while it is Defendants' forced transition that would push millions of applications through a system that took a year to process one plaintiff's plan change, FAC ¶ 105; Boykin Decl. ¶ 2 (application submitted January 2025 was not processed until January 2026), and is presently telling a single borrower three different payment amounts in three weeks, Lomheim Decl. ¶ 9. The backlogs are a cost of their policy, not of the stay. "There is generally no public interest in the perpetuation of unlawful agency action". *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020)

## VI.     Comity Does not Prevent this Court from Ruling

Defendants ask this Court to defer to a forum they persuaded to close. On July 30, the Eastern District of Missouri denied Plaintiffs' protective motion to intervene as untimely — and in doing so removed any remaining basis for deference. Order at 10. Judge Ross cabined the ruling expressly. The opinion "speaks only to Proposed Intervenors' arguments as they pertain to the timeliness of their motion to intervene in this action," and the court "does not herein reach the merits" of Plaintiffs' entitlement to the rights they assert, because those questions are "the subject of a separate action brought by Proposed Intervenors against Defendants, *Havens v. Department of Education*, No. 1:26-cv-

816-LLA (D.D.C.)." Order at 3 n.1. And its no-prejudice holding rests on the availability of *this* forum: Plaintiffs "will not be significantly prejudiced by denial of intervention, as they can and will pursue their rights in another action." *Id.* at 10 (citing *Green v. City of St. Louis*, No. 4:15-cv-1433-RWS, 2022 WL 4119853, at *3 (E.D. Mo. Sept. 9, 2022), and *United States v. Ritchie Special Credit Invs., Ltd.,* 620 F.3d 824, 834 (8th Cir. 2010)). The court Defendants would have this Court defer to has held that Plaintiffs' claims belong here and refused them entry there on that ground. Comity weighs in Plaintiffs' favor.

Every doctrine Defendants gather under the banner of "comity" presupposes one of two things: a pending parallel proceeding an injunction might disturb, or a collateral attack on another court's decision. Neither exists. *Missouri v. Trump* proceeded to final judgment on March 10, 2026, and the last paper pending on its docket has now been decided: the court denied Plaintiffs' protective motion to intervene as untimely, over Plaintiffs' objection and at Defendants' urging. Order at 3 n.1, 10. In doing so, the Missouri court said precisely what Plaintiffs have said all along about the relationship between the two cases: the question whether Plaintiffs are entitled to the rights they assert "is the subject of a separate action brought by Proposed Intervenors against Defendants, *Havens v. Department of Education*, No. 1:26-cv-816-LLA (D.D.C.)," and "[t]he Court does not herein reach the merits of any such argument." Order at 3 n.1. There is no parallel proceeding.

Nor do Plaintiffs attack any Missouri ruling: the vacatur Defendants requested is the *premise* of the Amended Complaint, because REPAYE's revival is its legal consequence. What Plaintiffs challenge is conduct Defendants undertook in Washington after final judgment, which no Missouri court adjudicated or was asked to adjudicate. *Missouri* concerned the validity of the SAVE Rule; this case concerns the Department's post-vacatur refusal to administer REPAYE. But Defendants has insisted *Missouri* left this question open, arguing at length that the vacatur "does not *compel*" reinstatement and "the agency could … reinstate[]" REPAYE or not. Mem. 26. Defendants cannot tell this Court that Missouri left the REPAYE question to the agency's choice (merits) and answering

it here would relitigate Missouri's work (comity). Defendants' own supplemental notice now asks this Court to stay or dismiss only "Plaintiffs' SAVE Plan Final Rule-based claims," implicitly acknowledging comity could not reach the REPAYE-administration claims on which this motion principally rests even if the doctrine applied. *See* ECF 28 at 2.

This last thread of the comity argument hinges on characterizing Plaintiffs SAVE Plan claims as a collateral attack on the Eastern District of Missouri's vacatur. Plaintiffs do not ask this Court to direct the Department to implement the SAVE Final Rule; as explained above, the benefits Plaintiffs seek vested before vacatur and are legally independent of the rule's continued existence. This distinction is confirmed by the very Court that issued the vacatur when it explained that whether "the February 27, 2026, order of dismissal required the Department of Education to immediately re-operationalize the SAVE Plan to their benefit is not the subject of this case." *Id.* at 7–8; *see* ECF 28 at 1–2. Defendants read that sentence as a reservation of doubt about Plaintiffs' merits. That is wrong. It is explicitly a jurisdictional allocation. A court that regarded this case as relitigating its judgment would not describe Plaintiffs' claims as ones it "does not herein reach."

