**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEATHER HAVENS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,<br><br>*Defendants*. | Civil Action No. 26 - 816 (LLA) |

**MEMORANDUM OPINION AND ORDER**

For decades, the federal government has provided direct loans to students pursuing postsecondary and higher education. *See* 20 U.S.C. § 1087a. Loan repayment plans vary. As relevant here, the federal government offers borrowers several income-contingent repayment ("ICR") plans, which tie borrowers' monthly payments to their income. *See id.* §§ 1078(b)(9)(A), 1087e(d)(1)(D); *see also* 34 C.F.R. § 685.209(a). In 2023, the U.S. Department of Education amended an existing ICR plan, the Revised Pay As You Earn ("REPAYE") plan, to create the Saving on a Valuable Education ("SAVE") plan. *See* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 Fed. Reg. 43820, 43900 (July 10, 2023). In March 2026, the U.S. District Court for the Eastern District of Missouri vacated the final rule creating SAVE, leaving SAVE enrollees in administrative forbearance. *See* ECF No. 25-11. In July 2026, the Department began instructing SAVE enrollees to choose new loan repayment plans within ninety days. *See* ECF No. 19-2, Ex. 4; ECF No. 20 ¶ 10.

Plaintiffs Heather Havens, Elizabeth Robeson, Anna Grunseth, and William Boykin are four borrowers who were enrolled in SAVE prior to the Eastern District of Missouri's vacatur of the SAVE rule. ECF No. 18 ¶¶ 21-26. Plaintiffs bring this action against the U.S. Department of Education and Linda McMahon in her official capacity as Secretary of Education (collectively, the "Department"), arguing that the Eastern District of Missouri's vacatur of the SAVE rule automatically reinstated the REPAYE rule, and that the Department's failure to reinstate REPAYE therefore violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* ECF No. 18 ¶¶ 135-148. Plaintiffs seek a preliminary injunction or an administrative stay enjoining the Department from "shadow repeal[ing]" REPAYE and requiring SAVE borrowers to enroll in a different loan repayment plan. ECF No. 19, at 1. For the reasons explained below, the court denies the motion.

## I. LEGAL BACKGROUND

### A. Federal Student Loan Repayment Plans

In the Higher Education Act of 1965 ("HEA"), Congress authorized the Department of Education "to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219 (1965) (codified at 20 U.S.C. § 1070 *et seq.*). In 1993, Congress enacted the Student Loan Reform Act which, as relevant here, amended the HEA and allowed the federal government to issue direct loans to students pursuing postsecondary and higher education. *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312 (1993) (codified at 20 U.S.C. §§ 1087a to 1087h).

As amended, the HEA establishes several plan options for borrowers to repay their student loans. *See* 20 U.S.C. § 1078(b)(9)(A). Borrowers may choose between fixed repayment plans and income-driven repayment ("IDR") plans. *Id.* §§ 1078(b)(9)(A), 1087e(d)(1)(A)-(E), (e). Fixed

repayment plans set borrowers' monthly payments based on their loan balances and require repayment of those balances in full by the end of a payment term. 34 C.F.R. § 685.208(a)-(b). In contrast, IDR plans set borrowers' monthly payments based on their income and typically provide for loan forgiveness—also known as "loan cancellation" or "discharge"—after a certain period of qualifying payments. *See id.* § 685.209(a), (k).

The HEA establishes two sets of IDR plans. First, in 20 U.S.C. § 1098e, Congress directly established the Income-Based Repayment Plan ("IBR"). Second, in 20 U.S.C. § 1087e, Congress authorized the Department to implement regulations to establish ICR plans. Pursuant to Section 1087e, the Department created three ICR plans: (1) the Income Contingent Repayment Plan ("Original ICR"), (2) Pay As You Earn ("PAYE"), and (3) REPAYE. 34 C.F.R. § 685.209(a). The diagram below sets forth how these programs are structured.




ECF No. 25-1, at 3.

When an enrollee in an IDR plan becomes eligible for loan forgiveness, the Department discharges the enrollee's remaining loan balance. *Id.* § 685.209(k). The Internal Revenue Service ("IRS") will then tax the discharged balance as income. *See* 26 U.S.C. § 61(a)(11) (defining taxable gross income to include "[i]ncome from discharge of indebtedness"). However, under the American Rescue Plan Act of 2021, any debt discharged under an IDR plan between January 1,

2021 and December 31, 2025 was excluded from taxation. Pub. L. No. 117-2, § 9675, 135 Stat. 4, 185 (previously codified at 26 U.S.C. § 108(f)(5) (2021)). That temporary tax exemption has expired. *See id.*

### 1. The REPAYE Rule

In 2015, the Department issued a final rule creating the REPAYE plan. Student Assistance General Provisions, Federal Family Education Loan Program, & William D. Ford Federal Direct Loan Program, 80 Fed. Reg. 67204 (Oct. 30, 2015). "To establish a new, widely available [ICR] plan targeted to the neediest borrowers," *id.* at 67204, REPAYE set borrowers' monthly payments based on their income and family size and capped those monthly payments at 10% of borrowers' monthly income, *id.* at 67205. For borrowers in negative amortization—that is, borrowers whose monthly payments did not cover the accrued interest on their loans—the Department would not charge any remaining interest on subsidized loans during the first three years of repayment, after which the Department would charge only 50% of the remaining interest. *Id.* at 67227, 67239.[1] REPAYE therefore "limit[ed] the rate at which loan balances increase[d] and the amount [borrowers] ultimately owed." *Id.* at 67227. Furthermore, REPAYE provided for loan forgiveness after 240 monthly payments (or twenty years of qualifying payments) for borrowers with only undergraduate loans, or 300 monthly payments (or twenty-five years of qualifying payments) for borrowers with loans for graduate or professional study. *Id.* at 67205, 67241. Because borrowers could enroll in REPAYE regardless of when they took out their loans, REPAYE was available to more borrowers than other ICR plans. *See id.* at 67204.

