**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEATHER HAVENS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, et al.,<br><br>Defendants. | Civil Action No. 1:26-cv-816-LLA |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF CORRECTED FILINGS (ECF NO. 31)**

Plaintiffs respectfully submit this short response to Defendants' corrected supplemental brief and Corrected Second Declaration of Anthony Lowery, ECF No. 31, because the corrections are new record evidence bearing on questions the parties have already briefed: the balance of the equities, the public interest, and the adequacy of Defendants' proposed mitigation measures.

**1. The corrections undercut Defendants' effort to minimize the affected population.** Defendants continue to argue that the declarants are "edge cases" representing a "likely small set of borrowers," perhaps "sui generis," based on six asserted traits while deleting the evidentiary foundation for those claims. ECF No. 31-1 at 6. Those are account-data characterizations offered by an agency whose records misstated the income of every one of these declarants, and whose declarant acknowledges that he was not aware of the limitation in the Department's system. ECF No. 31-4 ¶ 44. Plaintiffs already explained that the declarants are not outliers but exemplars of the population REPAYE was designed to serve. PI Reply 28. What remains verifiable are the Department's previously published data and estimates about the size of the population. The Department initially estimated that REPAYE would benefit six million borrowers when it promulgated the rule – excluding all borrowers eligible for PAYE and IBR – while estimating that two

million of those six would choose REPAYE. 80 Fed. Reg. 67,204, 67,229 (Oct. 30, 2015). This initial analysis turned out to be an underestimate, as approximately 3.3 million borrowers were enrolled by early 2021 prior to the SAVE rulemaking. PI Mot. 3–4, 17; Hinkle Decl. ¶ 13 & Ex. 10. And the most recent public data confirms that nearly seven million borrowers in the SAVE forbearance now face involuntary transfer – all of whom should be lawfully enrolled in REPAYE today. PI Mot. 17, 23; PI Reply 27; Hinkle Decl. Ex. 4. That is the population whose interests the public-interest analysis weighs. PI Mot. 22–23.

**2. The corrected second declaration of Anthony Lowery is a sworn account of systemic defects in the database and inconsistencies across the Department's systems through which the challenged transfers and every proposed mitigation measure would be administered.** The National Student Loan Data System (i) displays missing income data as an affirmative $0, indistinguishable from a borrower's true $0 income, ECF No. 31-4 ¶ 40; (ii) does not retain the IRS income data the agency itself uses to calculate monthly payments and therefore records income as $0, id. ¶ 41; and (iii) lost access to older borrower data through a 2024 system update which it also records as $0, id. ¶ 43. The agency's records analyst "was not aware" that the system "records a borrower's income as $0 when the system has no data," id. ¶ 44, and as to one declarant the agency remains "unable to definitively confirm" why its records read as they do, id. ¶ 41. The corrections also show that the defect is not confined to a single database. In every instance, the agency possessed or had received the declarant's actual income information. It received it directly from the IRS in Ms. Lomheim's case, id. ¶ 41; from the borrowers' own applications in Ms. Haines's and Ms. Hayes's cases, id. ¶ 42; and in the agency's own legacy data fields in Ms. Smith's case, id. ¶ 43. The original declaration equated one database's display with the agency's knowledge, but in reality the Department did have those data stored in other places. That's why Plaintiffs were able to confirm they previously submitted income – in some cases by directly chatting with the Department of Education from its own website.

*See* ECF Nos. 29-2 – 29-6. The involuntary transfer of roughly seven million borrowers would be executed across that same fragmented architecture.

Plaintiffs do not question Mr. Lowery's candor; the corrections matter for what they establish about the agency's systems, not its declarant. Plaintiffs raised precisely this concern in their opposition, which has now been confirmed. Plaintiffs explained that the Department's "own declaration suggests the Department has conflicting account information about IDR applications." PI Reply 30–31. The errors were identified only "after Plaintiffs filed supplemental non-party declarations disputing" the agency's records. ECF No. 31-4 ¶ 45. That is how these errors get caught: by borrowers with counsel, filing sworn rebuttals in federal court. The roughly seven million borrowers Defendants intend to transfer beginning September 29, 2026, will have no comparable check, and the consequences of error in that process are significant. The corrections thus corroborate, from within the agency, the "profound confusion" the Eastern District of Missouri has already found on this record, PI Reply 31 (quoting Order Denying Mot. to Intervene at 8, Missouri v. Trump, No. 4:24-cv-00520-JAR (E.D. Mo. July 30, 2026), ECF No. 116), and confirm that "[e]njoining the shadow repeal of REPAYE and allowing borrowers already enrolled in that plan to stay until 2028 or a valid rulemaking is conducted will actually simplify the repayment environment and ensure the type of administrative process that properly accounts for those interests." PI Reply 32.

**3. The corrections confirm that Defendants' proposed mitigation measures cannot defeat irreparable harm, because each one runs through the same records.** Defendants offer a menu of measures Defendants or borrowers could take including a discretionary forbearance, Public Service Loan Forgiveness, the Extended Graduated Repayment Plan, and promised refunds. ECF No. 31-1 at 7–8; Mem. 15, 20, 22; First Lowery Decl. ¶ 5. Plaintiffs have already explained why these measures cannot substitute for relief. PI Reply 32–33. The corrections add a common, structural problem. Every measure would be administered through the system described above. The refund

commitment illustrates the point. Defendants promise that if Plaintiffs prevail, the agency will refund or credit their overpayments. Mem. 15, 20; First Lowery Decl. ¶ 5. But calculating an overpayment requires knowing what the payment should have been. This requires the agency to use an income figure that the agency, by its own account, often cannot generate from its records. ECF No. 31-4 ¶¶ 5, 40–41. On this record, the refund promise is not merely legally insufficient, PI Reply 21–23; it is operationally undefined. At a minimum it would require new payment calculations for every affected borrower, and in all likelihood a new round of borrower documentation, imposing on millions of borrowers a fresh administrative burden to recover money the agency should not have collected. That burden and the errors it will generate push the balance of equities analysis strongly in favor of the Plaintiffs.

Dated: August 19, 2026

Respectfully submitted,

/s/ W. Austin Hinkle
William Austin Hinkle
D.C. Bar No. 90043756
Public Goods Practice LLP
1502 W 7th St. STE 100
Erie, PA 16502
(215) 931-9240

Paul Delaney Mayer (admitted pro hac vice)
D.C. Bar No. 1671773
Public Goods Practice LLP
1717 N Street NW STE 1
Washington, DC 20036

*Counsel for Plaintiffs*