Defendants' notice attempts one salvage: it reads the order's observation that reopening the settled case would cause "monumental upheaval" and require the parties "to relitigate matters that have been definitively settled," Order at 9–10, as support for Defendants' equities argument here. ECF 28 at 1. The passage will not bear that weight. The upheaval the Missouri court described was the upheaval of *granting the proposed motion for reconsideration and revisiting the vacatur* — relief no one seeks from this Court. Plaintiffs here do not ask to reopen, modify, or relitigate the Missouri judgment; they ask this Court to enforce that judgment's settled legal consequence.

Judicial estoppel is now conceded. Defendants acknowledge that the denial of intervention "likely moots" the argument. ECF 28 at 2. Their caveat — that the argument might revive if Plaintiffs "seek and obtain relief from the Eighth Circuit," *id.* — fails independently: estoppel under *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001), requires that a court have *accepted* the estopped party's

earlier position, and the only positions the Missouri court accepted were Defendants' own. The denial of Plaintiffs' motion is the opposite of judicial acceptance of anything Plaintiffs argued.[8] What Defendants call comity is, in substance, a request that no court anywhere review the Department's post-judgment conduct: not the Missouri court, whose closure Defendants urged and obtained, and not this one, in deference to that closure.

VII.    **The Court Should Deny Defendants Motion to Dismiss because SAVE Benefits Have Already Accrued**

Defendants ask this court to hold that a consent vacatur, entered without a final merits decision on lawfulness, reached back and erased benefits the Department's own records credit Plaintiffs with in 2024, based on payments made before the preliminary injunction was issued. Because those benefits are final and independently cognizable, Plaintiffs are merely asking the Court to enforce the benefits they have earned and what the Department's records already show.

While the preliminary injunction barred Defendants from processing discharges, it did not strip the benefits borrowers had already accrued. FAC ¶ 10. The Department already provided SAVE discharge to nearly 153,000 borrowers plus borrowers who used the PSLF buyback program and made payments under the SAVE plan formula throughout the period of the preliminary injunction.[9] Plaintiffs are merely asking for the same treatment as these borrowers.

a.    **The IDR Account Adjustment Explains the Temporal Confusion in the Record**

On April 19, 2022, the Department announced the one-time IDR account adjustment – an administrative action to, "address historical failures in the administration of the federal student loan

---

[8] Were the argument revived, it would fail on the merits for reasons the intervention papers themselves establish. The "no recourse outside of this proceeding" sentence Defendants excerpt addressed Rule 24(a)(2)'s impairment element as to benefits whose "sole legal source" was the SAVE Final Rule and the same passage expressly distinguished "[t]he prior REPAYE regulations, which the Department has in any event refused to administer." Mem. ISO Intervention at 17–18, *Missouri*, ECF 105-1 (filed in this action at ECF 11-1). The filings are complementary, not contradictory: if the vacatur were revisited, SAVE's own benefits revive; because it stands, REPAYE governs and Plaintiffs' accrued rights survive.

[9] Press Release, U.S. Dep't of Educ., *Biden-Harris Administration Approves $1.2 Billion in Loan Forgiveness for Over 150,000 SAVE Plan Borrowers* (Feb. 21, 2024), https://www.ed.gov/news/press-releases/biden-harris-administration-approves-12-billion-loan-forgiveness-over-150000-save-plan-borrowers [https://archive.is/rG5Ab], Suppl. Hinkle Decl. ¶ 7 & Ex. 15 [hereinafter Feb. 2024 SAVE Forgiveness Press Release].

program." The correction was aimed at addressing inaccurate records of the progress borrowers had made toward IDR discharge, correcting harms created by inaccurate information about IDR eligibility, and remediating the injuries caused by excessive periods of forbearance.[10] In total, more than 3.6 million borrowers received "at least three years of credit toward loan forgiveness, and many will see their loans forgiven automatically."[11]