---

[1] For borrowers in negative amortization on unsubsidized loans, the Department would charge only 50% of the remaining interest from the start of the repayment period. 80 Fed. Reg. at 67239.

### 2. The SAVE Rule

In 2023, the Department issued a final rule amending and renaming REPAYE to "SAVE." 88 Fed. Reg. at 43820. Among other changes, SAVE reduced the amount of borrowers' income used to calculate their monthly payments, eliminated any remaining accrued interest, and credited certain periods of payment deferment or forbearance toward the time needed for borrowers to receive loan forgiveness. *Id.* Under SAVE, borrowers still qualified for loan forgiveness after 240 or 300 monthly payments, or the equivalent of twenty or twenty-five years of qualifying payments. *Id.* at 43902-03. But SAVE expedited that timeline by granting loan forgiveness after 120 monthly payments, or the equivalent of ten years of qualifying payments, for any borrower whose "total original principal balance on all loans . . . under the REPAYE plan was less than or equal to $12,000." *Id.* at 43903. For every $1,000 above the $12,000 original balance, borrowers could receive loan forgiveness after an additional twelve months of payments, or the equivalent of one year of qualifying payments. *Id.*; *see Missouri v. Trump* ("*Missouri II*"), 128 F.4th 979, 987 (8th Cir. 2025) (explaining that SAVE "expedited loan forgiveness for most borrowers").

## B. *Missouri* Litigation and the One Big Beautiful Bill Act

In April 2024, a group of seven states sued the Department alleging that SAVE violated the APA. *Missouri v. Biden* ("*Missouri I*"), 738 F. Supp. 3d 1113, 1123, 1135 (E.D. Mo. 2024). The Eastern District of Missouri initially issued a preliminary injunction enjoining only SAVE's loan-forgiveness provisions. *Id.* at 1156. The Department then implemented the remaining SAVE provisions alongside the prior REPAYE loan-forgiveness provisions in what became known as the "hybrid rule." *Missouri II*, 128 F.4th at 998. On appeal, the Eighth Circuit instructed the Eastern District of Missouri to modify and broaden its preliminary injunction to enjoin the entire SAVE rule, as well as the hybrid rule. *Id.* The Eastern District of Missouri entered the modified

preliminary injunction in April 2025. Order, ECF No. 69, *Missouri v. Trump* ("*Missouri III*"), No. 24-CV-520 (E.D. Mo. Apr. 14, 2025).

In July 2025, during the pendency of the *Missouri* litigation, Congress enacted the One Big Beautiful Bill Act ("OBBBA"). Pub. L. No. 119-21, § 82001, 139 Stat. 72 (2025). Effective July 1, 2028, the OBBBA repeals provisions of Section 1087e, stripping the Department of its statutory authority to create ICR plans through regulations. *Id.* at 340-41. The OBBBA directs the Department to "take such steps as may be necessary to ensure" that ICR plan enrollees select new repayment plans before July 1, 2028. *Id.* at 337.

In December 2025, the plaintiff states and the Department reached a settlement agreement in the *Missouri* litigation. ECF No. 19-2, Ex. 2. The Department agreed to (1) not forgive loans under SAVE or REPAYE; (2) "not enforce the original REPAYE rule or otherwise enroll any borrowers, including SAVE borrowers, into the original REPAYE Plan"; and (3) "pursue negotiated rulemaking to effectuate this settlement," including a "formal and complete repeal of the SAVE Plan Final Rule," as well as "sunsetting" the Original ICR and PAYE plans consistent with the OBBBA. ECF No. 19-2, Ex. 2 ¶¶ 9, 11-12. In light of the settlement agreement, the parties jointly requested the Eastern District of Missouri to enter final judgment and vacate the entire SAVE rule. *See id.* ¶ 8.

Rather than entering final judgment, the Eastern District of Missouri dismissed the case as moot. *Missouri v. Trump* ("*Missouri IV*"), No. 24-CV-520, 2026 WL 548660, at *2 (E.D. Mo. Feb. 27, 2026). In reaching that conclusion, the Eastern District of Missouri noted "the apparent lack of adversity between the parties," which extinguished any live controversy and divested the court of its Article III jurisdiction. *Id.* On March 9, 2026, the Eighth Circuit summarily reversed and instructed the Eastern District of Missouri to enter final judgment. *Missouri v. Trump*

("*Missouri V*"), No. 26-1394, 2026 WL 696770, at *1 (8th Cir. Mar. 9, 2026). The Eastern District of Missouri did so the next day and vacated the entirety of the SAVE rule, with one exception. Order, ECF No. 102, *Missouri v. Trump* ("*Missouri VI*"), No. 24-CV-520 (E.D. Mo. Mar. 10, 2026); *see* ECF No. 25-11.[2] On March 13, 2026, Plaintiffs in this suit moved to intervene in the *Missouri* litigation, asking the Eastern District of Missouri to reconsider its vacatur of the SAVE rule. *See* ECF No. 29-10, at 1-2. The Eastern District of Missouri denied Plaintiffs' intervention request as untimely. *Id.* at 10.

On March 27, 2026, the Department publicly announced that, pursuant to the OBBBA, the Department would begin issuing notices on July 1, 2026, instructing SAVE enrollees to enroll in different loan repayment plans within ninety days. ECF No. 19-2, Ex. 4. According to the announcement, SAVE enrollees could still enroll in other IDR plans, including, in some cases, the ICR plans sunsetting in 2028. *Id.*[3] Enrollees who did not select new plans within their ninety-day period would be transferred to non-ICR plans. *Id.* SAVE enrollees would remain in administrative forbearance until they enrolled in a new plan. *See id.*

---

[2] The sole surviving provision of SAVE involves crediting certain payment deferments and forbearances toward loan forgiveness. 34 C.F.R. § 685.209(k)(4)(iv). This provision was not challenged by the plaintiffs in the *Missouri* litigation, *see* ECF No. 25-5, at 7 n.1, and it is not at issue in this case, ECF No. 25-1, at 8.