However, despite announcing this action in April 2022, the Department took years to fully implement the correction. It was not until October 1, 2024, that the Department finished reviewing every borrower account. *Id.* These corrections were unrelated to the SAVE Final Rule and functioned independently of that program. Which is why, despite having been in repayment for decades, Plaintiffs had not received loan discharge prior to their accounts being automatically placed into the SAVE litigation forbearance. Had the Department executed on the IDR account adjustment more quickly, Plaintiff Havens and Robeson would have already had their loans discharged. And it is why the Department's system of record reflects SAVE discharge eligibility being recorded during a period when the Plaintiffs were not earning credit toward discharge and the Department was enjoined from forgiving loans under the SAVE Final Rule.

Every payment and forbearance month underlying Plaintiffs' eligibility predates the injunction; the October 2024 entries were recorded when the Department finished counting, not when Plaintiffs finished earning.

### b. Plaintiffs are Not Requesting Forward Looking Application of SAVE

Plaintiffs filed this lawsuit when the SAVE Final Rule was operative because the Department had denied the relief they were entitled to under the plan. After the Final Rule was vacated, Plaintiffs

---

[10] Press Release, U.S. Dep't of Educ., *Department of Education Announces Actions to Fix Longstanding Failures in the Student Loan Programs* (Apr. 19, 2022), https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs [https://archive.is/qWZN4], Suppl. Hinkle Decl. ¶ 8 & Ex. 16..

[11] Fed. Student Aid, U.S. Dep't of Educ., *Payment Count Adjustments Toward Income-Driven Repayment and Public Service Loan Forgiveness Programs*, https://studentaid.gov/announcements-events/idr-account-adjustment (last visited Aug. 7, 2026), Suppl. Hinkle Decl. ¶ 9 & Ex. 17.

amended their complaint and are now asking the Court to direct the Department to process loan discharges and buy-back rights that already exist. The Department of Education need not take any actions to implement SAVE – it simply needs to provide the benefits that it has already determined, by operation of regulation, law, and administration, exist.

Loan discharge under SAVE functions automatically, "without the need for an application or documentation from the borrower." 88 Fed. Reg. at 43,904. And the Defendant's own declaration establishes the timeline. Plaintiff Robeson became "eligible for a discharge in October 2024," and Plaintiff Havens in August 2024. Lowery Decl. ¶ 11.

Likewise, the buy-back regulation automatically vests eligibility for months in forbearance once that month passes. The regulation fixes the amount of payment required at the time of the forbearance and, unlike PSLF buyback, allows borrowers to buy back periods of forbearance at any time. All that remains are discrete, mandatory, and ministerial functions. FAC at 20. *See Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) (Section 706(1) reaches a duty "amount[ing] to a specific, unequivocal command"); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004).

### c. *Harper* Answers the Wrong Question

To justify nullification of the benefits Plaintiffs accrued while the SAVE Final Rule governed, Defendants reach for *Harper v. Virginia Dep't of Taxation.* 509 U.S. 86 (1993). But *Harper* answers the question of how to handle an authoritative declaration of what the law is, this case requires the Court to determine what is to become of prior agency determinations made while the prior law governed. Defendants' theory fails twice over. First, there is no declaration of law here to apply retroactively, and even if there were, retroactivity doctrine governs matters still open, not determinations already final.

Starting with what *Harper* actually held. In *Davis* v. *Michigan Dep't. of Treasury,* the Supreme Court declared that the taxation schemes at question violated the constitutional doctrine of

intergovernmental tax immunity, 489 U.S. 803 (1989). *Harper* then asks whether the Virginia Supreme Court could decline to apply *Davis* for tax assessments made before *Davis* but that were before the court on review of the same question. The Supreme Court said no: "when this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." 509 U.S. at 97. That is, when the court announced a rule of law, that rule must be applied to the events and actions at question in an open case. *Children's Hospital Association of Texas v. Azar* is a variation on the same structure. The court of appeals determined on the merits that a rule a district court had vacated was valid all along, and that appellate declaration supplied the law that should have been applied by the District Court on remand. *Children's Hospital,* and the other cases cited by Defendants all work on the same mechanism – judicial statement of law made by a superior court then applied to open cases in a lower court – and, importantly also involve a previously vacated rule that is reinstated on the merits; not a rule vacated after being operationalized for nearly a year and on the books for nearly three.