[3] On July 1, 2026, the Department began offering borrowers a new IDR plan created by the OBBBA called the Repayment Assistance Plan ("RAP"). 20 U.S.C. § 1087e(d)(1)(F). RAP is available to all qualifying borrowers, regardless of when borrowers took out their loans. *See* 34 C.F.R. § 685.209(d)(4). The Department continues to offer PAYE and Original ICR to qualifying borrowers who have not taken out loans after July 1, 2026, but those plans will end on June 30, 2028. *Id.* § 685.209(d)(1), (3).

## II. FACTUAL BACKGROUND

Ms. Havens, Ms. Rosen, Ms. Grunseth, and Mr. Boykin are borrowers who were enrolled in SAVE prior to the Eastern District of Missouri's March 10, 2026 vacatur of the SAVE rule. ECF No. 18 ¶¶ 21-24; *see* ECF No. 19-3 ¶ 4; ECF No. 19-4 ¶ 2; ECF No. 19-5 ¶ 4; ECF No. 19-6 ¶ 2.

Ms. Havens has four federal student loans with a total outstanding balance of more than $75,000. ECF No. 19-3 ¶¶ 2, 7. Ms. Havens alleges that she has made 303 qualifying payments—more than the required 300 payments—on two of her loans, which are eligible for discharge and have a combined balance of more than $64,000. ECF No. 18 ¶¶ 21, 109; ECF No. 19-3 ¶ 8. According to Ms. Havens, the effective discharge date for those two loans was November or December 2025. ECF No. 18 ¶¶ 21, 109; ECF No. 19-3 ¶ 8. Ms. Havens acknowledges that she "may be eligible for loan cancellation under other [IDR] plans if [she] switch[es] plans," but she is "concerned about the possibility that [she] would have to pay taxes on that discharge." ECF No. 19-3 ¶ 9; *see* ECF No. 18 ¶ 110.

Ms. Havens called her loan servicer on March 6, 2026 regarding her eligibility for loan discharge and was told that she "did not need to apply [for loan forgiveness]" because "if [she] was eligible . . . the discharge would be processed automatically." ECF No. 19-3 ¶ 10; *see* ECF No. 18 ¶ 115. When Ms. Havens asked about loan discharge under SAVE, the loan service agent told her that "the SAVE plan was no longer being offered and that [she] would have to apply for a different [IDR] plan." ECF No. 19-3 ¶ 10; *see* ECF No. 18 ¶ 116. As of June 23, 2026, none of Ms. Havens's loans had been discharged. ECF No. 19-3 ¶ 10. Ms. Havens alleges that if she were to change repayment plans, the lowest IDR plan she would be eligible for would be $588 per month, or $196 more per month than what she would pay under REPAYE. *Id.* ¶ 15. Ms. Havens

received a notice from the Department on July 14, 2026, stating that SAVE was "no longer available to borrowers" and instructing her to enroll in a new loan repayment plan within ninety days. ECF No. 29-8, at 2. On October 19, 2026, Ms. Havens received a final notice indicating that she had thirty days to select a new plan. ECF No. 35, at 2.

Ms. Robeson has two federal student loans with a total outstanding balance of more than $90,000. ECF No. 18 ¶ 118; ECF No. 19-5 ¶ 2. Ms. Robeson alleges that she has made 325 qualifying payments—more than the required 216 payments—on her loans, which are eligible for discharge with an effective discharge date in April 2024. ECF No. 18 ¶ 118; *see* ECF No. 19-5 ¶ 3.[4] Like Ms. Havens, Ms. Robeson acknowledges that she "may be eligible for loan cancellation under other [IDR] plans if [she] switch[es] plans," but is "concerned about the possibility that [she] would have to pay taxes on that discharge." ECF No. 19-5 ¶ 3; *see* ECF No. 18 ¶ 119. Ms. Robeson's adjusted gross income for 2025 was approximately $8,000. ECF No. 18 ¶ 122; ECF No. 19-5 ¶ 2.

Ms. Robeson called her loan servicer on March 4, 2026 regarding her eligibility for loan discharge under SAVE and was told that "the only way to obtain a discharge would be to apply for another [IDR] plan." ECF No. 19-5 ¶ 5; *see* ECF No. 18 ¶ 125. As of June 23, 2026, none of Ms. Robeson's loans had been discharged. ECF No. 19-5 ¶ 5. On July 29, 2026, Ms. Robeson

---

[4] Plaintiffs generally assert that Ms. Robeson would be entitled to loan forgiveness "[u]nder the existing SAVE regulations or prior REPAYE regulations," ECF No. 18 ¶ 118, but they do not explain why Ms. Robeson had "216 required" payments on her outstanding loans, *id.*; *see* ECF No. 19-5 ¶ 3, even though REPAYE only provided for loan forgiveness after a fixed threshold of 240 or 300 qualifying payments, *see* 80 Fed. Reg. at 67241. Furthermore, it is unclear from the briefing whether Plaintiffs' references to "SAVE or REPAYE," *see, e.g.*, ECF No. 18 ¶ 22, refer to two distinct plans—the 2023 SAVE rule alongside the prior 2015 REPAYE rule—or instead use "SAVE" to refer to the prior REPAYE rule that Plaintiffs contend should have been reinstated.