Here, the first element is missing. No court, let alone the DC Circuit or Supreme Court, has adjudicated the SAVE Final Rule's validity on the merits and there was no substantive briefing in any court for any purpose following the passage of the OBBBA. The Eastern district of Missouri entered a preliminary injunction that was expanded by the Eighth Circuit, and the case was settled before any final judgment on the merits. A preliminary injunction is not a decision on the merits. *Camenisch*, 451 U.S. at 395. The vacatur Defendants invoke was entered on consent, at the government's own request, under a settlement providing that the agreement "shall not be construed as evidence or as an admission regarding any issues of law or fact, or regarding the truth or validity of any allegation or claim raised in this action." Settlement Agreement ¶ 15. Defendants thus ask this Court to give *Harper* effect to a legal determination that was never made and that their own settlement expressly disclaims. Applying *Harper* here would require this Court to hold, in substance, that SAVE was unlawful from its inception:

39

a stronger statement about the Rule's legality than the Eastern District of Missouri or the Eighth Circuit ever made.

What the vacatur did accomplish is narrower. At most, vacatur "deprive[d]" the Rule "of force" going forward. *ASH II*, 713 F.2d at 797. Not existing and being unlawful are categorically different status; consent vacatur may be able to establish the former but it cannot establish the latter. And under Defendants' own framework, a rule "remain[s] valid until replaced by a valid regulation or invalidated by a court." *Menorah* 768 F.2d at 297. From July 2023 until vacatur, the SAVE Final Rule was operative law. Determinations completed under a rule that was valid when they were made cannot be retroactively "unlawful" by virtue of a later order that adjudicated nothing.

The reliance picture confirms the mismatch of applying *Harper* here. The retroactivity cases addressed reliance strategically built by litigants during known, contested, time-limited litigation windows – reliance on a lower-court ruling while its appeal was pending. But Defendants seek to push this square peg of a framework into this case by focusing on reliance created following the dismissal in *Missouri*. That only scratches the surface. Plaintiffs, declarants, and millions of other borrowers' reliance built over years, through the Department's rulemaking, its public commitments, and nearly a year of unchallenged implementation. During that period the Department issued monthly bills under the SAVE Plan, Plaintiffs made payments, and the Department granted discharges to more than 150,000 similarly situated borrowers. Feb. 2024 SAVE Forgiveness Press Release, *supra*. At that point there was no litigation challenging the rule and certainly no preliminary injunction blocking its implementation. The Department itself contributed to this reliance; it lifted up these policies through press releases and statements from its most senior leadership promising affordable payments and eliminating a lifetime of debt. This is not about the period between dismissal and vacatur, it is about holding the Department accountable to its own statute, regulations, and public statements even when it doesn't align with its currently preferred policy outcome.

40

### d. Earned Entitlements and Final Determinations Survive Vacatur and Only Lawful Process Can Undo Them.

Even if the *Missouri* vacatur carried some declaration of law, Defendants' theory would still fail because agency determinations survive vacatur. Even a holding of unconstitutionality does not automatically erase, "…rights claimed to have become vested," "prior determinations deemed to have finality and acted upon accordingly," or considerations "of public policy in the light of the nature both of the statute and of its previous application." *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 374 (1940).

Completed administrative "determinations" retain validity even where the deciding body's very authority was constitutionally defective. *Buckley v. Valeo*, 424 U.S. 1, 142 (1976) (per curiam). The Supreme Court enforces removal orders whose legal premise it has held was wrong from the beginning, because the determination is not the rule. *United States v. Palomar-Santiago*, 593 U.S. 321, 326-29 (2021). The Department cannot claim the benefit of that distinction when it deports and deny it when it discharges.

Survival is only half the rule; the other half is that undoing a completed determination is itself agency action. Here that action was taken unlawfully. An agency "is certainly entitled to change its mind and institute a program that forbids [the practice] in the future," but it "cannot, without Congress' express authorization, use its new statutory interpretation to undo ... completed transactions." *Arkema Inc.*, 618at 39.