received a ninety-day notice to select a new loan repayment plan. ECF No. 35, at 3. On October 29, 2026, Ms. Robeson received a final thirty-day notice to select a new plan. *Id.*

Ms. Grunseth has federal student loans with an unspecified outstanding balance. *See* ECF No. 18 ¶ 23; ECF No. 19-4 ¶ 2. Ms. Grunseth alleges that she has made 105 eligible payments of the required 120 monthly payments on her student loans "under SAVE." ECF No. 18 ¶ 23; *see* ECF No. 19-4 ¶ 8. "If given the opportunity, [she] would buy back . . . 15 months of forbearance to qualify for loan discharge." ECF No. 19-4 ¶ 8; *see* ECF No. 18 ¶ 23.[5] Ms. Grunseth and her spouse have a combined household income of approximately $62,000. ECF No. 19-4 ¶ 7. Ms. Grunseth alleges that if she were to change repayment plans, the lowest plan she would be eligible for is $76 per month, or $14 more per month than what she would pay under REPAYE. *Id.* ¶¶ 6-7. On August 26, 2026, Ms. Grunseth received a ninety-day notice to select a new loan repayment plan. ECF No. 35, at 3.

Mr. Boykin has federal student loans with an unspecified outstanding balance. *See* ECF No. 18 ¶ 24; ECF No. 19-6 ¶ 2. Mr. Boykin was previously enrolled in SAVE but applied to a different repayment plan in January 2025 after hearing news that SAVE had been preliminarily enjoined. ECF No. 18 ¶ 105; ECF No. 19-6 ¶ 2. Mr. Boykin alleges that he had made 117 eligible payments of the required 132 monthly payments on his student loans. ECF No. 18 ¶ 105; ECF No. 19-6 ¶ 3.[6] Like Ms. Grunseth, Mr. Boykin "would buy back . . . 15 months of forbearance to

---

[5] Plaintiffs inconsistently describe this "buyback" program as being available under SAVE and REPAYE. *Compare* ECF No. 19-4 ¶ 8 (describing buying back "months of forbearance to qualify for loan discharge under SAVE"), *with* ECF No. 19-6 ¶ 3 (describing buying back "months of forbearance to qualify for loan discharge under REPAYE").

[6] Although Plaintiffs allege in the amended complaint that Mr. Boykin had 132 required payments to qualify for loan forgiveness "under the SAVE plan," No. 18 ¶ 24, Mr. Boykin attests in a

(*continued on next page*)

qualify for loan discharge" if "given the opportunity." ECF No. 19-6 ¶ 3; *see* ECF No. 18 ¶ 106. In a June 2026 declaration, Mr. Boykin attested that, based on his household income and other personal information at the time, the lowest IDR plan he was eligible for was $124 per month, or $41 more per month than what he would pay under REPAYE. ECF No. 19-6 ¶ 6. In an October 2026 declaration, Mr. Boykin attested that he has been enrolled in IBR since January 2026. *See* ECF No. 35-4 ¶ 5. The IBR plan initially required monthly payments of $0 for a twelve-month period. *See id.* Mr. Boykin contends that he improperly received a bill for a monthly payment of $330.01 in September 2026, and that his actual monthly payment under IBR should be $146 per month, or $49 more per month than what he would pay under REPAYE. *See id.* ¶¶ 5-12.[7]

## III. PROCEDURAL HISTORY

Plaintiffs filed suit on March 9, 2026 against the Department, alleging that the Eastern District of Missouri's dismissal of the *Missouri IV* litigation as moot required the Department to revive the SAVE rule, ECF No. 1 ¶¶ 7, 11, and the Department's failure to do so violated the APA, *id.* ¶¶ 115-133. After the Eastern District of Missouri issued a final judgment vacating almost the entirety of the SAVE rule in *Missouri VI*, the Department moved to dismiss, arguing that this court could not award Plaintiffs relief in light of that vacatur. ECF No. 17, at 6.

---

June 2026 declaration appended to the preliminary injunction motion that he was eligible for loan discharge "under SAVE *or* REPAYE," ECF No. 19-6 ¶ 3 (emphasis added). The Department suggests that Plaintiffs made a typo in representing that Mr. Boykin was "eligible for discharge under either SAVE or REPAYE 'after making 132 payments.'" ECF No. 25-1, at 19 (quoting ECF No. 19-6 ¶ 3). Plaintiffs offered no response to that contention. *See generally* ECF No. 29.

[7] Whether the $330.01 bill was an administrative error is an issue that is not before this court. Because Mr. Boykin represents that his monthly payment under IBR should be $146 per month, *see* ECF No. 35-4 ¶ 11, the court will use that figure in assessing any potential harm to him.

Plaintiffs filed an amended complaint on June 23, 2026. ECF No. 18. Although Plaintiffs maintained some allegations from the original complaint concerning SAVE, *see, e.g.*, *id.* ¶¶ 146-148, Plaintiffs primarily asserted new allegations about REPAYE, *id.* ¶¶ 135-142. Specifically, Plaintiffs argued that the Eastern District of Missouri's vacatur of the SAVE rule automatically reinstated the prior REPAYE rule, and the Department's failure to enforce REPAYE was a "shadow repeal" of the rule that violated the APA. *Id.* ¶¶ 133-134, 144. That same day, Plaintiffs also moved for a preliminary injunction or an administrative stay to require the Department to implement REPAYE and postpone SAVE enrollees' transitions to other loan repayment plans. ECF No. 19-1, at 24.

The court issued a briefing schedule the next day. June 24, 2026 Minute Order. However, upon the Department's unopposed extension request, ECF No. 20, the court modified the schedule to provide the parties additional time to complete briefing, June 30, 2026 Minute Order. In light of Plaintiffs' amended complaint, ECF No. 18, the court also denied Defendant's motion to dismiss Plaintiff's original complaint, ECF No. 17, as moot, June 30, 2026 Minute Order. The motion for a preliminary injunction or an administrative stay is fully briefed. ECF Nos. 19, 25, 26, 27, 29, 31. Plaintiffs have additionally filed a notice of subsequent developments. ECF No. 35.