Even if the Department had taken lawful action to retroactively apply its understanding of the legal viability of SAVE or REPAYE and eliminate accrued benefits under the rule, that action wouldn't survive scrutiny. Whether a new position may reach backward turns on the abruptness of the departure, "the extent to which the party against whom the new rule is applied relied on the former rule," and "the degree of the burden which a retroactive order imposes." *Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972). Every factor runs against the Department: an

41

abrupt reversal of its own recorded determinations, years of borrower reliance, and a burden measured in five-figure tax bills and forfeited discharges. This Court has said the same within the year: even where a legal standard "may be 'fixed'" all along, "an agency's decision to adopt it decades later and apply it to past conduct" is a distinct, retroactive act, and no agency holds an "automatic license" to apply a later-declared standard to completed conduct. *Montefiore* 2025 WL 2801237, at *13–*14. The Department has identified no lawful process here at all.

Finally, nothing in the *Missouri* proceedings decided any of this. The vacatur order vacated the Final Rule; it said nothing about determinations already made under it. No *Allied-Signal* analysis was conducted, and no merits determination was entered. And when Plaintiffs sought to raise these questions in that forum, the court denied intervention while expressly reserving the post-vacatur questions to this Court. Order at 3 n.1. The absence of any Missouri ruling on these questions is not a vacuum this Court must fill by guesswork; it is a question of administrative law with a settled answer.

## VIII. APA Section 705 Operates on the Agency Action

Defendants devote their scope section to a case that, by their own admission, "did not construe the APA." Mem. 42 (citing *Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025)). Their argument that CASA's "[t]raditional [e]quitable [p]rinciples" nonetheless "[a]pply to APA § 705," Mem. 42, rests on a single out-of-circuit decision.

### a. A Section 705 Stay Operates on the Agency Action to Preserve the Remedy

The D.C. Circuit has now said that a § 705 stay is not an injunction. In *Make the Road New York v. Mullin*, 179 F.4th 16, 32-33 (D.C. Cir. 2026), decided three weeks before Defendants filed and cited nowhere in their brief, the Circuit explained that "[u]nlike 'enjoin' or 'restrain,' a 'stay' does not order parties to do anything. Instead, it operates on the legal status of the challenged agency action." *Id.* at 32, quoting the Supreme Court's teaching that a stay "achieves [its] result by temporarily suspending the source of authority to act . . . not by directing an actor's conduct." *Nken v. Holder*, 556 U.S. 418, 428–29 (2009). "A stay is just the preliminary form of vacatur — much like a preliminary

42

injunction is the preliminary form of a permanent injunction." *Make the Road* 179 F.4ᵗʰ at at 31. The stay restrains the unlawful agency action, and any required actions are already present in the statute or duly promulgated regulation, not from the court. In this Circuit, the final remedy a § 705 stay preserves is not party-limited because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated — not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *accord Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Preliminary relief exists to preserve the court's ability to grant effective final relief, *Camenisch*, 451 U.S. at 395, and it therefore takes the shape of the final remedy it protects.

Section 705 authorizes the reviewing court to "issue all necessary and appropriate process to postpone the effective date of *an agency action* or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added). The object of the court's process is the *action*. There are only two actions here, the shadow repeal of REPAYE and involuntary transfer of loans off of that repayment plan. Not seven million agency actions.

Defendants answer that the statute contains "a built-in limitation: the stay must be cabined to achieve only what is 'necessary to prevent irreparable injury.'" Mem. 42. But that clause states the *condition* on which process issues without any party-specific qualifier. The statute "does not say 'to the extent necessary to prevent irreparable injury *to the plaintiffs*.'" *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872, 2025 WL 2192986, at *104 (D.D.C. Aug. 1, 2025).

Defendants' remaining textual observation do not provide much help: they note that "by moving in batches, the agency is postponing the effective date of the SAVE transition for most SAVE borrowers at this very moment." Mem. 42. But that says nothing about the process the statute gives the *court*, and the direct consequence of the challenged agency action to move *all* borrowers currenting in the SAVE litigation forbearance onto a different repayment plan. And the batches stagger only the

43

account transfers. But the repeal of REPAYE and the refusal to administer the revived rule are in full legal force as to every borrower today.