## IV. LEGAL STANDARDS

### A. Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)). To receive a preliminary injunction, the plaintiff must show (1) "that [s]he is likely to succeed on the merits," (2) "that [s]he is likely to suffer irreparable harm

in the absence of preliminary relief," (3) "that the balance of equities tips in h[er] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the government is the opposing party, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### B. Administrative Stay

The APA permits a court reviewing agency action to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" if it is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The standard for an administrative stay is substantially the same as the standard for a preliminary injunction. *See Nken*, 556 U.S. at 433-34. Because the public is "generally entitled to the prompt execution" of final agency orders, a stay "is not a matter of right, even if irreparable injury might otherwise result to the [plaintiff]." *Id.* at 427 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)).

## V. DISCUSSION

Plaintiffs argue that a preliminary injunction or an administrative stay is necessary because they will suffer irreparable harm in the absence of court intervention. Plaintiffs allege four "distinct" injuries caused by the Department's "shadow repeal" of REPAYE and the forced transfer of SAVE borrowers to other loan repayment plans: (1) taxable loan discharges, (2) higher monthly payments, (3) lost interest subsidies, and (4) the inability to make payments toward loan discharge. ECF No. 19-1, at 12; *see id.* at 12-23; ECF No. 19-1, at 20-22. Defendants counter that Plaintiffs lack standing as it concerns the taxation of their future loan discharges and that they otherwise cannot meet the standards for a preliminary injunction or an administrative stay. ECF

No. 25-1, at 14-30, 38-40. The court concludes that Plaintiffs lack standing concerning the taxability of their loan discharges and that they fail to show irreparable harm based on their other alleged injuries.

### A. Standing

In the preliminary injunction context, the plaintiffs must "show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)). Plaintiffs therefore "cannot rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing." *Id.* (internal quotation marks omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "To establish standing, a party must demonstrate: '(1) an injury in fact that is concrete and particularized as well as actual or imminent; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision.'" *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 76 (D.C. Cir. 2020) (quoting *Nat. Res. Def. Council v. Env't Prot. Agency*, 755 F.3d 1010, 1016 (D.C. Cir. 2014)). Because "standing is not dispensed in gross," "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 592 U.S. 413, 431 (2021).

Plaintiffs contend that the Department's "shadow repeal" of REPAYE, which is forcing Ms. Havens and Ms. Robeson to transfer to a different loan repayment plan, under which each will incur "significant tax burden[s]" due to a later effective loan-discharge date, is sufficient to give Ms. Havens and Ms. Robeson standing. ECF No. 19-1, at 7; ECF No. 29, at 11-12. The

Department responds that these purported tax burdens are self-inflicted, such that Ms. Havens and Ms. Robeson have failed to establish causation and redressability. *See* ECF No. 25-1, at 14-18. The court agrees with the Department. *See Food & Water Watch, Inc.*, 808 F.3d at 913 ("A party who fails to show a substantial likelihood of standing is not entitled to a preliminary injunction." (internal quotation marks omitted)).

As it concerns Ms. Havens and Ms. Robeson, Plaintiffs' theory of standing rests on the incorrect assumption that, but for the Department's unlawful conduct, Ms. Havens and Ms. Robeson would otherwise be able to qualify for tax-free loan discharges under the American Rescue Plan Act of 2021. *See* ECF No. 19-1, at 5-6, 20; ECF No. 29, at 11-12. Not so. As explained, *see supra* Part I.A., the federal government typically taxes discharged student loans, but the American Rescue Plan granted a *temporary* reprieve for discharges that occurred between January 1, 2021 and December 31, 2025, *see* 26 U.S.C. § 108(f)(5) (2021); *see also* ECF No. 19-1, at 9-10 ("[W]ith the expiration of the American Rescue Plan provision, any [loan] discharge on January 1, 2026, or later is considered taxable income.").

Nor can Ms. Havens or Ms. Robeson avail themselves of a limited extension to the American Rescue Plan's temporary reprieve from treating discharged student loan debt as taxable. Specifically, in 2025, a group of borrowers sued to ensure that borrowers could still benefit from the American Rescue Plan's tax relief if their loans were eligible for discharge in 2025 but not processed in time. Am. Compl., ECF No. 41 ¶¶ 8, 14, 24-29, 56, *Am. Fed'n of Tchrs. v. U.S. Dep't of Educ.*, No. 25-CV-802 (D.D.C. Sep. 9, 2025). A court ordered the Department to backdate SAVE enrollees' discharges to the date they became eligible for discharge, but only if the enrollee (1) had applied to transfer to a different IDR plan by December 31, 2025, and (2) the Department approved the transfer application after January 1, 2026. ECF No. 19-2, Ex. 1.

Plaintiffs concede that Ms. Havens and Ms. Robeson did not apply to another IDR plan by December 31, 2025, *see* ECF No. 19-1, at 6, 20, and they do not dispute that "the IRS would be correct to require payment of taxes for the loan discharge[s]" for Ms. Havens and Ms. Robeson if they do not fall within the limited exception carved out in *American Federation of Teachers*, ECF No. 29, at 21. Instead, Plaintiffs appear to argue that, under *American Federation of Teachers*, Ms. Havens's and Ms. Robeson's eligibility for loan forgiveness under REPAYE *alone* should result in backdating their loans for tax-free discharges. *See* ECF No. 19-1, at 20 (asserting that "student loan discharges are non-taxable events if they occurred prior to January 1, 2026"); *id.* at 21 (asserting that "merely honoring the existence of REPAYE will save plaintiffs thousands of dollars in tax liability"). That proposition finds no purchase in the text of the court's order in *American Federation of Teachers*, ECF No. 19-2, Ex. 1, or in the REPAYE program more generally. At bottom, Plaintiffs have not shown that Ms. Havens's and Ms. Robeson's purported tax injuries were caused by the Department's "shadow repeal" of REPAYE and the resulting need for Ms. Havens and Ms. Robeson to transfer to other loan repayment plans. *See Dep't of Educ. v. Brown*, 600 U.S. 551, 565 (2023) ("Put differently, the Department's decision to give *other* people relief under a *different* statutory scheme did not *cause* respondents not to obtain the benefits they want.").