### b. *CASA* does not Govern Section 705 Cases

*CASA* construed only the "equitable authority" conferred on federal courts "under the Judiciary Act" of 1789. 606 U.S. at 837–38, 847. Section 705 is a different grant in a statute the Court said "[n]othing" in CASA construed. *Id.* at 847 n.10. Justice Kavanaugh's concurrence made the reservation concrete explaining that even after *CASA*, "in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily 'set aside' a new agency rule." *Id.* at 869 (Kavanaugh, J., concurring). Members of the D.C. Circuit have gone further saying that *CASA* "is not a case about the scope of relief for agency review authorized by the APA," and the government "does next to nothing to advance the ball by pointing to CASA as the source of its purported limitation on the scope of stay relief under the APA." *Make the Rd. N.Y. v. Noem*, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025).

### IX.    Preliminary Relief that Maintains the Status Quo does not Require Bond

Federal courts have uniformly concluded that Rule 65(c)'s security requirement does not apply to stays issued under Section 705 because such a stay is neither a preliminary injunction nor a temporary restraining order. *Neguse v. U.S. Immigr. & Customs Enf't*, 813 F. Supp. 3d 45, 101 (D.D.C. 2025). In *Cabrera v. U.S. Department of Labor*, the district court denied the government's request for a bond, explaining: "Section 705 of the APA contains no such requirement, and DOL cites no authority that supports requiring a bond in these circumstances." *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91 (D.D.C. 2025). Similarly, the court in *American Federation of Teachers v. Department of Education* observed that the APA "has no bond requirement" and noted that it was "unaware of any other court finding that Section 705 relief requires a bond." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584 (D. Md. 2025) This principle has been applied consistently across multiple circuits. *See Asylum Seeker Advoc. Project v. United States Citizenship & Immigr. Servs.*, 808 F. Supp. 3d 708 (D. Md. 2025) *City of Columbus v.*

*Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025) *Afr. Communities Together v. Lyons*, No. 25-CV-6366 (PKC), 2026 WL 1382944 (S.D.N.Y. May 18, 2026)

## X.    The Court Should Deny a Stay Pending Appeal

The court should not stay its ruling pending appeal. As noted above, irreparable harms accrue every day the agency is allowed to maintain its shadow repeal and every day it refuses to provide a payment plan consistent with the law. Staying the ruling would defeat the purpose of the preliminary injunction and relief granted. A stay "is not a matter of right, even if irreparable injury might otherwise result"; it is "an intrusion into the ordinary processes of administration and judicial review," and "[t]he party requesting a stay bears the burden of showing that the circumstances justify" it. *Nken*, 556 U.S. at 427, 433–34 (citations omitted). Defendants offer no circumstance to justify their request, rather merely recite the elements under *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987). Under *Hilton*, the elements for a stay largely mirror those of the preliminary injunction, and Defendants provide no reason for the court to grant a preliminary injunction and then stray from that reasoning in granting a stay.

## CONCLUSION

For the foregoing reasons Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss and grant their motion and, pursuant to 5 U.S.C. § 705, (1) stay the Department's shadow repeal of the REPAYE plan to preserve borrowers' status and rights and (2) postpone the effective date of the Department's policy of involuntarily transferring REPAYE borrowers to other plans, in each case pending final judgment — relief that, because it operates against the agency action itself, applies nationwide. In the alternative, Plaintiffs request a preliminary injunction running to the four named Plaintiffs. Plaintiffs further request that because the requested relief asks only that the Department administers its own valid regulation, that the Court waive any bond under Federal Rule of Civil Procedure 65(c).

45

Date:  August 7, 2026                        Respectfully submitted,

                                             */s/ W. Austin Hinkle*
                                             William Austin Hinkle
                                             D.C. Bar No. 90043756
                                             Public Goods Practice LLP
                                             1502 W 7th St. STE 100
                                             Erie, PA 16502


                                             Paul Mayer (admitted pro hac vice)
                                             D.C. Bar No.1671773
                                             Public Goods Practice LLP
                                             1717 N Street NW STE 1
                                             Washington, DC 20036

                                             *Counsel for Plaintiffs*

46