For the same reason Plaintiffs fail to establish causation with regard to Ms. Havens and Ms. Robeson, they also fail to establish redressability. *See Newdow v. Roberts*, 603 F.3d 1002, 1012 n.6 (D.C. Cir. 2010) ("[C]ausation and redressability are closely related, and can be viewed as 'two facets' of a single requirement." (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984))). That is because, even if the Department ultimately discharges Ms. Havens's or Ms. Robeson's loans under REPAYE, Ms. Havens and Ms. Robeson would still owe taxes on those discharges,

which fall outside the American Rescue Plan's tax exemption and the court order in *American Federation of Teachers* backdating SAVE enrollees who applied to another loan repayment plan by December 31, 2025.[8] Plaintiffs therefore fail to establish that Ms. Havens and Ms. Robeson have standing based on the future taxation of their loan discharges.[9]

## B. Irreparable Harm

The D.C. Circuit has emphasized that "the basis of injunctive relief in the federal courts has always been irreparable harm," meaning that "[a] movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). In this way, the Circuit "has set a high standard for irreparable injury." *Id.* First, the injury "must be both certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief." *Id.* (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir.

---

[8] Furthermore, the Department contends that the IRS—which is not a party to this litigation—makes the ultimate determination regarding the tax implications of any loan discharge. *See* ECF No. 25-1, at 17-18. In response, Plaintiffs fault the Department "for *choosing* to report discharges as taxable income to the IRS." ECF No. 29, at 20 (emphasis added). But, as the Department points out, even if the court were to order the Department to discharge Plaintiffs' loans under REPAYE while prohibiting the Department from reporting any discharges to the IRS, the IRS would remain "free to treat REPAYE discharges as taxable income." ECF No. 25-1, at 17. Indeed, the parties in *American Federation of Teachers* agreed that it was "the IRS and the U.S. Department of the Treasury, and not [the Department of Education]" that had the "final say on whether . . . student loan cancellations qualify as taxable income under . . . the American Rescue Plan Act." ECF No. 25-16 ¶ 10.

[9] Because Ms. Robeson does not allege any other basis for standing beyond a tax injury, this analysis is likely sufficient to warrant her dismissal from the case. The court will address the Department's motion to dismiss, ECF No. 24, forthwith. *See, e.g.*, *Save Long Island Beach, Inc. v. U.S. Dep't of Com.*, No. 25-CV-02214, 2026 WL 2150375, at *2 (D.D.C. July 27, 2026) (first denying a motion for preliminary injunction, then considering a defendant's motion to dismiss for lack of subject matter jurisdiction and failure to state a claim).

1985) (per curiam)). Second, the injury "must be beyond remediation," and "[t]he possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297-98 (quoting *Wis. Gas Co.*, 758 F.2d at 674).

To meet this high standard, Plaintiffs must "substantiate the claim that irreparable injury is likely to occur" and show that "the alleged harm will directly result from the action which [they] seek[] to enjoin." *Wis. Gas Co.*, 758 F.2d at 674 (internal quotation marks omitted). Furthermore, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Id.* Indeed, "[c]ourts in this Circuit have recognized that economic loss can constitute irreparable injury only in limited circumstances: where 'monetary loss . . . threatens the very existence of the movant's business,' or where the claimed economic loss is unrecoverable." *Dall. Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 401 (D.D.C. 2020) (second alteration in original) (quoting *Wis. Gas Co.*, 758 F.2d at 674). Even where economic losses may be unrecoverable, Plaintiffs must still meet their "considerable burden of proving that those losses are *certain, great and actual*." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) (internal quotation marks omitted) (quoting *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005)).

The court concludes that the remaining Plaintiffs have not carried their burden of showing irreparable harm in the absence of a preliminary injunction or an administrative stay. That is a sufficient basis to deny their motion. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) (concluding that when a plaintiff failed to establish irreparable harm, "the district court did not err in declining to evaluate the remaining preliminary injunction factors"); *see, e.g.*, *Jansen v. Trump*, No. 25-CV-2961, 2026 WL 2481696, at *8 (D.D.C. Aug. 24, 2026) (denying a motion for a preliminary injunction after

considering only whether the plaintiff had shown irreparable harm); *Corp. for Pub. Broad. v. Fed. Emergency Mgmt. Agency*, 792 F. Supp. 3d 67, 75 (D.D.C. 2025) (same).

First, Plaintiffs assert that Ms. Havens, Ms. Grunseth, and Mr. Boykin will be harmed by increased monthly payments under a new loan repayment plan, and that Ms. Havens will lose access to a 50% interest subsidy available under REPAYE. ECF No. 19-1, at 21-22; ECF No. 19-3 ¶ 15; ECF No. 19-4 ¶¶ 6-7; ECF No. 19-6 ¶ 6. According to their declarations, under the most affordable alternative plan, Ms. Havens will pay $196 more per month, and Ms. Grunseth will pay $14 more per month. ECF No. 19-3 ¶ 15; ECF No. 19-4 ¶¶ 6-7. Mr. Boykin's most recent October 2026 declaration indicates that he would pay $49 more per month, ECF No. 3-4 ¶ 11, whereas his prior declaration indicated that he would pay $41 more per month, ECF No. 19-6 ¶ 6. In response, the Department offers a counter-declaration explaining that Ms. Havens miscalculated her repayment liability and would, in fact, receive a "better deal" under IBR than REPAYE. ECF No. 25-1, at 19; *see* ECF No. 25-3 ¶¶ 14-16. As to Ms. Grunseth and Mr. Boykin, the Department argues that $1,320 in total additional costs over a two-year span, before ICR plans sunset in July 2028, does not amount to irreparable harm. ECF No. 25-1, at 14-15, 19-21.[10]

As to the impact of shifting to a new loan repayment plan, Plaintiffs appear to concede that Ms. Havens will not experience any increased monthly payments under a non-REPAYE plan. *See* ECF No. 29, at 11-12. Plaintiffs simply state that "[the Department] agree[s] Plaintiffs face $1,320 in additional student loan repayment costs over the coming two years," *id.* at 11, but that is the amount that Ms. Grunseth and Mr. Boykin allege they will collectively have to pay and does not

[10] The Department calculated the $1,320 sum based on the available declarations during the preliminary-injunction briefing, prior to Plaintiffs' submission of Mr. Boykin's most recent October 2026 declaration. *See* ECF No. 25-1, at 19.

address any increased costs for Ms. Havens, *see id*. In any event, these alleged financial burdens are insufficient to justify preliminary relief. Plaintiffs contend in their reply brief that because money damages are unavailable under that APA, that alone justifies a finding of irreparable harm that warrants preliminary relief. ECF No. 29, at 14. True, "monetary damages are not available in an APA suit." *Padgett v. Vilsack*, No. 24-CV-2425, 2024 WL 4006050, at *4 (D.D.C. Aug. 30, 2024); *see* 5 U.S.C. § 702 (allowing for relief "other than money damages"). But the Department represents that—as distinct from issuing money damages—it can simply refund any overpayments on Plaintiffs' loans or apply them as credit toward future payments. ECF No. 25-1, at 20; *see* ECF No. 25-3 ¶ 5. Furthermore, although some economic losses may well be burdensome for Plaintiffs, these facts alone do not compel a finding of irreparable harm here. *See Dall. Safari Club*, 453 F. Supp. at 401 ("[A]lthough Plaintiffs in this case claim their losses would be unrecoverable because their claims arise under the APA, this fact 'does not, in and of itself, compel a finding of irreparable harm.'" (quoting *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 53)). For example, Plaintiffs state that Ms. Grunseth has a household income of $62,000, ECF No. 19-4 ¶ 7, but they provide no information about Ms. Havens's or Mr. Boykin's income or other assets, *see generally* ECF No. 19-3; ECF No. 19-6.

As to Ms. Havens's loss of access to REPAYE's 50% interest subsidy, Plaintiffs do not offer any information about the amount of lost interest subsidies, let alone explain the impact of that loss on Ms. Havens, including whether she could not pay for the interest on her loans absent the REPAYE subsidy. *See* ECF No. 19-1, at 22 (explaining generally that "interest will accrue and capitalize on balances" without reference to Ms. Havens); ECF No. 29, at 15 (explaining generally that "[w]hen interest accrues, borrowers' debt increases" without reference to Ms. Havens). But even assuming that Ms. Havens will be unable to pay for the interest on her

loans, that would not de facto increase her overall loan balance, despite Plaintiffs' contrary representation, *see* ECF No. 29, at 15-16, because any unpaid interest must first capitalize, *see* 34 C.F.R. § 685.202(b)(1) (explaining that unpaid accrued interest may be added to a borrower's principal loan balance through capitalization). And even if a triggering capitalization event occurred and Ms. Havens's overall loan balance increased, the ultimate relief that Plaintiffs seek includes the discharge of Ms. Havens's student loans and therefore obviates any purportedly irreparable harm. *See* ECF No. 18, at 30. Accordingly, the harms alleged by Plaintiffs—modest increases in monthly payments and unspecified lost interest subsidies—fall short of evincing harm that "is of such a degree, severity, and 'imminence that there is a clear and present need for equitable relief to prevent.'" *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020) (quoting *Wis. Gas Co.*, 758 F.2d at 674).

Second, Plaintiffs point to the "downstream consequences" of increased monthly loan payments, such as potentially diminished retirement savings, increased credit card debt, and delayed personal travel. ECF No. 19-1, at 7; *see id.* at 21; ECF No. 19-3 ¶¶ 12-13; ECF No. 19-4 ¶¶ 3-4; ECF No. 19-7 ¶ 7. The court is sympathetic to the argument that borrowers may be forced to make "financial tradeoffs" as a result of their student loan obligations. ECF No. 19-1, at 21. However, without supporting evidence, these "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wis. Gas Co.*, 758 F.2d at 674. Plaintiffs' declarations offer only "predict[ions]" that are "at best, remote and speculative" and fall short of showing a "clear and present need for extraordinary equitable relief." *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 52 (quoting *Power Mobility Coal.*, 404 F. Supp. 2d at 204).

What is more, some record evidence undermines Plaintiffs' claims that these downstream consequences are imminent. For example, Mr. Boykin was previously enrolled in SAVE but

switched to IBR in January 2026. ECF No. 19-6 ¶ 2. Although Mr. Boykin feared "losing [his] transportation or defaulting on credit cards if [his] payments increase[d]," *id.* ¶ 7, his declarations—including the most recent October 2026 declaration—are silent as to any harm he has suffered since transitioning to his new repayment plan. Indeed, the October 2026 declaration suggests that under the IBR plan, Mr. Boykin was initially required to pay "$0.00." ECF No. 35-4 ¶ 4. Because Plaintiffs do not "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future," *Wis. Gas Co.*, 758 F.2d at 674, they fail to establish irreparable harm based on "downstream" consequences, ECF No. 19-1, at 7.

Third, Plaintiffs contend that Ms. Havens, Ms. Grunseth, and Mr. Boykin lose the opportunity to make qualifying payments toward *any* IDR loan discharge if they are not allowed to enroll in REPAYE. ECF No. 19-1, at 22; *see* ECF No. 29, at 13. Perhaps in recognition that "REPAYE is set to sunset in July 2028" regardless of this court's disposition on the merits, ECF No. 29, at 13, Plaintiffs' irreparable harm argument centers on IDR discharge more broadly, *see* ECF No. 19-1, at 22 (contending that "[P]laintiffs will lose qualifying months toward IDR discharge that cannot be re-earned once the time passes"), rather than any discharge under REPAYE specifically. The problem with this argument is that, as Plaintiffs acknowledge, IDR discharge remains available "under other repayment plans including IBR, ICR, PAYE, and RAP." ECF No. 29, at 13. And Plaintiffs represent that Ms. Havens, Ms. Grunseth, and Mr. Boykin are eligible for other IDR plans, meaning that they could begin making qualifying payments toward *IDR* discharge as soon as they transition to new plans. *See* ECF No. 19-3 ¶ 15; ECF No. 19-4 ¶ 6; ECF No. 19-6 ¶ 2.

Even assuming that Plaintiffs could make qualifying payments toward loan discharge *only*

under REPAYE, Plaintiffs have not sufficiently explained why any related harm is "beyond remediation." *Cranford v. U.S. Dep't of Interior*, No. 25-CV-1116, 2026 WL 369717, at *5 (D.D.C. Feb. 10, 2026) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). In their amended complaint, Plaintiffs ask the court to order the Department to reinstate REPAYE. ECF No. 18, at 30. That relief would allow them to resume making qualifying payments toward loan discharge, *see* 34 C.F.R. § 685.209(k), which suggests that any harm could be remedied at a later time, *cf. Sierra Club v. Env't Prot. Agency*, 793 F. Supp. 3d 158, 166 (D.D.C. 2025) (stating that it is "generally disfavored" to issue preliminary relief that would also constitute "the ultimate relief in the case").

Finally, Plaintiffs' delay in seeking relief cuts against their claims of irreparable harm. A party moving for a preliminary injunction must show an "injury that is of such *imminence* that equitable relief is urgently necessary." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 298 (internal quotation marks omitted). Therefore, a plaintiff's delay in seeking injunctive relief "may support a conclusion that the plaintiff cannot satisfy the irreparable harm prong." *Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011). Plaintiffs moved for a preliminary injunction in June 2026—three months after they contend that REPAYE automatically sprung back into effect following the Eastern District of Missouri's March 10, 2026 vacatur of the SAVE rule but the Department nevertheless required them to transition to other loan repayment plans. ECF No. 19-1, at 14-15. Plaintiffs had long been on notice of the actions giving rise to their alleged injuries, which undermines their claim that they will face irreparable harm absent preliminary relief. *See, e.g.*, *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding "inexcusable" a delay of forty-four days in seeking preliminary relief); *Sierra Club*, 793 F. Supp. 3d at 165 (finding "inexcusable" a delay of 100 days in seeking preliminary relief); *Mylan Pharms., Inc. v. Shalala*,

81 F. Supp. 2d 30, 44 (D.D.C. 2000) (noting that a delay of two months in seeking preliminary relief "militates against a finding of irreparable harm").

Plaintiffs attempt to excuse their delay by asserting that they were diligently pursuing other avenues for relief before seeking a preliminary injunction. ECF No. 29, at 24-25. But the relief Plaintiffs sought during that period was unrelated to the harms they now allege: the repeal of SAVE and the lack of access to REPAYE. *See id.* at 23 (explaining that Plaintiffs were diligently pursuing relief "for *different* claims" (emphasis added)). Plaintiffs did not even allege that they could avail themselves of REPAYE in their initial complaint in this court or in their motion to intervene in the *Missouri* litigation, which was denied as untimely. *See* ECF No. 18; ECF No. 29-10. Rather, Plaintiffs sought to vindicate those claims for the first time in their amended complaint and motion for preliminary relief in this court. *See* ECF No. 18 ¶¶ 135-148; *see generally* ECF No. 19-1. Therefore, Plaintiffs' delay cannot be explained by any diligent pursuit of the same rights Plaintiffs now seek to vindicate. Because Plaintiffs have failed to demonstrate irreparable harm, they are not entitled to a preliminary injunction or an administrative stay. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.[11]

---

[11] Plaintiffs provide supplemental third-party declarations from five other student loan borrowers, *see* ECF No. 26, but those declarations are relevant only to the public-interest prong of the preliminary injunction analysis, *see Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) (noting that "injuries to third parties are not a basis to find irreparable harm"); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012) (same). The court grants Plaintiffs' request for leave to file a proposed response to the Department's notice of corrected filings, ECF No. 34, which pertain to information about the third-party declarants, *see* ECF Nos. 27, 31, but the court need not address the supplemental declarations because the court does not reach the public-interest prong.

## VI. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' Motion for Preliminary Injunction and Stay, ECF No. 19, is **DENIED**. It is further **ORDERED** that Plaintiffs' Motion for Leave to File Proposed Response to Defendants' Notice of Corrected Filings, ECF No. 34, is **GRANTED**, and the Clerk of Court shall docket ECF No. 34-1 as Plaintiffs' response. The court will issue a separate ruling on Defendants' Motion to Dismiss, ECF No. 24, in due course.

**SO ORDERED.**

LOREN L. ALIKHAN
United States District Judge

Date: November 18, 2026